No. 14-2129

_____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
_____

OHIO VALLEY ENVIRONMENTAL COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY, COAL RIVER MOUNTAIN WATCH AND
SIERRA CLUB

*Plaintiffs-Appellants*,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, THOMAS P. BOSTICK
Commander in Chief of Engineers, U.S. Army Corps of Engineers, and STEVEN
MCGUGAN, Colonel, District Engineer, U.S. Army Corps of Engineers,
Huntington District,

*Defendants-Appellees*,

and,

RAVEN CREST CONTRACTING

*Intervenor/Defendant-Appellee.*

_____

Appeal from the United States District Court for the Southern District of West
Virginia at Charleston in Case No. 2:12-cv-6689, Judge John T. Copenhaver

_____

**PLAINTIFFS'-APPELLANTS OPENING BRIEF**

_____

Joseph M. Lovett
J. Michael Becher
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
*jlovett@appalmad.org*
*mbecher@appalmad.org*
304-382-4798

Peter Morgan
Sierra Club
1536 Wynkoop St, Ste. 312
Denver, CO 80202
*peter.morgan@sierraclub.org*
303-454-3367

**Dated: January 15, 2015**

i

# UNITED STATES COURT OF APPEAL
# FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| OHIO VALLEY ENVIRONMENTAL COALITION, et al. | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | No. 14-2129 |
| v. | ) | |
| | ) | |
| U.S. ARMY CORPS OF ENGINEERS, *et al.,* | ) | |
| | ) | |
| Defendants-Appellees, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Raven Crest Contracting | ) | |
| | ) | |
| Intervenor/Defendant-Appellee | ) | |

## APPELLANTS' RULE 26.1 DISCLOSURE STATEMENT

**Ohio Valley Environmental Coalition:** The Ohio Valley Environmental Coalition has no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States and no publicly held corporation has a 10% or greater ownership in the Ohio Valley Environmental Coalition because it has never issued any stock or other security.

**West Virginia Highlands Conservancy:** The West Virginia Highlands Conservancy has no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States, and no publicly held corporation has a

10% or greater ownership interest in the West Virginia Highlands Conservancy because it has never issued any stock or other security.

**Coal River Mountain Watch:** Coal River Mountain Watch has no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States, and no publicly held corporation has a 10% or greater ownership interest in Coal River Mountain watch because it has never issued any stock or other security.

**Sierra Club:** Sierra Club has no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States, and no publicly held corporation has a 10% or greater ownership interest in Sierra Club because it has never issued any stock or other security.

/s/ J. Michael Becher
Joseph M. Lovett
J. Michael Becher
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
*jlovett@appalmad.org*
*mbecher@appalmad.org*
304-382-4798

/s/ Peter Morgan
Peter Morgan
Sierra Club
1536 Wynkoop St, Ste. 312
Denver, CO 80202
*peter.morgan@sierraclub.org*
303-454-3367

DATED:  January 15, 2015

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………vi

STATEMENT IN SUPPORT OF ORAL ARGUMENT………………………..1

STATEMENT OF JURISDICTION…………………………………………1

STATEMENT OF THE ISSUES…………………………………………1

STATEMENT OF THE CASE…………………………………………….2

    I. Procedural History ………………………………………………..2

    II. Decision Below……………………………………………………...3

STATEMENT OF FACTS……………………………………………5

SUMMARY OF THE ARGUMENT………………………………………..11

STANDARD OF REVVIEW……………………………………………...13

ARGUMENT……………………………………………………...15

    I. The Corps Violated NEPA When It Refused To Consider the Abundant
       Evidence Linking Surface Coal Mining With Serious Human Health
       Problems…………………………………………………...15

      A. The Corps Has a Statutory Duty to Consider the Human Health
        Effects of the Activities it Authorizes……………………….....15

      B. This Court's *Aracoma* Decision Does Not Control the Outcome of
        This Case…………………………………………………18

      C. The Corps was Required to Consider the Impacts of Coal Mining on
        Human Health Because the Actual Authorized Activity Here is Coal
        Mining through Streams…………………………………………..22

        1. The Corps authorized coal mining……..………………………23

        2. The Corps is required to consider all direct, indirect, and
          cumulative effects of the authorized activity, including negative
          impacts on human health……………………………………………25

      D. The Corps' Reliance on WVDEP Permitting as a Basis for Its
        Decision to Disregard Human Health Impacts is Not Supported by
        NEPA, SMCRA, the CWA or the Facts of this Case………………..29

      E. The Corps Violated NEPA and Its Own Regulations by Employing a
        Broader Scope of Review for Benefits than it did for Harms……….35

II. The Corps Violated Its Own Regulations for Implementing Section 404 of the CWA……………………………………………………….38

    A. The Corps Failed to Analyze Potential Health Effects of Its Discharges.............................................................................................38

    B. The Corps Public Interest Review Pursuant to 33 C.F.R. § 320.4(a)(1) Requires a Consideration of Health Studies……………………….40

CONCLUSION………………………………………………………...41

CERTIFICATE OF COMPLIANCE……………………………………...42

CERTIFICATE OF SERVICE……………………………………………43

STATUTES AND REGULATIONS……………………………………….44

# TABLE OF AUTHORITIES

**Cases**

*Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977) .........................................................................4

*Ass'n Concerned Over Resources and Nature v. Tenn. Aluminum Processors,* No. 1:10-00084, 2011 WL 1357690 (M.D. Tenn. Apr. 11, 2011) ...33

*Bowsher v. Synar*, 478 U.S. 714 (1986)...................................................4

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................4

*Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971) ........................................ 30, 35

*Catron Cty Bd of Comm'rs v. U.S. Fish and Wildlife Servs*,
  75 F.3d 1429 (10th Cir. 1996) .............................................................30

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971). ...............14

*Clinton v. City of New York*, 524 U.S. 417 (1998) ......................................4

*Envtl. Prot. Agency v. California ex rel. State Water Res. Control Bd.*,
  426 U.S. 200 (1976)..........................................................................33

*Friends of Back Bay v. United States Army Corps of Engineers,*
  681 F.3d 581, 587 (4th Cir. 2012) ............................................... 13, 14

*Hughes River v. Watershed Conservancy v. Glickman,* 81 F.3d 437
  (4th Cir. 1996)................................................... 26,27,28, 35, 36, 37

*Limerick Ecology Action, Inc. v. United States Nuclear Regulatory Comm'n.*, 869 F.2d 719 (3d Cir. 1989) .................................................30

*Ohio Valley Envtl. Coalition. v. Aracoma Coal Co.*, 556 F.3d 177
  (4th Cir. 2009) …………………………….....4, 14, 18, 19, 20, 21, 25, 29, 33, 34

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)......................15

*Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983). ................................36

*South La. Envtl. Council, Inc. v. Sand*, 629 F.2d 1005 (5th Cir.1980)). .................36

*State of Idaho v. Interstate Commerce Comm'n*, 35 F.3d 585 (D.C. 1996)............31

*State of N.C. v. F.A.A.*, 957 F.2d 1125, 1131 (4th Cir. 1992).......................... 16, 30

*U.S. Dept. of Labor v. Triplett*, 494 U.S. 715 (1990) ................................................4

*Watt v. Energy Action Educational Foundation*, 454 U.S. 151 (1981) ....................4


**Statutes**

33 U.S.C. § 1341 .................................................................................................32

33 U.S.C. § 1342 .................................................................................................32

42 U.S.C. § 4332 ........................................................................................... 15, 16

42 U.S.C. §§ 300f *et seq* ...................................................................................33

22 W.Va. Code § 3-8 ..................................................................................... 31, 32

22 W.Va. Code § 3-9………………………………………………………31, 32


**Regulations**

33 C.F.R. Pt. 325, App. B ........................................................................ 5, 22, 28

40 C.F.R. § 1502.16 ............................................................................... 15, 25, 26

40 C.F.R. § 1508 ................................................................................... 15, 16, 25

40 C.F.R. § 230.10 ....................................................................................... 38, 39

38 C.S.R. § 2-3.............................................................................................. 31, 32

33 C.F.R. § 320.4 ......................................................................................... 38, 40

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants, Ohio Valley Environmental Coalition, West Virginia Highlands Conservancy, Coal River Mountain Watch, and Sierra Club respectfully request oral argument.

## STATEMENT OF JURISDICTION

The district court in this action held jurisdiction because the action raised federal questions pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*., the Clean Water Act, 33 U.S.C. § 1251 *et seq*, and the Administrative Procedure Act, 5 U.S.C Subchapter II. Jurisdiction was therefore proper pursuant to 28 U.S.C. §§ 1331, 1361, 2201 and 2202. This Court has jurisdiction under 28 U.S.C. § 1291 to hear this appeal from a final judgment of the U.S. District Court. Plaintiffs-Appellants filed the appeal from a final order of the district, issued on August 18, 2014. The notice of appeal was timely filed on October 16, 2014, within the 60-day period provided under Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1. Did the Army Corps violate the National Environmental Policy Act and attendant regulations when it failed to consider scientific evidence linking the permitted activity – coal mining through streams – with significant negative impacts to human health?

1

2. Did the Army Corps fail to satisfy its obligations under the Clean Water Act when it failed to consider scientific evidence demonstrating that the authorized coal mining would have significant adverse effects on human health and welfare?

<u>STATEMENT OF THE CASE</u>

**I.  Procedural History**

On October 17, 2012, Plaintiffs-Appellants, Ohio Valley Environmental Coalition, West Virginia Highlands Conservancy Coal River Mountain Watch, and Sierra Club filed a complaint in the U.S. District Court for the Southern District of West Virginia, challenging the decision of the U.S. Army Corps of Engineers (the "Corps") to issue Raven Crest Contracting a Clean Water Act section 404 permit. Complaint, J.A. 9. Plaintiffs-Appellants alleged that the Corps violated the National Environmental Policy Act ("NEPA") and the Clean Water Act ("CWA") by failing to consider risks to the health of local residents before issuing the permit. *Id.* Specifically they alleged that the Corps was required to consider particular scientific literature demonstrating a link between coal mining and public health effects. *Id* at J.A. 23-26. Plaintiffs further alleged claims related to water quality independent of human health issues. *Id.* at J.A. 26-27, 28. On September 12, 2013, by stipulation, the parties agreed to the dismissal of water quality claims

2

independent of human health. ECF. Doc. 37, J.A. 7. Those claims were not part of the district court's Final Order and are not part of this appeal.

The parties filed cross-motions for summary judgment on the remaining issues related to human health. ECF. Docs. 14, 19, 21, J.A. 5-6. On August 18, 2014, the district court issued a memorandum opinion and order granting defendant and intervenor's motions for summary judgment and denying plaintiffs' motion for summary judgment. J.A. 32-88. A Judgment Order was issued on the same date. ECF. Doc. 46, J.A. 8. On October 16, 2014, Plaintiffs-Appellants filed their notice of appeal. J.A. 89-91.

## II.    Decision Below

The district court held that two of the plaintiffs, Ohio Valley Environmental Coalition and Coal River Mountain Watch, had representational standing through their member Nanette Nelson. J.A. 65. While the court recognized that Ms. Nelson was not a member of the West Virginia Highlands Conservancy or Sierra Club, it did not separately dismiss those plaintiffs for lack of standing. J.A. 59. The district court specifically noted that "the plaintiffs briefed this case together, and the position of all four is exactly the same on all issues," and that, therefore, "the court

3

will continue to refer to the 'plaintiffs' throughout the discussion, even though the court has found that two of the plaintiffs do not have standing." J.A. 60, n.8.[1]

Addressing the merits of the case, the district court relied heavily on the decision of *Ohio Valley Envtl. Coalition. v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009) to find that the Corps did not violate NEPA. The court found that the Corps' jurisdiction did not extend to the entire mine at issue, and as such, it deferred to the Corps' finding that its jurisdiction was limited to "the footprint of the regulated activity within the delineated water." J.A. 68. It held that the Corps was "not unreasonable" in excluding studies showing negative health impacts of surface mining from its environmental assessment under NEPA. J.A. 77-79. In reaching these findings the court erroneously stated, "[a]t no point do the plaintiffs appear to argue that the Corps was unjustified in excluding these studies if the limited scope of review adopted by it is deemed acceptable."[2] J.A. 78.

---

[1] Accordingly, the district court appears to have correctly recognized the well-established precedent that if one party has standing, other parties may remain in the litigation regardless of the status of their standing. *See Clinton v. City of New York*, 524 U.S. 417, 431 n.19 (1998); *U.S. Dept. of Labor v. Triplett*, 494 U.S. 715, 719 (1990); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160 (1981); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, and n. 9 (1977); *Buckley v. Valeo*, 424 U.S. 1, 12 (1976) (per curiam). All of the plaintiffs to the district court litigation have jointly appealed that court's decision.

[2] Plaintiffs made exactly that argument in each of their three briefs in support of summary judgment. In their summary judgment brief, the plaintiffs argued that "The Roundbottom Creek Permit authorizes the mining-through and burial of more

4

Reviewing plaintiffs' arguments regarding the Corps' obligation to use the same scope of analysis for analyzing the harms and benefits of a proposal, pursuant to 33 C.F.R. pt. 325 App. B(7)(b)(3), the district court recognized that "the Corps did not strictly comply with the prescription of the cited NEPA regulation." J.A. 82. It found, however, that this was a harmless error. *Id.*

The district court rejected plaintiffs CWA claims, finding that the same scope of review applied under that statute as under NEPA. J.A. 86. As such, the court concluded that the Corps would only have to consider direct effects of the discharge into streams. *Id.* It found that this scope of review did not encompass the health studies proffered by plaintiffs. *Id.*

## STATEMENT OF FACTS

On June 29, 2010, the Corps issued public notice for a "dredge and fill" permit to be granted to Raven Crest Contracting ("Raven Crest") for operations on

---

than 2.5 miles of streams, and *these mining activities are within the scope of NEPA review that the Corps itself defined*. Pls.' Ex. B, Admin Rec. Doc. #81, DD at 9. ('The NEPA Scope used for review… is limited to the narrow issue of the filling of jurisdictional waters…'). The Corps failed to consider any health impacts from these activities." ECF Doc. 15, PageID #642.  In their combined memorandum in opposition to the Corps' and Raven Crest's motions for summary judgment and in support of their own, plaintiffs included an entire section titled:  "The Corps' Own Scope of Analysis Requires Consideration of Public Health Risks." ECF Doc. 23 PageID# 736-37. In their reply brief plaintiffs again argued that "Under the 404(b)(1) guidelines the effects of mining activities, *even within the Corps' self-defined jurisdictional area* must be examined, and that examination must include an examination of studies demonstrating a connection between mining and negative human health consequences." ECF Doc. 26 PageID# 794-95 (emphasis added).

the Boone North No. 5 Surface Mine under section 404 of the Clean Water Act. JA 134. That notice proposed a permit that would allow the mine-through of 12,416 feet of stream and to allow construction of in-stream sediment ponds which would impact an additional 2,663 feet of stream in the Roundbottom Creek watershed on a proposed 725-acre surface mine in Boone County West Virginia. J.A. 135.

The section 404 permit was a prerequisite for beginning mining operations, because the land on which the Boone North No. 5 mine is located is interlaced with streams. J.A. 126, 142. Coal extraction, therefore, requires extensive mine-through of streams. J.A. 135. The process of mining through a stream necessitates complete destruction of that waterway; the streambed is excavated and underlying earth removed to extract the coal beneath. *See* J.A. 532 n.1. In its review of the permit application, the Corps noted that the destruction of streams on the Boone North No. 5 Mine is an integral part of the mining process, as it would be impossible to economically extract coal without doing so. J.A. 538, 540-47 (rejecting alternative mining methods as economically impracticable and finding that mining without the mine-through of streams would result in recovery of only 7% of the extractable coal).

On July, 1, 2010, within the public comment period, Sierra Club submitted comments to the Corps urging the agency to consider mounting evidence of

negative public health consequences of large-scale surface mines, like the Boone North No. 5 mine. J.A. 162. Quoting from a landmark study in the January 8, 2010 issue of the journal *Science,* Sierra Club explained "[a]dult hospitalizations for chronic pulmonary disorders and hypertension are elevated as a function of county-level coal production, as are rates of mortality; lung cancer; and chronic heart, lung, and kidney disease." J.A. 204. Sierra Club went on to describe another study which found "[c]oal mining [is] significantly associated with ecological disintegrity and higher cancer mortality" and that "cancer clusters… correspond to areas of high coal mining intensity." *Id.*

On November 10, 2011, nine months before the Corps issued its decision to grant the 404 permit to Raven Crest, Sierra Club supplemented its comments. J.A. 232. In addition to reiterating the findings of studies contained in previous comments, this update explained the findings of two newer peer-reviewed articles. J.A. 238-39. The first of these studies found that deficiencies in health-related quality of life are concentrated in surface mining areas of Appalachia. *Id.* 239. The study concluded that, on average, people residing in areas with higher numbers of large surface mines experience four additional years of poor health during their lifetimes, compared to residents of non-mining areas. *Id.* The second study found that the rate of birth defects is 26 percent higher in Appalachian counties with surface mining than in Appalachian counties with no surface mining. *Id.*

Even without the Sierra Club's comments, the Corps would have known about the accumulating scientific evidence that large surface coal mines are closely associated with negative public health outcomes. For example, the U.S. Environmental Protection Agency ("EPA"), which is required to cooperate with the Corps in reviewing section 404 permits, 33 C.F.R. § 325(a)(3), stated in its guidance for review of mountaintop mining permits that "[p]ossible human health impacts from coal mining activities have also been documented, including peer-reviewed public health literature that has preliminarily identified associations between increases in surface coal mining activities and increasing rates of cancer, birth defects, and other health problems in Appalachian communities." J.A. 262. When it vetoed the Corps-issued section 404 permit for operations on the Spruce Mountain mine in West Virginia, one of the largest surface coal mines ever proposed in the state, EPA concluded that "[a] growing body of research suggests that health disparities are not uniformly distributed across the Appalachian region, but are instead concentrated in areas where surface coal mining takes place." J.A. 520-21. In each of these documents, EPA cited to primary literature supporting its conclusions.

Not surprisingly, studies demonstrating the association between public health problems and surface mining have received considerable press attention.

Articles have not only appeared in the local press, but have also been covered by national media outlets such as CBS New, USA Today and CNN. J.A. 320-78.

At the time the Corps issued the 404 permit to Raven Crest, nearly twenty separate studies linking large scale surface coal mining in Appalachia with serious health problems had appeared in highly regarded scientific journals. J.A. 380-81. Those studies show a positive correlation between the prevalence of cancer (J.A. 499), mortality from cancer (J.A. 218), kidney disease (J.A. 389), birth defects (J.A. 243), mortality from cardiovascular and pulmonary disease (J.A. 406), impaired function, and poor health and mortality in general (J.A. 252). Although socio-economic factors unrelated to mining contribute to poor health problems in Appalachia, such factors were controlled for in the studies and do not explain the significant health disparities found in the literature. Significant correlations between health problems and mining persist even after statistical adjustment for age, smoking, obesity, poverty, education, availability of doctors and other risks. J.A. 252, 389-90, 423, 464-65, 483, 491. Health disparities are present not only for men who experience the most on-the-job exposures, but for women and children who live near the mines as well. J.A. 216. Shockingly, one study found that coal mining areas of Appalachia experienced an excess of 1,607 deaths compared to non-mining areas of the same region over a 5 year period, even after accounting for

negative socio-economic factors. J.A. 392. This puts the mortality of Appalachian mining communities 24 years behind the rest of the nation. *Id.*

Evidence linking public health harms to large-scale surface mining is not new. Research on the impacts of mining has accumulated steadily for the last several years. Research began with the examination of county level data examining general health indicators in counties with mining. J.A. 392. The studies then became more specific, examining the prevalence of certain diseases and disease outcomes. J.A. 406. The studies have determined that effects are most severe in areas where mining intensity is highest. J.A. 252.

On August 30, 2012, the Corps issued the 404 permit authorizing the destruction of streams via coal mining at the Boone North No. 5 mine. J.A. 658-59. Despite a robust body of literature demonstrating a link between surface mining, of the type to be conducted on the Boone North No. 5 mine, and serious public health consequences, the Corps ignored these issues in its analysis of the 404 permit. *See.* J.A. 642. The text of the agency's decision document addresses human health concerns only by stating, "the WVDEP [West Virginia Department of Environmental Protection] anticipates no negative impacts to human health, municipal and private water supplies," J.A. 565, and that "SMCRA [the Surface Mining Control and Reclamation Act] requires that the applicant comply with applicable air and water quality regulations as well as applicable health and safety

standards." J.A. 564. The Corps addressed plaintiffs' comments in an appendix,

merely stating:

> References concerning water quality and public health have been
> reviewed. These issues are not within the purview of the Corps'
> regulatory authority, but are considered by the WVDEP during the
> SMCRA permitting process to assure the project would not violate
> EPA-approved water quality standards, pursuant to CWA [Clean
> Water Act] Sections 401 and 402. The Corps defers to the WVDEP as
> the agency with primary responsibility and expertise for assuring the
> proposed effluent discharges meet state water quality standards.

J.A. 642.

## SUMMARY OF THE ARGUMENT

When it issued the Clean Water Act section 404 permit authorizing coal

mining through streams at the Boone North mine without considering the negative

human health impacts of that mining, the Corps violated its duties under both

NEPA and the Clean Water Act. NEPA requires the Corps to take a hard look at

the effects on human health of the activities it authorizes. The Clean Water Act

requires the Corps to consider significantly adverse effects of the authorized

discharge of pollutants on human health. There can be no question in this case that

the Corps was presented with multiple scientific studies demonstrating that surface

coal mining negatively impacts human health, or that the Corps refused entirely to

consider those studies when it chose to authorize mining through streams.

Even accepting the Corps' own determination of the limited geographic scope of its jurisdiction over the Boone North mine, the Corps was still required under NEPA to consider evidence of the mine's serious health risks. Because the Boone North mine involves extensive mining through streams, and because the Corps itself defined the scope of its review as including the impacts of that coal mining through streams, the Corps was required to consider the human health effects of the mining.

Rather than conduct the independent analysis required by NEPA, the Corps improperly deferred to the state's surface mining and pollution discharge permitting processes, neither of which address human health impacts. The Corps did not – and could not – justify its deference by explaining how the state's review would sufficiently analyze the public health impacts of surface mining. Because neither SMCRA nor the state-implemented provisions of the Clean Water Act requires a review of the human health impacts of coal mining, the Corps cannot rely on assessments conducted under those provisions to satisfy its own NEPA obligations.

The Corps also violated NEPA and its own regulations by employing a broader scope of review for its consideration of the mining project's economic benefits as compared to its environmental effects. The Corps' comparatively

inflated estimate of economic benefits skewed its analysis and prevented it from taking the required hard look at the project's adverse environmental effects.

Separate from its NEPA obligations, the Corps' violated its own regulations for implementing section 404 of the Clean Water Act by failing to consider the human health effects of the authorized mining at the Boone North mine. The Corps is required to look beyond the effects of authorized discharges to municipal drinking water supplies to more broadly consider significantly adverse effects of pollution discharges on human health or welfare. The Corps is also required to conduct a broad-based public interest review that includes consideration of the impacts of an authorized project on human health. By failing entirely to consider the abundant studies describing the serious human health impacts of coal mining, the Corps violated these duties.

## STANDARD OF REVIEW

When reviewing an administrative agency's final decision under the Administrative Procedure Act ("APA"), this Court reviews the agency's decision making *de novo* "without deference to the district court's resolution of the issue," and applies the appropriate standard of review to the agency's decision. *Friends of Back Bay v. United States Army Corps of Engineers,* 681 F.3d 581, 587 (4th Cir. 2012). The APA requires the reviewing court to "hold unlawful and set aside [a federal] agency action…whenever the challenged act is arbitrary, capricious, an

13

abuse of discretion, or otherwise not in accordance with the law." *Id.* at 586-87

(quoting 5 U.S.C. § 706(2)(A) (internal quotation marks omitted)). To determine

whether a decision was arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law, the reviewing court "must consider whether the

decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*,

401 U.S. 402, 416 (1971). Review of an agency action is "highly deferential" but

does not "reduce judicial review to a rubber stamp of agency action." *Friends of*

*Back Bay*, 681 F.3d at 587 (quoting *Aracoma Coal Co.*, 556 F.3d 177, 192 (4th

Cir. 2009)).

This appeal involves claims brought under NEPA and the Clean Water Act.

In deciding whether an agency acted arbitrarily under NEPA, the Court "must

ensure that the agency has examined the relevant data and articulated a satisfactory

explanation for its action." *Defenders of Wildlife v. N. Carolina Dep't of Transp.*,

762 F.3d 374, 396 (4th Cir. 2014) (internal citations and quotations omitted). The

Court's task "is to ensure that the agency took a hard look at the environmental

consequences of the proposed action." *Id.* (internal quotation marks omitted). The

Court applies the APA's arbitrary and capricious standard to agency

determinations made under the Clean Water Act. *See Aracoma Coal Co.*, 556 F.3d

at 192.

ARGUMENT

I.    **The Corps Violated NEPA When It Refused To Consider the Abundant Evidence Linking Surface Coal Mining With Serious Human Health Problems.**

In its decision to issue the 404 permit for the Boone North mine, and its related determination that "this permit will not have a significant impact on the quality of the human environment" (J.A. 583), the Corps refused to consider abundant information showing a close connection between surface coal mining and negative impacts on human health. As a result, the Corps violated its duty under NEPA to take a "hard look" at the environmental effects of the activity it was authorizing—coal mining.

A.    **The Corps Has a Statutory Duty to Consider the Human Health Effects of the Activities it Authorizes.**

NEPA requires the Corps to consider "the environmental impact" of its decisions to authorize activities under section 404 of the Clean Water Act. *See* 42 U.S.C. § 4332(C)(i). Specifically, the Corps must take a "hard look" at the environmental consequences of activities authorized under section 404. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA regulations require the Corps to consider *all* "effects" of the actions it authorizes, whether direct, indirect, or cumulative. 40 C.F.R. § 1502.16, 1508.8. Among other things, the Corps must consider the effects of its permitting actions on human health. *Id.* at § 1508.8 ("Effects includes . . . health").

15

At the heart of NEPA is the requirement that an agency must draft a "detailed statement" analyzing all "significant" environmental effects of the proposed action. 42 U.S.C. § 4332. This document is referred to as an "environmental impact statement" ("EIS"). 40 C.F.R. § 1508.11. In some circumstances, an agency may conduct a preliminary investigation, known as an "environmental assessment" ("EA"), to determine whether the impacts will be significant. 40 C.F.R. § 1508.9(a)(1). At a minimum, an EA must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id*. "An agency's refusal to prepare an [EIS] is arbitrary and capricious if its action might have a significant environmental impact." *State of N.C. v. F.A.A.*, 957 F.2d 1125, 1131 (4th Cir. 1992).

NEPA specifically requires "all agencies of the Federal Government" to comply with the Act. 42 U.S.C. § 4332(2). This means that the Corps is required to conduct its own analysis and is prohibited from "avoiding the Act's requirements by simply relying on another agency's conclusions about a federal action's impact on the environment." *State of N.C. v. F.A.A.*, 957 F.2d at 1129-30. As a result, even if an activity authorized by the Corps is subject to additional permitting or regulatory requirements, the Corps must still analyze all of the environmental effects of that activity. In this case, that the authorized coal mining also required

state-issued permits under the Clean Water Act and Surface Mining Control and Reclamation Act did not relieve the Corps of its duty to consider the effects of that mining on human health.

Despite its duty under NEPA, the Corps made only two passing references in its decision document to the potential impacts of the authorized coal mining project on human health, and failed to even acknowledge the multiple studies that describe those impacts and that were identified by the Plaintiffs-Appellants in their comments. The Corps stated that "the WVDEP anticipates no negative impacts to human health, municipal and private water supplies," and that "SMCRA requires that the applicant comply with applicable air and water quality regulations as well as applicable health and safety standards." J.A. 564-65. In an appendix, the Corps cursorily acknowledged Plaintiffs-Appellants' comments, and again deferred to WVDEP's separate permitting decisions. J.A. 642. The Corps therefore improperly deferred to state agency review to limit its own review.

The Corps acknowledged that the authorized coal mining would occur near homes and communities. The Corps noted that "[t]he proposed fill site on Mill Branch is approximately ½ mile from the residential community of Racine," and that "[o]ne residence exists at the mouth of the Roundbottom Creek watershed." J.A. 552. That residence is "0.8 mile downstream" from the proposed project. J.A.

17

563. The Corps also acknowledged that "ground water users located downstream along Roundbottom Creek and Mill Branch draw from an identified alluvial aquifer." J.A. 562.

The Corps therefore had information before it indicating that surface coal mining negatively impacts human health. The Corps also had information indicating that the authorized surface coal mining would be conducted in close proximity to human communities. The Corps' refusal to consider the full impacts of the proposed mining on those communities violated its obligations under NEPA.

### B. This Court's *Aracoma* Decision Does Not Control the Outcome of This Case.

In finding that the Corps' failure to consider the human health studies was not arbitrary or capricious, the district court relied heavily on this Court's decision in *Ohio Valley Envt'l Coalition v. Aracoma Coal Co.*, 556 F3d 177 (4th Cir. 2009). *See e.g.* J.A. 73. That reliance was misplaced. Although there are superficial similarities between the facts of this case and the facts at issue in *Aracoma*, namely that both cases involve section 404 permits related to surface coal mining operations, *Aracoma* does not control the outcome of this case. The actual authorized activity in this case—coal mining through streams—is distinct from the activity at issue in *Aracoma*—construction of underdrains for refuse disposal valley fills. The environmental effects the Plaintiffs-Appellants claim the Corps failed to consider in this case—the impacts of mining on human health—are also

18

distinct from the ecological impacts at issue in *Aracoma*. Those differences are not merely superficial, but go to the core questions of the extent to which the Corps had discretion to avoid consideration of human health impacts and the extent to which other regulatory regimes apply. As a result, this Court must address the fundamental questions raised in this litigation directly, and not merely through the lens of its holding in *Aracoma*.

Although the Corps-issued permits under review in *Aracoma* and the present case both authorize activities related to surface coal mining, the nature of the specific authorized activities differ greatly. In *Aracoma*, this Court determined that the authorized activity was "nothing more than the filling of jurisdictional waters for the purpose of creating an underdrain system for the larger valley fill." *Aracoma,* 556 F3d. at 194. The Court determined that "the Corps has no legal authority to prevent the placement of fill material in areas outside of the waters of the United States." *Id*. Because the scope of the authorized activity was so constrained in *Aracoma*, and because the plaintiffs sought review of the effects of the broader coal mining project, the plaintiffs were forced to challenge that scope determination. This Court ultimately sided with the Corps on that question, holding that the Corps "reasonably determined" that the scope of its NEPA analysis need not extend "beyond the Corps' limited jurisdiction to include environmental effects on upland areas." *Id*. at 197.

Here, in the permit and decision documents at issue the Corps repeatedly recognized that the actual activity it was authorizing was coal mining. The Corps described the proposed project requiring authorization as "direct impacts to a total of 15,079 linear feet of streams in conjunction with [the] proposed Boone #5 surface mine," and acknowledged that the majority of those 15,079 feet of direct impacts consisted of "*mining through streams* (excavation and backfill)." J.A. 531 (emphasis added). The Corps also stated that the "extent to which the entire project will be within the Corps jurisdiction" was direct impacts to "15,079 feet of stream." J.A. 537. In other words, the Corps explicitly recognized that it was authorizing coal mining through streams. Accordingly, even if this Court defers to the Corps' own scope determination, it must conclude that the Corps' jurisdiction includes coal mining impacts.

The environmental effects at issue in the two cases are also distinct. This Court described the *Aracoma* plaintiffs' concerns as relating to "the significant individual and cumulative adverse effects the projects would have on water quality, aquatic and terrestrial ecosystems and habitats, species survival and diversity, crucial stream functions, forests, and the aesthetic value of the destroyed mountains." *Aracoma*, 556 F3d at 188. In contrast, as described by the district court, in the present case "the plaintiffs allege that the Corps, when issuing the § 404(b)(1) permit that allows Raven Crest to mine-through streams and to place fill

20

material in streams, was required to, but did not, properly consider *detrimental human health effects* associated with surface coal mining." J.A. 33 (emphasis added). While the *Aracoma* case focused on impacts to ecosystems and species, the present suit focuses on impacts to human health. This distinction is critical because, as will be discussed in more detail below, no other permit or regulatory regime addresses human health effects from coal mining. In explaining its decision in *Aracoma,* this Court emphasized that extending its jurisdiction to upland areas of a valley fill would "effectively read out of the equation the elaborate, congressionally mandated schema for the permitting of surface mining operations prescribed by SMCRA"—which contain detailed regulations for controlling the construction and operation of such a fill. *Aracoma,* 556 F3d at 195. There is no parallel permitting scheme that requires broad-based consideration of public health consequences of surface mining.

This case presents unique questions that have not previously been addressed by this Court. Those questions include whether the Corps must consider, among the effects of authorized surface coal mining through streams, studies showing that surface coal mining negatively impacts human health. Those questions also include whether any regulatory regime currently addresses the negative impacts of surface coal mining on human health such that the Corps can avoid considering those impacts as part of its NEPA review.

### C. The Corps was Required to Consider the Impacts of Coal Mining on Human Health Because the Actual Authorized Activity Here is Coal Mining Through Streams.

The Corps' NEPA implementing regulations require it, "to address the impacts of the specific activity requiring a DA [Department of the Army] permit and those portions of the entire project over which the [Corps] district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. Pt. 325, App. B, § 7(b)(1)); *see also, Aracoma,* 556 F.3d at 194. Here, the specific activity requiring a Corps permit is coal mining in streams.

Even accepting *arguendo* the Corps' narrow interpretation of the scope of its jurisdiction in this case, the Corps was still required to consider the effects of mining on human health because it specifically authorized mining within its self-defined jurisdictional area. There can be little question that the Corps authorized mining. The Corps repeatedly described the activity being permitted as the mine-through of streams on the site to recover coal reserves. Because the Corps defined the authorized activity in this case as coal mining through streams, the Court need not resolve the question of whether the Corps improperly limited the scope of its review, or whether the Corps had control or responsibility over mining on upland areas. The Corps failed to take the required hard look at the permitted activity within the undisputed jurisdictional area.

###### 1.     *The Corps authorized coal mining.*

From the beginning of its involvement with the Boone North permit, the Corps has acknowledged that it was authorizing coal mining in streams. In the Public Notice published in June 2010, the Corps described the project under the heading "Description of the Proposed Work" as "direct impacts to a total of 15,079 linear feet of streams . . . . As part of the project, *mining through streams* (excavation and backfill) would impact 700 feet perennial, 5,855 feet intermittent, and 5,861 feet of ephemeral stream." J.A. 135 (emphasis added).

The Corps again confirmed, throughout its combined decision document, its understanding that it was authorizing mining activity within streams. First, the Corps restated – under the heading "Proposed Work" – that the proposed project involved "[m]ining through streams (excavation and backfill)," and that this mining "would impact 700 feet of perennial, 8,518 feet of intermittent, and 5,861 feet of ephemeral streams." J.A. 531. That's almost three miles of authorized coal mining.

The Corps understood that these authorized mining activities involved the same types of soil, mineral and rock disturbance and removal as mining in non-jurisdictional areas. The Corps noted that as a result of the proposed mining "the original streambed and riparian area would be destroyed by excavation through the stream and underlying earth." J.A. 532, n.1. The Corps observed that seven of the

coal seams to be mined "cross virtually all streams on site." J.A. 531. Describing the mining, the Corps also noted that "the proposed fill activity would involve a substantial amount of excavation and backfilling where streams now exist." J.A. 558. The district court properly recognized that the Corps considered the authorized activity to be coal mining, noting that "[i]t is clear from the Corps' decision that the Corps considered the mine-through activities as those it could regulate under the CWA." J.A. 70.

In describing the proposed mining impacts, the Corps distinguished this specific project from other coal mining projects that only require authorization under section 404 for the creation of "valley fill" refuse impoundments. The Corps specifically observed that "the project impacts to waters of the U.S. would not occur solely from disposal of excess overburden but *only from mining through streams*." J.A. 544 (emphasis added). The Corps also noted that "[m]ost of the project surface area would be excavated and backfilled due to mining of multiple seams in close proximity. This project would not involve constructing a traditional valley fill." J.A. 576.

The Corps therefore acknowledged that the mining would occur directly in the streams over which the Corps has control, not just in separate, upland areas. As a result, the permit at issue in this case—and the Corps' related NEPA analysis— are distinguishable from the permit and Corps analysis upheld by this Court in its

*Aracoma* decision which involved only "the regulation of valley fills and associated sediment ponds." 556 F.3d 177, 189 (4th Cir. 2009). Here, the Corps was required to analyze all of the effects of the coal mining activities it authorized within jurisdictional streams, including documented impacts on human health.

> 2.   *The Corps is required to consider all direct, indirect, and cumulative effects of the authorized activity, including negative impacts on human health.*

Because the Corps explicitly authorized coal mining activities, it was bound to consider all reasonably foreseeable effects of that activity, including effects on human health. 40 C.F.R. §§ 1502.16; 1508.8.  The "effects" which the agency is bound to consider include both "direct effects" and "indirect effects."40 C.F.R. 1508.8. "Direct effects" are "caused by the action and occur at the same time and place." *Id*. "Indirect effects" are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. Here, the multiple studies before the Corps make clear that negative impacts to human health are at least an indirect effect of surface coal mining. *See e.g.* J.A. 219 ("research has found exacerbated Appalachian health disparities as a function of coal production even after controlling for covariates such as smoking, education, poverty, race, health insurance and access to physicians"); J.A. 223 ("These results suggest. . . a causal link between coal mining and cancer mortality.  This contention is supported by prior research demonstrating that coal mining and

processing may increase carcinogenic contamination of air and water in nearby areas."). Therefore, the Corps was required by NEPA to study those effects. *See* 40 C.F.R. § 1502.16 (requiring consideration of both direct and indirect effects and their significance).

This Court has previously found a Corps permitting decision to be inadequate under NEPA when that decision failed to consider the full range of effects of the authorized activity. In *Hughes River Watershed Conservancy v. Glickman*, this Court held that the Corps violated NEPA when it failed to take a "hard look" at the environmental effects of invasive species expected to result from a dam project whose construction was authorized by the Corps under a section 404 fill permit. 81 F.3d 437, 445-46 (4th Cir. 1996). The "authorized activity" at issue in the *Hughes River* decision was "discharging fill material into the North Fork." *Id*. at 441 n.2. But because that discharge of fill material took the form of dam construction, the Corps was required to consider a broader range of impacts related to the functioning of the dam itself. This Court ultimately held that the Corps was required to consider not only the immediate effects of the fill activities, but also information available to the Corps "that zebra mussels would infest the North Fork if the Project were completed." *Id*. at 444. Specifically, this Court found that the Corps failed to adequately consider information that, as a result of the project, zebra mussels would destroy indigenous mussels downstream from the dam, clog

26

intake structures, and have negative effects on the North Fork's ecosystem as a whole. *Id*. These invasive mussels would not be introduced as a result of dam *construction*, but rather would occur from activities during dam operations including "boating" and "fish bait buckets." *Id*. at 444-45. In other words, this Court held that the Corps was required to consider information that the authorized dam construction project would lead to broader negative impacts once completed.

Similarly, in this case the Corps was required to consider the information showing that surface coal mining in Appalachia of the type authorized by the Corps leads to negative human health outcomes for the surrounding community. At no point in this litigation has the Corps disputed that it was made aware of information on coal mining's negative impacts on human health. And the Corps cannot plausibly dispute—given the language quoted above from the public notice and decision document—that the authorized activity in this case is coal mining through streams. Accordingly, the Corps was bound to consider that information as part of its NEPA review.

In *Hughes River*, the authorized discharge took the form of dam construction, and the Corps was required under NEPA to consider the environmental effects resulting from dam operation, including the predicted zebra mussel infestation. Here, the authorized discharge took the form of coal mining through streams. Accordingly, the Corps was required under NEPA to consider the

27

environmental effects resulting directly and indirectly from that coal mining, including the predicted negative impacts of coal mining to human health.

The argument that the Corps is required to consider all of the effects of the authorized surface coal mining is distinct from a claim that the Corps must increase the scope of its review to include a broader geographic area, including aspects of the project located in upland, non-jurisdictional areas. Even accepting the limited scope of the Corps' review, the Corps still must consider "the impacts of the specific activity requiring a DA permit." 33 C.F.R. Pt. 325, App. B, § 7(b)(1).

The district court was wrong when it concluded that "the Corps was not unreasonable in excluding the studies as outside its scope of review for the reason that the articles do not contemplate that the health effects were caused by the type of discharges associated with this mine." J.A. 77. That is too narrow a reading of the Corps' NEPA obligations, and ignores the requirement that the Corps consider all direct, indirect, and cumulative impacts of the authorized activity. 40 C.F.R. § 1508.8. That reading is also contrary to the holding of the *Hughes River* decision, where the Corps was required to consider the effects of the dam as a whole, not merely those effects directly caused by the discharges involved in constructing the dam.

**D. The Corps' Reliance on WVDEP Permitting as a Basis for Its Decision to Disregard Human Health Impacts is Not Supported by NEPA, SMCRA, the CWA or the Facts of this Case.**

The Corps attempted to avoid its duty to consider the human health impacts of the approved mining project by deferring to state agency action taken under SMCRA and the Clean Water Act. The district court incorrectly endorsed this approach under its interpretation of the *Aracoma* decision and that decision's discussion of "overlapping state and federal schemes." J.A. 73-74 (citing *Aracoma*, 556 F.3d at 197 n.11). In fact, in this case, unlike *Aracoma*, there is no statutory overlap between the Corps' section 404 and NEPA responsibilities on the one hand, and the WVDEP's authority under section 402 and SMCRA on the other.

While the Corps attempted to avoid considering public health impacts based on the WVDEP's CWA and SMCRA permitting processes, nowhere did it explain how the state agency's review would sufficiently analyze the public health concerns raised by the health studies as a consequence of surface mining. In its response to Sierra Club's comments directing the Corps to the body of literature examining the relationship between mining and serious risks to human health, the Corps stated simply:

> references concerning water quality and public health have been reviewed. These issues are not within the purview of the Corps' regulatory authority but are considered by WVDEP during the [Surface Mining Control and Reclamation Act] SMCRA permitting

29

> process to assure that the project would not violate EPA-approved
> water quality standards, pursuant to CWA Sections 401 and 402. The
> Corps defers to WVDEP as the agency with primary responsibility. . .

J.A. 642. This conclusory statement falls far short of the analysis required to

support reliance on another agency's expertise or conclusions.

Vague and unsupported references to other statutes cannot satisfy the Corps'

obligations under NEPA. *See State of N.C. v. F.A.A.*, 957 F.2d. at 1129-30

("[Section 102(2) of NEPA] precludes an agency from avoiding the Act's

requirements by simply relying on another agency's conclusions about a federal

action's impact on the environment."); *Calvert Cliffs' Coordinating Committee,*

*Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1122-23 (D.C. Cir.

1971) (explaining that NEPA would "wither away in disuse, [if] applied only to

those environmental issues wholly unregulated by any other federal, state or

regional body."). Compliance with another environmental statute does not equate

to compliance with NEPA, unless that other statute contains a functionally

equivalent review. *Limerick Ecology Action, Inc. v. United States Nuclear*

*Regulatory Comn'n.*, 869 F.2d 719, 729 (3d Cir. 1989) (holding that "compliance

with NEPA is required unless specifically excluded by statute or existing law

makes compliance impossible"); *see also, Catron Cty Bd of Comm'rs v. U.S. Fish*

*and Wildlife Servs*, 75 F.3d 1429, 1435-36 (10th Cir. 1996) (rejecting an argument

that NEPA compliance was excused for an action taken pursuant to the

Endangered Species Act); *State of Idaho v. Interstate Commerce Comm'n*, 35 F.3d 585, 595-96 (D.C. 1996) (finding an agency may not "delegate its NEPA responsibilities").

If the Corps believed that WVDEP adequately addressed all of the potential public health impacts of the authorized mining project, it was wrong. SMCRA Permit application requirements are found in Title 22 Section 3-8 to 3-9 of the West Virginia Code and Title 38 Section 2-3 of the West Virginia Code of State Regulations. The applicable sections of the West Virginia Code make no mention of any analysis or review of human health or safety for a typical permit. 22 W.Va. Code §§ 3-8, 3-9. The regulations require such an analysis only when a structure on the site will be modified or reconstructed, 38 C.S.R. § 2-3.8.b.5.D[3], when an experimental practice is proposed, 38 C.S.R. § 2-3.10.a[4], or when the operation involves an in-situ processing facility, 38 C.S.R. § 2-3.11.c.[5]  None of these

---

[3] Specifically this section requires "A showing that the risk of harm to the environment or to public health or safety is not significant during the period of modification or reconstruction."

[4] This section requires demonstration that the experimental practice "[w]ill not reduce the protection afforded public health and safety below that provided by the requirements of the rule," 38 C.S.R. § 2-3.10.a.3.B, and requires the permittee to "[i]dentify at the earliest possible time, potential risk to the environment and public health and safety which may be caused by the experimental practice during and after mining," 38 C.S.R. § 2-3.10.a.4.B.

[5] In such a case the permittee must provide "[a] plan for treatment, confinement or disposal of all acid-forming, toxic, forming or radioactive gases, solids, or liquids

31

provisions apply to the Boone North No. 5 Surface Mine and therefore no general review of human health was required or conducted under SMCRA. Nor is a finding of no significant impact to human health required to be made by the WVDEP before a SMCRA permit is issued. *See* 38 C.S.R. § 2-3.32 (specifically providing the findings which must be made before permit issuance); 22 W.Va. Code § 3-8, 3-9 (prohibiting mining without a permit and listing permit application requirements). Because WVSCMRA, as applied by the WVDEP to the Boone North No. 5 Surface Mine, does not duplicate the analysis of human health impacts required by NEPA, it cannot supplant such an analysis.

Likewise, CWA sections 401 and 402 do not require a broad review of human health effects of a permitting action. Section 401 requires certification by a state that a federal project will not result in violation of state water quality standards. 33 U.S.C. § 1341. Such certification, however, does not consider potential impacts that might occur even if water quality standards are achieved. Section 402, 33 U.S.C. § 1342, requires the WVDEP – when issuing a pollution discharge permit – "to transform generally applicable effluent limitations and other standards including those based on water quality into the obligations (including a timetable for compliance) of the individual discharger." *Envtl. Prot. Agency v.*

---

constituting a fire, health, safety or environmental hazard caused by the mining and recovery process."

*California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976). While

this provision places important limits on water pollutants, it does not eliminate

them. Importantly, neither section of the CWA applies to groundwater—and thus

to well water—nor to drinking water from wells or municipal sources. *See Ass'n*

*Concerned Over Resources and Nature v. Tenn. Aluminum Processors,* No. 1:10-

00084, 2011 WL 1357690 at *16-*17 (M.D. Tenn. Apr. 11, 2011) (providing a

comprehensive review of the CWA's applicability to groundwater in the various

circuits; *see also*, 42 U.S.C. §§ 300f *et seq.* ("Safe Drinking Water Act").

　　Because the regulatory schemes under SMCRA and sections 401 and 402 of

the CWA do not include a review of human health effects raised by Plaintiffs-

Appellants in their comments, the Corps cannot fulfill its duties under NEPA by

pointing to the work of other agencies pursuant to those provisions.  This case is

different from *Aracoma*. In that case, where the plaintiffs' claims were limited to

the Corps' duty to consider water quality impacts of the authorized valley fills and

related mining, the court held that the federal agency could rely on existing

statutory schemes that the court concluded adequately address the very concerns

raised by commenters. *See Aracoma,* 556 F.3d at 195-96. Here, in contrast, there is

no existing statutory scheme to address the impacts of the authorized mining on

human health. In order for the Corps to defer to relevant work already conducted

by another agency, it is required to show how the work of that agency applies to

the issues which must be addressed under NEPA. In other words, the Corps was required to demonstrate the specific ways in which WVDEP regulations and oversight address impacts to human health. The Corps did not do this, and indeed could not do this.

The absence of any serious consideration of impacts to human health under SMCRA and the Clean Water Act also means that the district court was incorrect when it determined that this case involves "overlapping state and federal schemes." J.A. 74 (citing *Aracoma*, 556 F.3d at 197 n.11). The district court relied on that determination to avoid considering two decisions of the Ninth Circuit Court of Appeals concerning the environmental review required of the Corps when issuing section 404 permits. *Id.* In so doing, the district court failed to account for the total *lack* of any overlap in this case regarding the consideration of the impacts of mining on human health. NEPA and the Corps' own regulations alone require consideration of those impacts.

The Corps' abdication of its NEPA responsibilities is particularly egregious when one considers that the health studies themselves demonstrate the inadequacy of the existing SMCRA and Clean Water Act regulatory schemes to address impacts to human health. The studies which document the impacts of surface mining on human health all dealt with mines that were subject to SMCRA, and to sections 401 and 402 of the Clean Water Act. These statutes are not new. Clean

34

Water Act § 401 has not been amended since 1977. Pub. L. 95-217. While Clean Water Act § 402 has been updated periodically since its passage in 1948, it has not been substantially revised since 1987. Publ. L. 102-580, Title III, § 364. SMCRA has been on the books since 1977. Pub. L. 95-87, Title I § 101. The health studies available to the Corps clearly demonstrate that the status quo for permitting surface coal mining does not prevent serious negative impacts to human health. The Corps erred, therefore, by deferring to those plainly inadequate permitting schemes to justify its own refusal to consider the effects of surface mining on human health.

### E. The Corps Violated NEPA and Its Own Regulations by Employing a Broader Scope of Review for Benefits than it did for Harms.

Separate from its inadequate review of the environmental effects of the authorized mining activity, the Corps also violated NEPA by utilizing a drastically different scope for its consideration of economic benefits as compared to environmental effects. The Corps' own NEPA regulations for reviewing section 404 permits require that "[i]n all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal." 33 CFR Pt. 325, App. B § 7(b)(3).

This Court has recognized that "NEPA requires agencies to balance a project's economic benefits against its adverse environmental effects." *Hughes River Watershed Conservancy*, 81 F.3d at 446 (citing *Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1113

35

(D.C.Cir.1971)). The danger in a skewed analysis is that "[t]he use of inflated economic benefits in this balancing process may result in approval of a project that otherwise would not have been approved because of its adverse environmental effects." *Id*. When conducting its balancing analysis, "[t]he Corps cannot tip the scales of [its analysis] by promoting possible benefits while ignoring their costs." *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983). This Court will "engage in a 'narrowly focused' review of the economic assumptions underlying a project to determine whether the economic assumptions 'were so distorted as to impair fair consideration' of the project's adverse environmental effects." *Hughes River*, 81 F.3d at 446 (quoting *South La. Envtl. Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir.1980)).

Here, the gap between the Corps' narrow consideration of environmental effects and its broad assessment of economic benefits is so wide as to distort and impair fair consideration of the project's impacts. As described above, in this case the Corps limited its review of environmental effects to only the direct impacts to "15,079 feet of stream" and "adjacent riparian areas." J.A. 537-38. In sharp contrast, the Corps' review of economic benefits included "employment, income, local economy, tax base, and energy needs." J.A. 551. The Corps did not limit its consideration of employment benefits to only jobs at the mine itself, but utilized a "multiplier" to estimate that "the project would indirectly support up to 570

additional jobs." J.A. 551. The Corps therefore utilized the smallest possible scope for its consideration of environmental effects, and the largest possible scope for its consideration of economic benefits. This is not permissible.

The district court explicitly recognized that the Corps' skewed analysis failed to comply with the requirements of its own NEPA regulations. The District Court found that "the Corps did not strictly comply with the prescription of [33 CFR part 325, App. B § 7(b)(3)] by considering these economic benefits while limiting the scope of the health effects to the filling of jurisdictional waters." Doc. J.A. 82. The district court failed to give proper effect to this finding, however, and instead held the Corps' error to be "harmless" based on the court's prior flawed determination that the Corps took "a hard look at the relevant environmental consequences of its decision." J.A. 82-83.

This Court should reject the approach taken by the district court and instead follow the approach utilized by this Court in its *Hughes River* decision. There, the court determined that the Corps' reliance on an "inflated estimate" of economic benefits prevented the Corps from taking the required "hard look at the Project's adverse environmental effects." 81 F.3d at 447. The *Hughes River* court ultimately determined that the Corps' "inflated estimate of the Project's recreation benefits violated NEPA because it impaired fair consideration of the Project's adverse environmental effects." *Id*. at 448. In just the same way, the unreasonably broad

37

scope of economic benefits considered by the Corps in this case "inflated" the

project's estimated benefits and "impaired fair consideration" of the mining

project's adverse environmental effects, including negative impacts on human

health.

## II.    The Corps Violated Its Own Regulations for Implementing Section 404 of the CWA.

Two regulations promulgated pursuant to section 404 of the CWA require

the Corps to consider potential human health effects of the permit granted for the

Boone North No. 5 Surface Mine.  Under the section 404(b)(1) guidelines, the

Corps is required to consider "[s]ignificantly adverse effects of the discharge of

pollutants on human health or welfare. . . ."  40 C.F.R. § 230.10(c)(1). Under a

more general regulation of the section 404 program, the Corps must conduct a

broad public interest review in which "[t]he benefits which may be reasonably

expected to accrue from the proposal must be balanced against its reasonably

foreseeable detriments." 33 C.F.R. § 320.4(a)(1). That review is required to include

an analysis of the general needs and welfare of the people. *Id*.

### A. The Corps Failed to Analyze Potential Health Effects of the Authorized Discharges.

Aside from a review of municipal drinking water sources in the area, the

Corps failed to consider the potential effects of the authorized discharges on

human health and welfare.  While the Corps is specifically directed to look at the

effects of the authorized discharges on municipal water supply, this direction is part of a non-exhaustive list of criteria. *See* 40 C.F.R. § 230.10(c)(1) (calling on the Corps to consider "[s]ignificantly adverse effects of the discharge of pollutants on human health or welfare, including *but not limited to* effects on municipal water supplies, plankton, fish, shellfish, wildlife and special aquatic sites."). In this case it was necessary for the Corps to look more carefully at health effects because of the nature of the issues raised in public health studies.

First, these studies raise questions about impacts of stream disturbance and discharges of fill material that go beyond effects on drinking water supplies. *See e.g.* J.A. 218-219 (finding significant associations between proximity to coal mining and higher cancer mortality, including cancer clusters that correspond to areas of high coal mining intensity). The Corps did not address any issues that may have stemmed from exposure through pathways other than drinking water.

Second, there is specific evidence in the health studies that treatment through municipal drinking water may not protect against the dangers caused by mining discharge. Those pathways include both inhalation and ingestion of microscopic nanoparticles as well as drinking water violations at community-based municipal treatment facilities in mountaintop removal areas. At least one study indicates that reliance on municipal drinking water in coal-mining areas is not a guarantee against health effects of mining discharges. J.A. 507.

39

## B. The Corps Public Interest Review Pursuant to 33 C.F.R. § 320.4(a)(1) Requires a Consideration of Health Studies.

The public interest review required by 33 C.F.R. § 320.4(a)(1) is a broad-based review that encompasses not only the "needs and welfare of the people" but also such things as "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land us, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership." 33 C.F.R. § 320.4(a)(1). Accordingly, this review requires consideration of far more than the immediate effects of the discharge of pollutants. It certainly requires consideration of the impacts of the authorized project on human health.

Importantly, elsewhere in its analysis of the permit the Corps exercised its authority over aspects of the entire mining operation. For one, it evaluated different upland mining configurations in order to determine the least damaging practical alternative. J.A. 540-47. The Corps further exercised its authority over the mining operation by imposing special conditions related to revegetation (Special Condition 14), protection of the federally endangered Indiana bat (Special Condition 16), and the protection of historic or archeological sites (Special Condition 17). J.A. 592-96. The Corps cannot argue that it lacks authority over mining operations when it exercised that authority when issuing this permit. The Corps' failure to consider

40

the potential human health consequences of its decision as part of its broader assessment violated NEPA.

## CONCLUSION

For all of the reasons described above, the Corps violated its obligation under both NEPA and the Clean Water Act when it authorized surface coal mining through streams at the Boone North mine without considering the negative human health effects of that mining. Plaintiffs-appellants respectfully request that the Court reverse the decision of the District Court upholding the Boone North permit and instruct the District Court to set the permit aside.

DATED:  January 15, 2015

Respectfully Submitted,

/s/ J. Michael Becher
Joseph M. Lovett
J. Michael Becher
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
*jlovett@appalmad.org*
*mbecher@appalmad.org*
304-382-4798

/s/ Peter Morgan
Peter Morgan
Sierra Club
1536 Wynkoop St, Ste. 312
Denver, CO 80202
*peter.morgan@sierraclub.org*
303-454-3367

*Counsel for Ohio Valley Environmental Coalition, West Virginia Highlands Conservancy, Coal River Mountain Watch, and Sierra Club*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  Excepting portions of the brief described in Fed. R. App. P. 32(A)(7)(B)(iii), the brief contains 10,038 words.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. Pl. 32(a)(6).  The brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2013 in Time New Roman, 14-point.

DATED:  January 15, 2015

/s/ J. Michael Becher
J. Michael Becher

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of October 2015, I have served the forgoing

Appellants' Opening Brief on all registered counsel through the Court's electronic

filing system (ECF).

<u>/s/ J. Michael Becher</u>
J. Michael Becher

**ADDENDUM OF STATUTES AND REGULATIONS**

**c**

**Effective: June 16, 2011**

West's Annotated Code of West Virginia Currentness
  Chapter 22. Environmental Resources
    Article 3. Surface Coal Mining and Reclamation Act (Refs & Annos)
      →→ **§ 22-3-8. Prohibition of surface mining without a permit; permit requirements; successor in interest; duration of permits; proof of insurance; termination of permits; permit fees**

(a) No person may engage in surface mining operations unless he or she has first obtained a permit from the secretary in accordance with the following:

(1) All permits issued pursuant to the requirements of this article shall be issued for a term not to exceed five years: *Provided,* That if the applicant demonstrates that a specified longer term is reasonably needed to allow the applicant to obtain necessary financing for equipment and the opening of the operation, and if the application is full and complete for the specified longer term, the secretary may extend a permit for a longer term: *Provided, however,* That subject to the prior approval of the secretary, with the approval being subject to the provisions of subsection (c), section eighteen of this article, a successor in interest to a permittee who applies for a new permit, or transfer of a permit, within thirty days of succeeding to the interest and who is able to obtain the bond coverage of the original permittee, may continue surface mining and reclamation operations according to the approved mining and reclamation plan of the original permittee until the successor's permit application or application for transfer is granted or denied.

(2) Proof of insurance is required on an annual basis.

(3) A permit terminates if the permittee has not commenced the surface mining operations covered by the permit within three years of the date the permit was issued: *Provided,* That the secretary may grant reasonable extensions of time upon a timely showing that the extensions are necessary by reason of litigation precluding commencement, or threatening substantial economic loss to the permittee, or by reason of conditions beyond the control and without the fault or negligence of the permittee: *Provided, however,* That with respect to coal to be mined for use in a synthetic fuel facility or specific major electric-generating facility, the permittee shall be considered to have commenced surface mining operations at the time the construction of the synthetic fuel or generating facility is initiated.

(4) Each application for a new surface mining permit filed pursuant to this article shall be accompanied by a fee of $3,500. All permit fees and renewal fees provided in this section or elsewhere in this article shall be collected by the secretary and deposited with the Treasurer of the State of West Virginia to the credit of the Operating Permit Fees Fund and shall be used, upon requisition of the secretary, for the administration of this article.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(5) Prior to the issuance of any permit, the secretary shall ascertain from the Commissioner of the Division of Labor whether the applicant is in compliance with section fourteen, article five, chapter twenty-one of this code. Upon issuance of the permit, the secretary shall forward a copy to the Commissioner of the Division of Labor, who shall assure continued compliance under the permit.

(6)(A) Prior to the issuance of any permit the secretary shall ascertain from the Executive Director of Workforce West Virginia and the Insurance Commissioner whether the applicant is in compliance with the provisions of section six-c, article two, chapter twenty-one-a of this code and section five, article two, chapter twenty-three of this code with regard to any required subscription to the Unemployment Compensation Fund or to the Workers' Compensation Fund, the payment of premiums and other charges to the fund, the timely filing of payroll reports and the maintenance of adequate deposits. If the applicant is delinquent or defaulted, or has been terminated by the executive director or the Insurance Commissioner, the permit may not be issued until the applicant returns to compliance or is restored by the executive director or the Insurance Commissioner under a reinstatement agreement: *Provided,* That in all inquiries the Executive Director of Workforce West Virginia and the Insurance Commissioner shall make response to the Department of Environmental Protection within fifteen calendar days; otherwise, failure to respond timely is considered to indicate the applicant is in compliance and the failure will not be used to preclude issuance of the permit.

(B) It is a requirement of this article that each operator maintain continued compliance with the provisions of section five, article two, chapter twenty-three of this code and section six-c, article two, chapter twenty-one-a of this code and provide proof of compliance to the secretary on a quarterly basis.

CREDIT(S)

Acts 1994, c. 61; Acts 1995, c. 253, eff. Feb. 10, 1995; Acts 2003, 2nd Ex. Sess., c. 27, eff. July 1, 2003; Acts 2009, c. 96, eff. July 2, 2009; Acts 2011, c. 166, eff. June 16, 2011.

Current with laws of the 2014 Second Extraordinary Session.

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Effective:[See Text Amendments]**

West's Annotated Code of West Virginia Currentness
   Chapter 22. Environmental Resources
      Article 3. Surface Coal Mining and Reclamation Act (Refs & Annos)
        **§ 22-3-9. Permit application requirements and contents**

(a) The surface-mining permit application shall contain:

(1) The names and addresses of: (A) The permit applicant; (B) the owner of record of the property, surface and mineral, to be mined; (C) the holders of record of any leasehold interest in the property; (D) any purchaser of record of the property under a real estate contract; (E) the operator, if different from the applicant; and (F) if any of these are business entities other than a single proprietor, the names and addresses of the principals, officers and resident agent;

(2) The names and addresses of the owners of record of all surface and subsurface areas contiguous to any part of the proposed permit area: Provided, That all residents living on property contiguous to the proposed permit area shall be notified by the applicant, by registered or certified mail, of such application on or before the first day of publication of the notice provided for in subdivision (6) of this subsection;

(3) A statement of any current surface-mining permits held by the applicant in the state and the permit number and each pending application;

(4) If the applicant is a partnership, corporation, association or other business entity, the following where applicable: The names and addresses of every officer, partner, resident agent, director or person performing a function similar to a director, together with the names and addresses of any person owning of record ten percent or more of any class of voting stock of the applicant; and a list of all names under which the applicant, officer, director, partner or principal shareholder previously operated a surface-mining operation in the United States within the five-year period preceding the date of submission of the application;

(5) A statement of whether the applicant, or any officer, partner, director, principal shareholder of the applicant, any subsidiary, affiliate or persons controlled by or under common control with the applicant, has ever been an officer, partner, director or principal shareholder in a company which has ever held a federal or state mining permit which in the five-year period prior to the date of submission of the application has been permanently suspended or revoked or has had a mining bond or similar security deposited in lieu of bond forfeited and, if so, a brief explanation of the facts involved;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(6) A copy of the applicant's advertisement to be published in a newspaper of general circulation in the locality of the proposed permit area at least once a week for four successive weeks. The advertisement shall contain in abbreviated form the information required by this section including the ownership and map of the tract location and boundaries of the proposed site so that the proposed operation is readily locatable by local residents, the location of the office of the division where the application is available for public inspection and stating that written protests will be accepted by the director until a certain date which is at least thirty days after the last publication of the applicant's advertisement;

(7) A description of the type and method of surface-mining operation that exists or is proposed, the engineering techniques used or proposed, and the equipment used or proposed to be used;

(8) The anticipated starting and termination dates of each phase of the surface-mining operation and the number of acres of land to be affected;

(9) A description of the legal documents upon which the applicant's legal right to enter and conduct surface-mining operations on the proposed permit area is based and whether that right is the subject of pending court litigation: Provided, That nothing in this article may be construed as vesting in the director the jurisdiction to adjudicate property-rights disputes;

(10) The name of the watershed and location of the surface stream or tributary into which surface and pit drainage will be discharged;

(11) A determination of the probable hydrologic consequences of the mining and reclamation operations, both on and off the mine site, with respect to the hydrologic regime, quantity and quality of water in surface and groundwater systems, including the dissolved and suspended solids under seasonal flow conditions and the collection of sufficient data for the mine site and surrounding areas so that an assessment can be made by the director of the probable cumulative impacts of all anticipated mining in the area upon the hydrology of the area, and particularly upon water availability: Provided, That this determination is not required until such time as hydrologic information on the general area prior to mining is made available from an appropriate federal or state agency or, if existing and in the possession of the applicant, from the applicant: Provided, however, That the permit application shall not be approved until the information is available and is incorporated into the application;

(12) Accurate maps to an appropriate scale clearly showing: (A) The land to be affected as of the date of application; (B) the area of land within the permit area upon which the applicant has the legal right to enter and conduct surface-mining operations; and (C) all types of information set forth on enlarged topographical maps of the United States geological survey of a scale of 1:24,000 or larger, including all man-made features and significant known archaeological sites existing on the date of application. In addition to other things specified by the director, the map shall show the boundary lines and names of present owners of record of all surface areas abutting the proposed permit area and the location of all structures within one thousand feet of the proposed permit area;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(13) Cross-section maps or plans of the proposed affected area, including the actual area to be mined, prepared by or under the direction of and certified by a person approved by the director, showing pertinent elevation and location of test borings or core samplings, where required by the director, and depicting the following information: (A) The nature and depth of the various strata or overburden; (B) the location of subsurface water, if encountered, and its quality; (C) the nature and thickness of any coal or rider seams above the seam to be mined; (D) the nature of the stratum immediately beneath the coal seam to be mined; (E) all mineral crop lines and the strike and dip of the coal to be mined, within the area of land to be affected; (F) existing or previous surface-mining limits; (G) the location and extent of known workings of any underground mines, including mine openings to the surface; (H) the location of any significant aquifers; (I) the estimated elevation of the water table; (J) the location of spoil, waste or refuse areas and topsoil preservation areas; (K) the location of all impoundments for waste or erosion control; (L) any settling or water treatment facility or drainage system; (M) constructed or natural drainways and the location of any discharges to any surface body of water on the area of land to be affected or adjacent thereto; and (N) adequate profiles at appropriate cross sections of the anticipated final surface configuration that will be achieved pursuant to the operator's proposed reclamation plan;

(14) A statement of the result of test borings or core samples from the permit area, including: (A) Logs of the drill holes; (B) the thickness of the coal seam to be mined and analysis of the chemical and physical properties of the coal; (C) the sulfur content of any coal seam; (D) chemical analysis of potentially acid or toxic forming sections of the overburden; and (E) chemical analysis of the stratum lying immediately underneath the coal to be mined: Provided, That the provisions of this subdivision may be waived by the director with respect to the specific application by a written determination that such requirements are unnecessary;

(15) For those lands in the permit application which a reconnaissance inspection suggests may be prime farmlands, a soil survey shall be made or obtained according to standards established by the secretary of agriculture in order to confirm the exact location of such prime farmlands;

(16) A reclamation plan as presented in section ten of this article;

(17) Information pertaining to coal seams, test borings, core samplings or soil samples as required by this section shall be made available to any person with an interest which is or may be adversely affected: Provided, That information which pertains only to the analysis of the chemical and physical properties of the coal, except information regarding mineral or elemental content which is potentially toxic to the environment, shall be kept confidential and not made a matter of public record;

(18) When requested by the director, the climatological factors that are peculiar to the locality of the land to be affected, including the average seasonal precipitation, the average direction and velocity of prevailing winds, and the seasonal temperature ranges; and

(19) Other information that may be required by rules reasonably necessary to effectuate the purposes of this article.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(b) If the director finds that the probable total annual production at all locations of any coal surface-mining operator will not exceed three hundred thousand tons, the determination of probable hydrologic consequences including the engineering analyses and designs necessary as required by this article or rules promulgated thereunder; the development of cross-section maps and plans as required by this article or rules promulgated thereunder; the geologic drilling and statement of results of test borings and core samplings as required by this article or rules promulgated thereunder; preblast surveys required by this article or rules promulgated thereunder; the collection of site-specific resource information and production of protection and enhancement plans for fish and wildlife habitats and other environmental values required by this article or rules promulgated thereunder; and the collection of archaeological and historical information required by this article and rules promulgated thereunder and any other archaeological and historical information required by the federal department of the interior and the preparation of plans that may be necessitated thereby shall, upon the written request of the operator, be performed by a qualified public or private laboratory designated by the director and a reasonable cost of the preparation of such determination and statement shall be assumed by the division from funds provided by the United States department of the interior pursuant to the federal Surface Mining Control and Reclamation Act of 1977, [FN1] as amended.

(c) Before the first publication of the applicant's advertisement, each applicant for a surface-mining permit shall file, except for that information pertaining to the coal seam itself, a copy of the application for public inspection in the nearest office of the division as specified in the applicant's advertisement.

(d) Each applicant for a permit shall be required to submit to the director as a part of the permit application a certificate issued by an insurance company authorized to do business in this state covering the surface-mining operation for which the permit is sought, or evidence that the applicant has satisfied state self-insurance requirements. The policy shall provide for personal injury and property damage protection in an amount adequate to compensate any persons damaged as a result of surface coal mining and reclamation operations, including use of explosives, and entitled to compensation under the applicable provisions of state law. The policy shall be maintained in full force and effect during the terms of the permit or any renewal, including the length of all reclamation operations.

(e) Each applicant for a surface-mining permit shall submit to the director as part of the permit application a blasting plan where explosives are to be used, which shall outline the procedures and standards by which the operator will meet the provisions of the blasting performance standards.

(f) The applicant shall file as part of the permit application a schedule listing all notices of violation, bond forfeitures, permit revocations, cessation orders or permanent suspension orders resulting from a violation of the federal Surface Mining Control and Reclamation Act of 1977, as amended, this article or any law or regulation of the United States or any department or agency of any state pertaining to air or environmental protection received by the applicant in connection with any surface-mining operation during the three-year period prior to the date of application, and indicating the final resolution of any notice of violation, forfeiture, revocation, cessation or permanent suspension.

(g) Within five working days of receipt of an application for a permit, the director shall notify the operator in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

writing, stating whether the application is administratively complete and whether the operator's advertisement may be published. If the application is not administratively complete, the director shall state in writing why the application is not administratively complete.


CREDIT(S)

Acts 1994, c. 61.

    [FN1] 30 U.S.C.A. § 1201 et seq.

Current with laws of the 2014 Second Extraordinary Session.

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT



**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 33. Navigation and Navigable Waters (Refs & Annos)
     Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter IV. Permits and Licenses (Refs & Annos)
       → → § 1341. Certification

(a) Compliance with applicable requirements; application; procedures; license suspension

**(1)** Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

**(2)** Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirements in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such a hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such agency, based upon the recommendations of such State, the Administrator, and upon any additional evidence, if

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

any, presented to the agency at the hearing, shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

**(3)** The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or permit, the State, or if appropriate, the interstate agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(4)** Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the operation of any such federally licensed or permitted facility or activity will violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is received from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(5)** Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

**(6)** Except with respect to a permit issued under section 1342 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the per-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

son having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

**(b) Compliance with other provisions of law setting applicable water quality requirements**

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

**(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees**

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

**(d) Limitations and monitoring requirements of certification**

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

CREDIT(S)

(June 30, 1948, c. 758, Title IV, § 401, as added Oct. 18, 1972, Pub.L. 92-500, § 2, 86 Stat. 877; amended Dec. 27, 1977, Pub.L. 95-217, §§ 61(b), 64, 91 Stat. 1598, 1599.)

Current through P.L. 113-234 approved 12-16-2014

Westlaw. (C) 2015 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

**Effective: February 7, 2014**

United States Code Annotated Currentness
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter IV. Permits and Licenses (Refs & Annos)
      → → **§ 1342. National pollutant discharge elimination system**

(a) Permits for discharge of pollutants

**(1)** Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

**(2)** The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

**(3)** The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

**(4)** All permits for discharges into the navigable waters issued pursuant to section 407 of this title shall be deemed to be permits issued under this subchapter, and permits issued under this subchapter shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

**(5)** No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objective of this chapter to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(i)(2) of this title, or the date of approval by the Administrator of a permit

program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

(b) State permit programs

At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each such submitted program unless he determines that adequate authority does not exist:

**(1)** To issue permits which--

**(A)** apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

**(B)** are for fixed terms not exceeding five years; and

**(C)** can be terminated or modified for cause including, but not limited to, the following:

**(i)** violation of any condition of the permit;

**(ii)** obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

**(iii)** change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

**(D)** control the disposal of pollutants into wells;

**(2)(A)** To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or

**(B)** To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

title;

**(3)** To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

**(4)** To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

**(5)** To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

**(6)** To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

**(7)** To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

**(8)** To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to assure compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

**(9)** To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

(c) Suspension of Federal program upon submission of State program; withdrawal of approval of State program; return of State program to Administrator

**(1)** Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pur-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

suant to subsection (b) of this section, the Administrator shall suspend the issuance of permits under subsection (a) of this section as to those discharges subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this section or does not conform to the guidelines issued under section 1314(i)(2) of this title. If the Administrator so determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

**(2)** Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated pursuant to section 1314(i)(2) of this title.

**(3)** Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program. The Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

**(4) Limitations on partial permit program returns and withdrawals**

A State may return to the Administrator administration, [FN1] and the Administrator may withdraw under paragraph (3) of this subsection approval, of--

**(A)** a State partial permit program approved under subsection (n)(3) of this section only if the entire permit program being administered by the State department or agency at the time is returned or withdrawn; and

**(B)** a State partial permit program approved under subsection (n)(4) of this section only if an entire phased component of the permit program being administered by the State at the time is returned or withdrawn.

(d) Notification of Administrator

**(1)** Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

**(2)** No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter. Whenever the Administrator objects to the issuance of a permit under this paragraph such written objection shall contain a statement of the reasons for such objection and the effluent limitations and conditions which such permit would include if it were issued by the Administrator.

**(3)** The Administrator may, as to any permit application, waive paragraph (2) of this subsection.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Appeal: 14-2129    Doc: 23    Filed: 01/15/2015    Pg: 66 of 112

**(4)** In any case where, after December 27, 1977, the Administrator, pursuant to paragraph (2) of this subsection, objects to the issuance of a permit, on request of the State, a public hearing shall be held by the Administrator on such objection. If the State does not resubmit such permit revised to meet such objection within 30 days after completion of the hearing, or, if no hearing is requested within 90 days after the date of such objection, the Administrator may issue the permit pursuant to subsection (a) of this section for such source in accordance with the guidelines and requirements of this chapter.

**(e) Waiver of notification requirement**

In accordance with guidelines promulgated pursuant to subsection (i)(2) of section 1314 of this title, the Administrator is authorized to waive the requirements of subsection (d) of this section at the time he approves a program pursuant to subsection (b) of this section for any category (including any class, type, or size within such category) of point sources within the State submitting such program.

**(f) Point source categories**

The Administrator shall promulgate regulations establishing categories of point sources which he determines shall not be subject to the requirements of subsection (d) of this section in any State with a program approved pursuant to subsection (b) of this section. The Administrator may distinguish among classes, types, and sizes within any category of point sources.

**(g) Other regulations for safe transportation, handling, carriage, storage, and stowage of pollutants**

Any permit issued under this section for the discharge of pollutants into the navigable waters from a vessel or other floating craft shall be subject to any applicable regulations promulgated by the Secretary of the department in which the Coast Guard is operating, establishing specifications for safe transportation, handling, carriage, storage, and stowage of pollutants.

**(h) Violation of permit conditions; restriction or prohibition upon introduction of pollutant by source not previously utilizing treatment works**

In the event any condition of a permit for discharges from a treatment works (as defined in section 1292 of this title) which is publicly owned is violated, a State with a program approved under subsection (b) of this section or the Administrator, where no State program is approved or where the Administrator determines pursuant to section 1319(a) of this title that a State with an approved program has not commenced appropriate enforcement action with respect to such permit, may proceed in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated.

**(i) Federal enforcement not limited**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

(j) Public information

A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction.

(k) Compliance with permits

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health. Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 1311, 1316, or 1342 of this title, or (2) section 407 of this title, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. For the 180-day period beginning on October 18, 1972, in the case of any point source discharging any pollutant or combination of pollutants immediately prior to such date which source is not subject to section 407 of this title, the discharge by such source shall not be a violation of this chapter if such a source applies for a permit for discharge pursuant to this section within such 180-day period.

(l) Limitation on permit requirement

(1) Agricultural return flows

The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit.

(2) Stormwater runoff from oil, gas, and mining operations

The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

products, finished product, byproduct, or waste products located on the site of such operations.

(3) Silvicultural activities

(A) NPDES permit requirements for silvicultural activities

The Administrator shall not require a permit under this section nor directly or indirectly require any State to require a permit under this section for a discharge from runoff resulting from the conduct of the following silviculture activities conducted in accordance with standard industry practice: nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance.

(B) Other requirements

Nothing in this paragraph exempts a discharge from silvicultural activity from any permitting requirement under section 1344 of this title, existing permitting requirements under section 1342 of this title, or from any other federal law.

(C) The authorization provided in Section [FN2] 1365(a) of this title does not apply to any non-permitting program established under 1342(p)(6) [FN3] of this title for the silviculture activities listed in 1342(l)(3)(A) [FN4] of this title, or to any other limitations that might be deemed to apply to the silviculture activities listed in 1342(l)(3)(A) [FN4] of this title.

(m) Additional pretreatment of conventional pollutants not required

To the extent a treatment works (as defined in section 1292 of this title) which is publicly owned is not meeting the requirements of a permit issued under this section for such treatment works as a result of inadequate design or operation of such treatment works, the Administrator, in issuing a permit under this section, shall not require pretreatment by a person introducing conventional pollutants identified pursuant to section 1314(a)(4) of this title into such treatment works other than pretreatment required to assure compliance with pretreatment standards under subsection (b)(8) of this section and section 1317(b)(1) of this title. Nothing in this subsection shall affect the Administrator's authority under sections 1317 and 1319 of this title, affect State and local authority under sections 1317(b)(4) and 1370 of this title, relieve such treatment works of its obligations to meet requirements established under this chapter, or otherwise preclude such works from pursuing whatever feasible options are available to meet its responsibility to comply with its permit under this section.

(n) Partial permit program

(1) State submission

The Governor of a State may submit under subsection (b) of this section a permit program for a portion of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

discharges into the navigable waters in such State.

(2) Minimum coverage

A partial permit program under this subsection shall cover, at a minimum, administration of a major category of the discharges into the navigable waters of the State or a major component of the permit program required by subsection (b) of this section.

(3) Approval of major category partial permit programs

The Administrator may approve a partial permit program covering administration of a major category of discharges under this subsection if--

    **(A)** such program represents a complete permit program and covers all of the discharges under the jurisdiction of a department or agency of the State; and

    **(B)** the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b) of this section.

(4) Approval of major component partial permit programs

The Administrator may approve under this subsection a partial and phased permit program covering administration of a major component (including discharge categories) of a State permit program required by subsection (b) of this section if--

    **(A)** the Administrator determines that the partial program represents a significant and identifiable part of the State program required by subsection (b) of this section; and

    **(B)** the State submits, and the Administrator approves, a plan for the State to assume administration by phases of the remainder of the State program required by subsection (b) of this section by a specified date not more than 5 years after submission of the partial program under this subsection and agrees to make all reasonable efforts to assume such administration by such date.

(o) Anti-backsliding

(1) General prohibition

In the case of effluent limitations established on the basis of subsection (a)(1)(B) of this section, a permit may

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

not be renewed, reissued, or modified on the basis of effluent guidelines promulgated under section 1314(b) of this title subsequent to the original issuance of such permit, to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit. In the case of effluent limitations established on the basis of section 1311(b)(1)(C) or section 1313(d) or (e) of this title, a permit may not be renewed, reissued, or modified to contain effluent limitations which are less stringent than the comparable effluent limitations in the previous permit except in compliance with section 1313(d)(4) of this title.

(2) Exceptions

A permit with respect to which paragraph (1) applies may be renewed, reissued, or modified to contain a less stringent effluent limitation applicable to a pollutant if--

**(A)** material and substantial alterations or additions to the permitted facility occurred after permit issuance which justify the application of a less stringent effluent limitation;

**(B)(i)** information is available which was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and which would have justified the application of a less stringent effluent limitation at the time of permit issuance; or

**(ii)** the Administrator determines that technical mistakes or mistaken interpretations of law were made in issuing the permit under subsection (a)(1)(B) of this section;

**(C)** a less stringent effluent limitation is necessary because of events over which the permittee has no control and for which there is no reasonably available remedy;

**(D)** the permittee has received a permit modification under section 1311(c), 1311(g), 1311(h), 1311(i), 1311(k), 1311(n), or 1326(a) of this title; or

**(E)** the permittee has installed the treatment facilities required to meet the effluent limitations in the previous permit and has properly operated and maintained the facilities but has nevertheless been unable to achieve the previous effluent limitations, in which case the limitations in the reviewed, reissued, or modified permit may reflect the level of pollutant control actually achieved (but shall not be less stringent than required by effluent guidelines in effect at the time of permit renewal, reissuance, or modification).

Subparagraph (B) shall not apply to any revised waste load allocations or any alternative grounds for translating water quality standards into effluent limitations, except where the cumulative effect of such revised allocations results in a decrease in the amount of pollutants discharged into the concerned waters, and such revised allocations are not the result of a discharger eliminating or substantially reducing its discharge of pollutants due to complying with the requirements of this chapter or for reasons otherwise unrelated to water quality.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(3) Limitations

In no event may a permit with respect to which paragraph (1) applies be renewed, reissued, or modified to contain an effluent limitation which is less stringent than required by effluent guidelines in effect at the time the permit is renewed, reissued, or modified. In no event may such a permit to discharge into waters be renewed, reissued, or modified to contain a less stringent effluent limitation if the implementation of such limitation would result in a violation of a water quality standard under section 1313 of this title applicable to such waters.

(p) Municipal and industrial stormwater discharges

(1) General rule

Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under this section) shall not require a permit under this section for discharges composed entirely of stormwater.

(2) Exceptions

Paragraph (1) shall not apply with respect to the following stormwater discharges:

**(A)** A discharge with respect to which a permit has been issued under this section before February 4, 1987.

**(B)** A discharge associated with industrial activity.

**(C)** A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

**(D)** A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

**(E)** A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

(3) Permit requirements

(A) Industrial discharges

Permits for discharges associated with industrial activity shall meet all applicable provisions of this section

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and section 1311 of this title.

(B) Municipal discharge

Permits for discharges from municipal storm sewers--

    **(i)** may be issued on a system- or jurisdiction-wide basis;

    **(ii)** shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

    **(iii)** shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

(4) Permit application requirements

    (A) Industrial and large municipal discharges

Not later than 2 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after February 4, 1987. Not later than 4 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

    (B) Other municipal discharges

Not later than 4 years after February 4, 1987, the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after February 4, 1987. Not later than 6 years after February 4, 1987, the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

(5) Studies

The Administrator, in consultation with the States, shall conduct a study for the purposes of--

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(A)** identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

**(B)** determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

**(C)** establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

(6) Regulations

Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate.

(q) Combined sewer overflows

(1) Requirement for permits, orders, and decrees

Each permit, order, or decree issued pursuant to this chapter after December 21, 2000 for a discharge from a municipal combined storm and sanitary sewer shall conform to the Combined Sewer Overflow Control Policy signed by the Administrator on April 11, 1994 (in this subsection referred to as the "CSO control policy").

(2) Water quality and designated use review guidance

Not later than July 31, 2001, and after providing notice and opportunity for public comment, the Administrator shall issue guidance to facilitate the conduct of water quality and designated use reviews for municipal combined sewer overflow receiving waters.

(3) Report

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not later than September 1, 2001, the Administrator shall transmit to Congress a report on the progress made by the Environmental Protection Agency, States, and municipalities in implementing and enforcing the CSO control policy.

**(r) Discharges incidental to the normal operation of recreational vessels**

No permit shall be required under this chapter by the Administrator (or a State, in the case of a permit program approved under subsection (b)) for the discharge of any graywater, bilge water, cooling water, weather deck run-off, oil water separator effluent, or effluent from properly functioning marine engines, or any other discharge that is incidental to the normal operation of a vessel, if the discharge is from a recreational vessel.

**CREDIT(S)**

(June 30, 1948, c. 758, Title IV, § 402, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 880; amended Pub.L. 95-217, §§ 33(c), 50, 54(c)(1), 65, 66, Dec. 27, 1977, 91 Stat. 1577, 1588, 1591, 1599, 1600; Pub.L. 100-4, Title IV, §§ 401 to 404(a), (c), formerly (d), 405, Feb. 4, 1987, 101 Stat. 65 to 67, 69; Pub.L. 102-580, Title III, § 364, Oct. 31, 1992, 106 Stat. 4862; Pub.L. 104-66, Title II, § 2021(e)(2), Dec. 21, 1995, 109 Stat. 727; Pub.L. 106-554, § 1(a)(4) [Div. B, Title I, § 112(a)], Dec. 21, 2000, 114 Stat. 2763, 2763A-224; Pub.L. 110-288, § 2, July 29, 2008, 122 Stat. 2650; Pub.L. 113-79, Title XII, § 12313, Feb. 7, 2014, 128 Stat. 992.)

[FN1] So in original.

[FN2] So in original. Probably should not be capitalized.

[FN3] So in original. Probably should read "section 1342(p)(6)".

[FN4] So in original. Probably should read "section 1342(l)(3)(A)".

Current through P.L. 113-234 approved 12-16-2014

Westlaw. (C) 2015 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

c

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
 Title 33. Navigation and Navigable Waters
  Chapter II. Corps of Engineers, Department
  of the Army
   Part 320. General Regulatory Policies
   (Refs & Annos)
   → **§ 320.4 General policies for evaluating permit applications.**

The following policies shall be applicable to the review of all applications for DA permits. Additional policies specifically applicable to certain types of activities are identified in 33 CFR parts 321 through 324.

(a) Public Interest Review.

(1) The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, eco-

nomics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people. For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines. Subject to the preceding sentence and any other applicable guidelines and criteria (see §§ 320.2 and 320.3), a permit will be granted unless the district engineer determines that it would be contrary to the public interest.

(2) The following general criteria will be considered in the evaluation of every application:

(i) The relative extent of the public and private need for the proposed structure or work:

(ii) Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and

(iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited.

(3) The specific weight of each factor is determined by its importance and relevance to the particular proposal. Accordingly, how import-

ant a factor is and how much consideration it deserves will vary with each proposal. A specific factor may be given great weight on one proposal, while it may not be present or as important on another. However, full consideration and appropriate weight will be given to all comments, including those of federal, state, and local agencies, and other experts on matters within their expertise.

(b) Effect on wetlands.

(1) Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest. For projects to be undertaken or partially or entirely funded by a federal, state, or local agency, additional requirements on wetlands considerations are stated in Executive Order 11990, dated 24 May 1977.

(2) Wetlands considered to perform functions important to the public interest include:

(i) Wetlands which serve significant natural biological functions, including food chain production, general habitat and nesting, spawning, rearing and resting sites for aquatic or land species;

(ii) Wetlands set aside for study of the aquatic environment or as sanctuaries or refuges;

(iii) Wetlands the destruction or alteration of which would affect detrimentally natural drainage characteristics, sedimentation patterns, salinity distribution, flushing characteristics, current patterns, or other environmental characteristics;

(iv) Wetlands which are significant in shielding other areas from wave action, erosion, or storm damage. Such wetlands are often associated with barrier beaches, islands, reefs and bars;

(v) Wetlands which serve as valuable storage areas for storm and flood waters;

(vi) Wetlands which are ground water discharge areas that maintain minimum baseflows important to aquatic resources and those which are prime natural recharge areas;

(vii) Wetlands which serve significant water purification functions; and

(viii) Wetlands which are unique in nature or scarce in quantity to the region or local area.

(3) Although a particular alteration of a wetland may constitute a minor change, the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources. Thus, the particular wetland site for which an application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area. In addition, the district engineer may undertake, where appropriate, reviews of particular wetland areas in consultation with the Regional Director of the U.S. Fish and Wildlife Service, the Regional Director of the National Marine Fisheries Service of the National Oceanic and Atmospheric Administration, the Regional Administrator of the Environmental Protection Agency, the local representative of the Soil Conservation Service of the Department of Agriculture, and the head of the appropriate state agency to assess the cumulative effect of activities in such areas.

(4) No permit will be granted which involves

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the alteration of wetlands identified as important by paragraph (b)(2) of this section or because of provisions of paragraph (b)(3), of this section unless the district engineer concludes, on the basis of the analysis required in paragraph (a) of this section, that the benefits of the proposed alteration outweigh the damage to the wetlands resource. In evaluating whether a particular discharge activity should be permitted, the district engineer shall apply the section 404(b)(1) guidelines (40 CFR part 230.10(a)(1), (2), (3)).

(5) In addition to the policies expressed in this subpart, the Congressional policy expressed in the Estuary Protection Act, Pub.L. 90–454, and state regulatory laws or programs for classification and protection of wetlands will be considered.

(c) Fish and wildlife. In accordance with the Fish and Wildlife Coordination Act (paragraph 320.3(e) of this section) district engineers will consult with the Regional Director, U.S. Fish and Wildlife Service, the Regional Director, National Marine Fisheries Service, and the head of the agency responsible for fish and wildlife for the state in which work is to be performed, with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application. The Army will give full consideration to the views of those agencies on fish and wildlife matters in deciding on the issuance, denial, or conditioning of individual or general permits.

(d) Water quality. Applications for permits for activities which may adversely affect the quality of waters of the United States will be evaluated for compliance with applicable effluent limitations and water quality standards, during the construction and subsequent operation of the proposed activity. The evaluation should include the consideration of both point and non-point sources of pollution. It should be noted, however, that the Clean Water Act assigns responsibility for control of non-point sources of pollution to the states. Certification of compliance with applicable effluent limitations and water quality standards required under provisions of section 401 of the Clean Water Act will be considered conclusive with respect to water quality considerations unless the Regional Administrator, Environmental Protection Agency (EPA), advises of other water quality aspects to be taken into consideration.

(e) Historic, cultural, scenic, and recreational values. Applications for DA permits may involve areas which possess recognized historic, cultural, scenic, conservation, recreational or similar values. Full evaluation of the general public interest requires that due consideration be given to the effect which the proposed structure or activity may have on values such as those associated with wild and scenic rivers, historic properties and National Landmarks, National Rivers, National Wilderness Areas, National Seashores, National Recreation Areas, National Lakeshores, National Parks, National Monuments, estuarine and marine sanctuaries, archeological resources, including Indian religious or cultural sites, and such other areas as may be established under federal or state law for similar and related purposes. Recognition of those values is often reflected by state, regional, or local land use classifications, or by similar federal controls or policies. Action on permit applications should, insofar as possible, be consistent with, and avoid significant adverse effects on the values or purposes for which those classifications, controls, or policies were established.

(f) Effects on limits of the territorial sea. Structures or work affecting coastal waters may modify the coast line or base line from which the territorial sea is measured for purposes of the Submerged Lands Act and international law. Generally, the coast line or base line is the line of ordinary low water on the mainland; however, there are exceptions where

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

there are islands or lowtide elevations offshore (the Submerged Lands Act, 43 U.S.C. 1301(a) and United States v. California, 381 U.S.C. 139 (1965), 382 U.S. 448 (1966)). Applications for structures or work affecting coastal waters will therefore be reviewed specifically to determine whether the coast line or base line might be altered. If it is determined that such a change might occur, coordination with the Attorney General and the Solicitor of the Department of the Interior is required before final action is taken. The district engineer will submit a description of the proposed work and a copy of the plans to the Solicitor, Department of the Interior, Washington, DC 20240, and request his comments concerning the effects of the proposed work on the outer continental rights of the United States. These comments will be included in the administrative record of the application. After completion of standard processing procedures, the record will be forwarded to the Chief of Engineers. The decision on the application will be made by the Secretary of the Army after coordination with the Attorney General.

(g) Consideration of property ownership. Authorization of work or structures by DA does not convey a property right, nor authorize any injury to property or invasion of other rights.

(1) An inherent aspect of property ownership is a right to reasonable private use. However, this right is subject to the rights and interests of the public in the navigable and other waters of the United States, including the federal navigation servitude and federal regulation for environmental protection.

(2) Because a landowner has the general right to protect property from erosion, applications to erect protective structures will usually receive favorable consideration. However, if the protective structure may cause damage to the property of others, adversely affect public health and safety, adversely impact floodplain or wetland values, or otherwise appears contrary to the public interest, the district engineer will so advise the applicant and inform him of possible alternative methods of protecting his property. Such advice will be given in terms of general guidance only so as not to compete with private engineering firms nor require undue use of government resources.

(3) A riparian landowner's general right of access to navigable waters of the United States is subject to the similar rights of access held by nearby riparian landowners and to the general public's right of navigation on the water surface. In the case of proposals which create undue interference with access to, or use of, navigable waters, the authorization will generally be denied.

(4) Where it is found that the work for which a permit is desired is in navigable waters of the United States (see 33 CFR part 329) and may interfere with an authorized federal project, the applicant should be apprised in writing of the fact and of the possibility that a federal project which may be constructed in the vicinity of the proposed work might necessitate its removal or reconstruction. The applicant should also be informed that the United States will in no case be liable for any damage or injury to the structures or work authorized by Sections 9 or 10 of the Rivers and Harbors Act of 1899 or by section 404 of the Clean Water Act which may be caused by, or result from, future operations undertaken by the Government for the conservation or improvement of navigation or for other purposes, and no claims or right to compensation will accrue from any such damage.

(5) Proposed activities in the area of a federal project which exists or is under construction will be evaluated to insure that they are compatible with the purposes of the project.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(6) A DA permit does not convey any property rights, either in real estate or material, or any exclusive privileges. Furthermore, a DA permit does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws or regulations. The applicant's signature on an application is an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application. The district engineer will not enter into disputes but will remind the applicant of the above. The dispute over property ownership will not be a factor in the Corps public interest decision.

(h) Activities affecting coastal zones. Applications for DA permits for activities affecting the coastal zones of those states having a coastal zone management program approved by the Secretary of Commerce will be evaluated with respect to compliance with that program. No permit will be issued to a non-federal applicant until certification has been provided that the proposed activity complies with the coastal zone management program and the appropriate state agency has concurred with the certification or has waived its right to do so. However, a permit may be issued to a non-federal applicant if the Secretary of Commerce, on his own initiative or upon appeal by the applicant, finds that the proposed activity is consistent with the objectives of the Coastal Zone Management Act of 1972 or is otherwise necessary in the interest of national security. Federal agency and Indian tribe applicants for DA permits are responsible for complying with the Coastal Zone Management Act's directives for assuring that their activities directly affecting the coastal zone are consistent, to the maximum extent practicable, with approved state coastal zone management programs.

(i) Activities in marine sanctuaries. Applications for DA authorization for activities in a marine sanctuary established by the Secretary of Commerce under authority of section 302 of the Marine Protec-

tion, Research and Sanctuaries Act of 1972, as amended, will be evaluated for impact on the marine sanctuary. No permit will be issued until the applicant provides a certification from the Secretary of Commerce that the proposed activity is consistent with the purposes of Title III of the Marine Protection, Research and Sanctuaries Act of 1972, as amended, and can be carried out within the regulations promulgated by the Secretary of Commerce to control activities within the marine sanctuary.

(j) Other Federal, state, or local requirements.

(1) Processing of an application for a DA permit normally will proceed concurrently with the processing of other required Federal, state, and/or local authorizations or certifications. Final action on the DA permit will normally not be delayed pending action by another Federal, state or local agency (See 33 CFR 325.2 (d)(4)). However, where the required Federal, state and/or local authorization and/or certification has been denied for activities which also require a Department of the Army permit before final action has been taken on the Army permit application, the district engineer will, after considering the likelihood of subsequent approval of the other authorization and/or certification and the time and effort remaining to complete processing the Army permit application, either immediately deny the Army permit without prejudice or continue processing the application to a conclusion. If the district engineer continues processing the application, he will conclude by either denying the permit as contrary to the public interest, or denying it without prejudice indicating that except for the other Federal, state or local denial the Army permit could, under appropriate conditions, be issued. Denial without prejudice means that there is no prejudice to the right of the applicant to reinstate processing of the Army permit application if subsequent approval is received from the appropriate Federal, state and/or local

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

agency on a previously denied authorization and/or certification. Even if official certification and/or authorization is not required by state or federal law, but a state, regional, or local agency having jurisdiction or interest over the particular activity comments on the application, due consideration shall be given to those official views as a reflection of local factors of the public interest.

(2) The primary responsibility for determining zoning and land use matters rests with state, local and tribal governments. The district engineer will normally accept decisions by such governments on those matters unless there are significant issues of overriding national importance. Such issues would include but are not necessarily limited to national security, navigation, national economic development, water quality, preservation of special aquatic areas, including wetlands, with significant interstate importance, and national energy needs. Whether a factor has overriding importance will depend on the degree of impact in an individual case.

(3) A proposed activity may result in conflicting comments from several agencies within the same state. Where a state has not designated a single responsible coordinating agency, district engineers will ask the Governor to express his views or to designate one state agency to represent the official state position in the particular case.

(4) In the absence of overriding national factors of the public interest that may be revealed during the evaluation of the permit application, a permit will generally be issued following receipt of a favorable state determination provided the concerns, policies, goals, and requirements as expressed in 33 CFR parts 320–324, and the applicable statutes have been

considered and followed: e.g., the National Environmental Policy Act; the Fish and Wildlife Coordination Act; the Historical and Archeological Preservation Act; the National Historic Preservation Act; the Endangered Species Act; the Coastal Zone Management Act; the Marine Protection, Research and Sanctuaries Act of 1972, as amended; the Clean Water Act, the Archeological Resources Act, and the American Indian Religious Freedom Act. Similarly, a permit will generally be issued for Federal and Federally-authorized activities; another federal agency's determination to proceed is entitled to substantial consideration in the Corps' public interest review.

(5) Where general permits to avoid duplication are not practical, district engineers shall develop joint procedures with those local, state, and other Federal agencies having ongoing permit programs for activities also regulated by the Department of the Army. In such cases, applications for DA permits may be processed jointly with the state or other federal applications to an independent conclusion and decision by the district engineer and the appropriate Federal or state agency. (See 33 CFR 325.2(e).)

(6) The district engineer shall develop operating procedures for establishing official communications with Indian Tribes within the district. The procedures shall provide for appointment of a tribal representative who will receive all pertinent public notices, and respond to such notices with the official tribal position on the proposed activity. This procedure shall apply only to those tribes which accept this option. Any adopted operating procedures shall be distributed by public notice to inform the tribes of this option.

(k) Safety of impoundment structures. To insure that all impoundment structures are designed for

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

safety, non-Federal applicants may be required to demonstrate that the structures comply with established state dam safety criteria or have been designed by qualified persons and, in appropriate cases, that the design has been independently reviewed (and modified as the review would indicate) by similarly qualified persons.

(l) Floodplain management.

(1) Floodplains possess significant natural values and carry out numerous functions important to the public interest. These include:

(i) Water resources values (natural moderation of floods, water quality maintenance, and groundwater recharge);

(ii) Living resource values (fish, wildlife, and plant resources);

(iii) Cultural resource values (open space, natural beauty, scientific study, outdoor education, and recreation); and

(iv) Cultivated resource values (agriculture, aquaculture, and forestry).

(2) Although a particular alteration to a floodplain may constitute a minor change, the cumulative impact of such changes may result in a significant degradation of floodplain values and functions and in increased potential for harm to upstream and downstream activities. In accordance with the requirements of Executive Order 11988, district engineers, as part of their public interest review, should avoid to the extent practicable, long and short term significant adverse impacts associated with the occupancy and modification of floodplains, as well as the direct and indirect support of floodplain development whenever there is a practicable alternative. For those activities which in the public interest must occur in or impact upon floodplains, the district engineer shall ensure, to the maximum extent practicable, that the impacts of potential flooding on human health, safety, and welfare are minimized, the risks of flood losses are minimized, and, whenever practicable the natural and beneficial values served by floodplains are restored and preserved.

(3) In accordance with Executive Order 11988, the district engineer should avoid authorizing floodplain developments whenever practicable alternatives exist outside the floodplain. If there are no such practicable alternatives, the district engineer shall consider, as a means of mitigation, alternatives within the floodplain which will lessen any significant adverse impact to the floodplain.

(m) Water supply and conservation. Water is an essential resource, basic to human survival, economic growth, and the natural environment. Water conservation requires the efficient use of water resources in all actions which involve the significant use of water or that significantly affect the availability of water for alternative uses including opportunities to reduce demand and improve efficiency in order to minimize new supply requirements. Actions affecting water quantities are subject to Congressional policy as stated in section 101(g) of the Clean Water Act which provides that the authority of states to allocate water quantities shall not be superseded, abrogated, or otherwise impaired.

(n) Energy conservation and development. Energy conservation and development are major national objectives. District engineers will give high priority to the processing of permit actions involving energy projects.

(o) Navigation.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1) Section 11 of the Rivers and Harbors Act of 1899 authorized establishment of harbor lines shoreward of which no individual permits were required. Because harbor lines were established on the basis of navigation impacts only, the Corps of Engineers published a regulation on 27 May 1970 (33 CFR 209.150) which declared that permits would thereafter be required for activities shoreward of the harbor lines. Review of applications would be based on a full public interest evaluation and harbor lines would serve as guidance for assessing navigation impacts. Accordingly, activities constructed shoreward of harbor lines prior to 27 May 1970 do not require specific authorization.

(2) The policy of considering harbor lines as guidance for assessing impacts on navigation continues.

(3) Protection of navigation in all navigable waters of the United States continues to be a primary concern of the federal government.

(4) District engineers should protect navigational and anchorage interests in connection with the NPDES program by recommending to EPA or to the state, if the program has been delegated, that a permit be denied unless appropriate conditions can be included to avoid any substantial impairment of navigation and anchorage.

(p) Environmental benefits. Some activities that require Department of the Army permits result in beneficial effects to the quality of the environment. The district engineer will weigh these benefits as well as environmental detriments along with other factors of the public interest.

(q) Economics. When private enterprise makes application for a permit, it will generally be assumed that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place. However, the district engineer in appropriate cases, may make an independent review of the need for the project from the perspective of the overall public interest. The economic benefits of many projects are important to the local community and contribute to needed improvements in the local economic base, affecting such factors as employment, tax revenues, community cohesion, community services, and property values. Many projects also contribute to the National Economic Development (NED), (i.e., the increase in the net value of the national output of goods and services).

(r) Mitigation. [FN1]

(1) Mitigation is an important aspect of the review and balancing process on many Department of the Army permit applications. Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses. Losses will be avoided to the extent practicable. Compensation may occur on-site or at an off-site location. Mitigation requirements generally fall into three categories.

[1] This is a general statement of mitigation policy which applies to all Corps of Engineers regulatory authorities covered by these regulations (33 CFR parts 320–330). It is not a substitute for the mitigation requirements necessary to ensure that a permit action under section 404 of the Clean Water Act complies with the section 404(b)(1) Guidelines. There is currently an interagency Working Group formed to develop guidance on implementing mitigation requirements of the Guidelines.

(i) Project modifications to minimize adverse

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

project impacts should be discussed with the applicant at pre-application meetings and during application processing. As a result of these discussions and as the district engineer's evaluation proceeds, the district engineer may require minor project modifications. Minor project modifications are those that are considered feasible (cost, constructability, etc.) to the applicant and that, if adopted, will result in a project that generally meets the applicant's purpose and need. Such modifications can include reductions in scope and size; changes in construction methods, materials or timing; and operation and maintenance practices or other similar modifications that reflect a sensitivity to environmental quality within the context of the work proposed. For example, erosion control features could be required on a fill project to reduce sedimentation impacts or a pier could be reoriented to minimize navigational problems even though those projects may satisfy all legal requirements (paragraph (r)(1)(ii) of this section) and the public interest review test (paragraph (r)(1)(iii) of this section) without such modifications.

(ii) Further mitigation measures may be required to satisfy legal requirements. For Section 404 applications, mitigation shall be required to ensure that the project complies with the 404(b)(1) Guidelines. Some mitigation measures are enumerated at 40 CFR 230.70 through 40 CFR 230.77 (Subpart H of the 404(b)(1) Guidelines).

(iii) Mitigation measures in addition to those under paragraphs (r)(1)(i) and (ii) of this section may be required as a result of the public interest review process. (See 33 CFR 325.4(a).) Mitigation should be developed and incorporated within the public interest review process to the extent that the mitigation is found by the district engineer to be reasonable and justified. Only those measures required to ensure that the

project is not contrary to the public interest may be required under this subparagraph.

(2) All compensatory mitigation will be for significant resource losses which are specifically identifiable, reasonably likely to occur, and of importance to the human or aquatic environment. Also, all mitigation will be directly related to the impacts of the proposal, appropriate to the scope and degree of those impacts, and reasonably enforceable. District engineers will require all forms of mitigation, including compensatory mitigation, only as provided in paragraphs (r)(1)(i) through (iii) of this section. Additional mitigation may be added at the applicants' request.

SOURCE: 51 FR 41220, Nov. 13, 1986, unless otherwise noted.

AUTHORITY: 33 U.S.C. 401 et seq.; 33 U.S.C. 1344; 33 U.S.C. 1413.

33 C. F. R. § 320.4, 33 CFR § 320.4

Current through Jan. 8, 2015; 80 FR 1328.

© 2015 Thomson Reuters.
END OF DOCUMENT

C

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 33. Navigation and Navigable Waters
    Chapter II. Corps of Engineers, Department of the Army
      Part 325. Processing of Department of the Army Permits (Refs & Annos)
        ➜ **Appendix B to Part 325--NEPA Implementation Procedures for the Regulatory Program**

1. Introduction

2. General

3. Development of Information and Data

4. Elimination of Duplication with State and Local Procedures

5. Public Involvement

6. Categorical Exclusions

7. EA/FONSI Document

8. Environmental Impact Statement--General

9. Organization and Content of Draft EISs

10. Notice of Intent

11. Public Hearing

12. Organization and Content of Final EIS

13. Comments Received on the Final EIS

14. EIS Supplement

15. Filing Requirement

16. Timing

17. Expedited Filing

18. Record of Decision

19. Predecision Referrals by Other Agencies

20. Review of Other Agencies' EISs

21. Monitoring

1. Introduction. In keeping with Executive Order 12291 and 40 CFR 1500.2, where interpretive problems arise in implementing this regulation, and consideration of all other factors do not give a clear indication of a reasonable interpretation, the interpretation (consistent with the spirit and intent of NEPA) which results in the least paperwork and delay will be used. Specific examples of ways to reduce paperwork in the NEPA process are found at 40 CFR 1500.4. Maximum advantage of these recommendations should be taken.

2. General. This Appendix sets forth implementing procedures for the Corps regulatory program. For additional guidance, see the Corps NEPA regulation 33 CFR Part 230 and for general policy guidance, see the CEQ regulations 40 CFR 1500–1508.

3. Development of Information and Data. See 40 CFR 1506.5. The district engineer may require the applicant to furnish appropriate information that the district engineer considers necessary for the preparation of an Environmental Assessment (EA) or Environmental Impact Statement (EIS). See also 40 CFR 1502.22 regarding incomplete or unavailable information.

4. Elimination of Duplication with State and Local Procedures. See 40 CFR 1506.2.

5. Public Involvement. Several paragraphs of this appendix (paragraphs 7, 8, 11, 13, and 19) provide information on the requirements for district engineers to make available to the public certain environmental documents in accordance with 40 CFR

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

1506.6.

6. Categorical Exclusions--a. General. Even though an EA or EIS is not legally mandated for any Federal action falling within one of the "categorical exclusions," that fact does not exempt any Federal action from procedural or substantive compliance with any other Federal law. For example, compliance with the Endangered Species Act, the Clean Water Act, etc., is always mandatory, even for actions not requiring an EA or EIS. The following activities are not considered to be major Federal actions significantly affecting the quality of the human environment and are therefore categorically excluded from NEPA documentation:

(1) Fixed or floating small private piers, small docks, boat hoists and boathouses.

(2) Minor utility distribution and collection lines including irrigation;

(3) Minor maintenance dredging using existing disposal sites;

(4) Boat launching ramps;

(5) All applications which qualify as letters of permission (as described at 33 CFR 325.5(b)(2)).

b. Extraordinary Circumstances. District engineers should be alert for extraordinary circumstances where normally excluded actions could have substantial environmental effects and thus require an EA or EIS. For a period of one year from the effective data of these regulations, district engineers should maintain an information list on the type and number of categorical exclusion actions which, due to extraordinary circumstances, triggered the need for an EA/FONSI or EIS. If a district engineer determines that a categorical exclusion should be modified, the information will be furnished to the division engineer who will review and analyze the actions and circumstances to determine if there is a basis for recommending a modification to the list of categorical exclusions. HQUSACE (CECW–OR) will review recommended changes for Corps-wide consistency and revise the list accordingly.

7. EA/FONSI Document. (See 40 CFR 1508.9 and 1508.13 for definitions)--a. Environmental Assessment (EA) and Findings of No Significant Impact (FONSI). The EA should normally be combined with other required documents (EA/404(b)(1)/SOF/FONSI). "EA" as used throughout this Appendix normally refers to this combined document. The district engineer should complete an EA as soon as practicable after all relevant information is available (i.e., after the comment period for the public notice of the permit application has expired) and when the EA is a separate document it must be completed prior to completion of the statement of finding (SOF). When the EA confirms that the impact of the applicant's proposal is not significant and there are no "unresolved conflicts concerning alternative uses of available resources * * * ' (section 102(2)(E) of NEPA), and the proposed activity is a "water dependent" activity as defined in 40 CFR 230.10(a)(3), the EA need not include a discussion on alternatives. In all other cases where the district engineer determines that there are unresolved conflicts concerning alternative uses of available resources, the EA shall include a discussion of the reasonable alternatives which are to be considered by the ultimate decisionmaker. The decision options available to the Corps, which embrace all of the applicant's alternatives, are issue the permit, issue with modifications or deny the permit. Modifications are limited to those project modifications within the scope of established permit conditioning policy (See 33 CFR 325.4). The decision option to deny the permit results in the "no action" alternative (i.e. no activity requiring a Corps permit). The combined document normally should not exceed 15 pages and shall conclude with a FONSI (See 40 CFR 1508.13) or a determination that an EIS is required. The district engineer may delegate the signing of the NEPA document. Should the EA demonstrate that an EIS is necessary, the district engineer shall follow the procedures outlined in paragraph 8 of this Appendix. In those cases where it is obvious an EIS is re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

quired, an EA is not required. However, the district engineer should document his reasons for requiring an EIS.

b. Scope of Analysis. (1) In some situations, a permit applicant may propose to conduct a specific activity requiring a Department of the Army (DA) permit (e.g., construction of a pier in a navigable water of the United States) which is merely one component of a larger project (e.g., construction of an oil refinery on an upland area). The district engineer should establish the scope of the NEPA document (e.g., the EA or EIS) to address the impacts of the specific activity requiring a DA permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review.

(2) The district engineer is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action.

Typical factors to be considered in determining whether sufficient "control and responsibility" exists include:

(i) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).

(ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.

(iii) The extent to which the entire project will be within Corps jurisdiction.

(iv) The extent of cumulative Federal control and responsibility.

A. Federal control and responsibility will include the portions of the project beyond the limits of Corps jurisdiction where the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project. These are cases where the environmental consequences of the additional portions of the projects are essentially products of Federal financing, assistance, direction, regulation, or approval (not including funding assistance solely in the form of general revenue sharing funds, with no Federal agency control over the subsequent use of such funds, and not including judicial or administrative civil or criminal enforcement actions).

B. In determining whether sufficient cumulative Federal involvement exists to expand the scope of Federal action the district engineer should consider whether other Federal agencies are required to take Federal action under the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.), the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.), the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.), Executive Order 11990, Protection of Wetlands, (42 U.S.C. 4321 91977), and other environmental review laws and executive orders.

C. The district engineer should also refer to paragraphs 8(b) and 8(c) of this appendix for guidance on determining whether it should be the lead or a cooperating agency in these situations.

These factors will be added to or modified through guidance as additional field experience develops.

(3) Examples: If a non-Federal oil refinery, electric generating plant, or industrial facility is proposed to be built on an upland site and the only DA permit requirement relates to a connecting pipeline, supply loading terminal or fill road, that pipeline, terminal or fill road permit, in and of itself, normally would not constitute sufficient overall Federal involvement with the project to justify expanding the scope of a Corps NEPA document to cover upland portions of the facility beyond the structures in the immediate vicinity of the regulated activity that would

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

effect the location and configuration of the regulated activity.

Similarly, if an applicant seeks a DA permit to fill waters or wetlands on which other construction or work is proposed, the control and responsibility of the Corps, as well as its overall Federal involvement would extend to the portions of the project to be located on the permitted fill. However, the NEPA review would be extended to the entire project, including portions outside waters of the United States, only if sufficient Federal control and responsibility over the entire project is determined to exist; that is, if the regulated activities, and those activities involving regulation, funding, etc. by other Federal agencies, comprise a substantial portion of the overall project. In any case, once the scope of analysis has been defined, the NEPA analysis for that action should include direct, indirect and cumulative impacts on all Federal interests within the purview of the NEPA statute. The district engineer should, whenever practicable, incorporate by reference and rely upon the reviews of other Federal and State agencies.

For those regulated activities that comprise merely a link in a transportation or utility transmission project, the scope of analysis should address the Federal action, i.e., the specific activity requiring a DA permit and any other portion of the project that is within the control or responsibility of the Corps of Engineers (or other Federal agencies).

For example, a 50–mile electrical transmission cable crossing a 1 1/4 mile wide river that is a navigable water of the United States requires a DA permit. Neither the origin and destination of the cable nor its route to and from the navigable water, except as the route applies to the location and configuration of the crossing, are within the control or responsibility of the Corps of Engineers. Those matters would not be included in the scope of analysis which, in this case, would address the impacts of the specific cable crossing.

Conversely, for those activities that require a DA permit for a major portion of a transportation or utility transmission project, so that the Corps permit bears upon the origin and destination as well as the route of the project outside the Corps regulatory boundaries, the scope of analysis should include those portions of the project outside the boundaries of the Corps section 10/404 regulatory jurisdiction. To use the same example, if 30 miles of the 50–mile transmission line crossed wetlands or other "waters of the United States," the scope of analysis should reflect impacts of the whole 50–mile transmission line.

For those activities that require a DA permit for a major portion of a shoreside facility, the scope of analysis should extend to upland portions of the facility. For example, a shipping terminal normally requires dredging, wharves, bulkheads, berthing areas and disposal of dredged material in order to function. Permits for such activities are normally considered sufficient Federal control and responsibility to warrant extending the scope of analysis to include the upland portions of the facility.

In all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal.

8. Environmental Impact Statement--General--a. Determination of Lead and Cooperating Agencies. When the district engineer determines that an EIS is required, he will contact all appropriate Federal agencies to determine their respective role(s), i.e., that of lead agency or cooperating agency.

b. Corps as Lead Agency. When the Corps is lead agency, it will be responsible for managing the EIS process, including those portions which come under the jurisdiction of other Federal agencies. The district engineer is authorized to require the applicant to furnish appropriate information as discussed in paragraph 3 of this appendix. It is permissible for the Corps to reimburse, under agreement, staff support from other Federal agencies beyond the immediate jurisdiction of those agencies.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

c. Corps as Cooperating Agency. If another agency is the lead agency as set forth by the CEQ regulations (40 CFR 1501.5 and 1501.6(a) and 1508.16), the district engineer will coordinate with that agency as a cooperating agency under 40 CFR 1501.6(b) and 1508.5 to insure that agency's resulting EIS may be adopted by the Corps for purposes of exercising its regulatory authority. As a cooperating agency the Corps will be responsible to the lead agency for providing environmental information which is directly related to the regulatory matter involved and which is required for the preparation of an EIS. This in no way shall be construed as lessening the district engineer's ability to request the applicant to furnish appropriate information as discussed in paragraph 3 of this appendix.

When the Corps is a cooperating agency because of a regulatory responsibility, the district engineer should, in accordance with 40 CFR 1501.6(b)(4), "make available staff support at the lead agency's request" to enhance the latter's interdisciplinary capability provided the request pertains to the Corps regulatory action covered by the EIS, to the extent this is practicable. Beyond this, Corps staff support will generally be made available to the lead agency to the extent practicable within its own responsibility and available resources. Any assistance to a lead agency beyond this will normally be by written agreement with the lead agency providing for the Corps expenses on a cost reimbursable basis. If the district engineer believes a public hearing should be held and another agency is lead agency, the district engineer should request such a hearing and provide his reasoning for the request. The district engineer should suggest a joint hearing and offer to take an active part in the hearing and ensure coverage of the Corps concerns.

d. Scope of Analysis. See paragraph 7b.

e. Scoping Process. Refer to 40 CFR 1501.7 and 33 CFR 230.12.

f. Contracting. See 40 CFR 1506.5.

(1) The district engineer may prepare an EIS, or may obtain information needed to prepare an EIS, either with his own staff or by contract. In choosing a contractor who reports directly to the district engineer, the procedures of 40 CFR 1506.5(c) will be followed.

(2) Information required for an EIS also may be furnished by the applicant or a consultant employed by the applicant. Where this approach is followed, the district engineer will (i) advise the applicant and/or his consultant of the Corps information requirements, and (ii) meet with the applicant and/or his consultant from time to time and provide him with the district engineer's views regarding adequacy of the data that are being developed (including how the district engineer will view such data in light of any possible conflicts of interest).

The applicant and/or his consultant may accept or reject the district engineer's guidance. The district engineer, however, may after specifying the information in contention, require the applicant to resubmit any previously submitted data which the district engineer considers inadequate or inaccurate. In all cases, the district engineer should document in the record the Corps independent evaluation of the information and its accuracy, as required by 40 CFR 1506.5(a).

g. Change in EIS Determination. If it is determined that an EIS is not required after a notice of intent has been published, the district engineer shall terminate the EIS preparation and withdraw the notice of intent. The district engineer shall notify in writing the appropriate division engineer; HQUSACE (CECW–OR); the appropriate EPA regional administrator, the Director, Office of Federal Activities (A–104), EPA, 401 M Street SW., Washington, DC 20460 and the public of the determination.

h. Time Limits. For regulatory actions, the district engineer will follow 33 CFR 230.17(a) unless unusual delays caused by applicant inaction or compliance with other statutes require longer time frames for EIS preparation. At the outset of the EIS

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

effort, schedule milestones will be developed and made available to the applicant and the public. If the milestone dates are not met the district engineer will notify the applicant and explain the reason for delay.

9. Organization and Content of Draft EISs--a. General. This section gives detailed information for preparing draft EISs. When the Corps is the lead agency, this draft EIS format and these procedures will be followed. When the Corps is one of the joint lead agencies, the joint lead agencies will mutually decide which agency's format and procedures will be followed.

b. Format--(1) Cover Sheet. (a) Ref. 40 CFR 1502.11.

(b) The "person at the agency who can supply further information" (40 CFR 1502.11(c) is the project manager handling that permit application.

(c) The cover sheet should identify the EIS as a Corps permit action and state the authorities (sections 9, 10, 404, 103, etc.) under which the Corps is exerting its jurisdiction.

(2) Summary. In addition to the requirements of 40 CFR 1502.12, this section should identify the proposed action as a Corps permit action stating the authorities (sections 9, 10, 404, 103, etc.) under which the Corps is exerting its jurisdiction. It shall also summarize the purpose and need for the proposed action and shall briefly state the beneficial/adverse impacts of the proposed action.

(3) Table of Contents.

(4) Purpose and Need. See 40 CFR 1502.13. If the scope of analysis for the NEPA document (see paragraph 7b) covers only the proposed specific activity requiring a Department of the Army permit, then the underlying purpose and need for that specific activity should be stated. (For example, "The purpose and need for the pipe is to obtain cooling water from the river for the electric generating plant.") If the scope of analysis covers a more ex-

tensive project, only part of which may require a DA permit, then the underlying purpose and need for the entire project should be stated. (For example, "The purpose and need for the electric generating plant is to provide increased supplies of electricity to the (named) geographic area.") Normally, the applicant should be encouraged to provide a statement of his proposed activity's purpose and need from his perspective (for example, "to construct an electric generating plant"). However, whenever the NEPA document's scope of analysis renders it appropriate, the Corps also should consider and express that activity's underlying purpose and need from a public interest perspective (to use that same example, "to meet the public's need for electric energy"). Also, while generally focusing on the applicant's statement, the Corps, will in all cases, exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective.

(5) Alternatives. See 40 CFR 1502.14. The Corps is neither an opponent nor a proponent of the applicant's proposal; therefore, the applicant's final proposal will be identified as the "applicant's preferred alternative" in the final EIS. Decision options available to the district engineer, which embrace all of the applicant's alternatives, are issue the permit, issue with modifications or conditions or deny the permit.

(a) Only reasonable alternatives need be considered in detail, as specified in 40 CFR 1502.14(a). Reasonable alternatives must be those that are feasible and such feasibility must focus on the accomplishment of the underlying purpose and need (of the applicant or the public) that would be satisfied by the proposed Federal action (permit issuance). The alternatives analysis should be thorough enough to use for both the public interest review and the 404(b)(1) guidelines (40 CFR Part 230) where applicable. Those alternatives that are unavailable to the applicant, whether or not they require Federal action (permits), should normally be included in the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

analysis of the no-Federal-action (denial) alternative. Such alternatives should be evaluated only to the extent necessary to allow a complete and objective evaluation of the public interest and a fully informed decision regarding the permit application.

(b) The "no-action" alternative is one which results in no construction requiring a Corps permit. It may be brought by (1) the applicant electing to modify his proposal to eliminate work under the jurisdiction of the Corps or (2) by the denial of the permit. District engineers, when evaluating this alternative, should discuss, when appropriate, the consequences of other likely uses of a project site, should the permit be denied.

(c) The EIS should discuss geographic alternatives, e.g., changes in location and other site specific variables, and functional alternatives, e.g., project substitutes and design modifications.

(d) The Corps shall not prepare a cost-benefit analysis for projects requiring a Corps permit. 40 CFR 1502.23 states that the weighing of the various alternatives need not be displayed in a cost-benefit analysis and "* * * should not be when there are important qualitative considerations." The EIS should, however, indicate any cost considerations that are likely to be relevant to a decision.

(e) Mitigation is defined in 40 CFR 1508.20, and Federal action agencies are directed in 40 CFR 1502.14 to include appropriate mitigation measures. Guidance on the conditioning of permits to require mitigation is in 33 CFR 320.4(r) and 325.4. The nature and extent of mitigation conditions are dependent on the results of the public interest review in 33 CFR 320.4.

(6) Affected Environment. See Ref. 40 CFR 1502.15.

(7) Environmental Consequences. See Ref. 40 CFR 1502.16.

(8) List of Preparers. See Ref. 40 CFR 1502.17.

(9) Public Involvement. This section should list the dates and nature of all public notices, scoping meetings and public hearings and include a list of all parties notified.

(10) Appendices. See 40 CFR 1502.18. Appendices should be used to the maximum extent practicable to minimize the length of the main text of the EIS. Appendices normally should not be circulated with every copy of the EIS, but appropriate appendices should be provided routinely to parties with special interest and expertise in the particular subject.

(11) Index. The Index of an EIS, at the end of the document, should be designed to provide for easy reference to items discussed in the main text of the EIS.

10. Notice of Intent. The district engineer shall follow the guidance in 33 CFR Part 230, Appendix C in preparing a notice of intent to prepare a draft EIS for publication in the Federal Register.

11. Public Hearing. If a public hearing is to be held pursuant to 33 CFR Part 327 for a permit application requiring an EIS, the actions analyzed by the draft EIS should be considered at the public hearing. The district engineer should make the draft EIS available to the public at least 15 days in advance of the hearing. If a hearing request is received from another agency having jurisdiction as provided in 40 CFR 1506.6(c)(2), the district engineer should coordinate a joint hearing with that agency whenever appropriate.

12. Organization and Content of Final EIS. The organization and content of the final EIS including the abbreviated final EIS procedures shall follow the guidance in 33 CFR 230.14(a).

13. Comments Received on the Final EIS. For permit cases to be decided at the district level, the district engineer should consider all incoming comments and provide responses when substantive issues are raised which have not been addressed in the final EIS. For permit cases decided at higher au-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

thority, the district engineer shall forward the final EIS comment letters together with appropriate responses to higher authority along with the case. In the case of a letter recommending a referral under 40 CFR Part 1504, the district engineer will follow the guidance in paragraph 19 of this appendix.

14. EIS Supplement. See 33 CFR 230.13(b).

15. Filing Requirements. See 40 CFR 1506.9. Five (5) copies of EISs shall be sent to Director, Office of Federal Activities (A–104), Environmental Protection Agency, 401 M Street SW., Washington, DC 20460. The official review periods commence with EPA's publication of a notice of availability of the draft or final EISs in the Federal Register. Generally, this notice appears on Friday of each week. At the same time they are mailed to EPA for filing, one copy of each draft or final EIS, or EIS supplement should be mailed to HQUSACE (CECW–OR) WASH DC 20314–1000.

16. Timing. 40 CFR 1506.10 describes the timing of an agency action when an EIS is involved.

17. Expedited Filing. 40 CFR 1506.10 provides information on allowable time reductions and time extensions associated with the EIS process. The district engineer will provide the necessary information and facts to HQUSACE (CECW–RE) WASH DC 20314–1000 (with copy to CECW–OR) for consultation with EPA for a reduction in the prescribed review periods.

18. Record of Decision. In those cases involving an EIS, the statement of findings will be called the record of decision and shall incorporate the requirements of 40 CFR 1505.2. The record of decision is not to be included when filing a final EIS and may not be signed until 30 days after the notice of availability of the final EIS is published in the Federal Register. To avoid duplication, the record of decision may reference the EIS.

19. Predecision Referrals by Other Agencies. See 40 CFR Part 1504. The decisionmaker should noti-

fy any potential referring Federal agency and CEQ of a final decision if it is contrary to the announced position of a potential referring agency. (This pertains to a NEPA referral, not a 404(q) referral under the Clean Water Act. The procedures for a 404(q) referral are outlined in the 404(q) Memoranda of Agreement. The potential referring agency will then have 25 calendar days to refer the case to CEQ under 40 CFR Part 1504. Referrals will be transmitted through division to CECW–RE for further guidance with an information copy to CECW–OR.

20. Review of Other Agencies' EISs. District engineers should provide comments directly to the requesting agency specifically related to the Corps jurisdiction by law or special expertise as defined in 40 CFR 1508.15 and 1508.26 and identified in Appendix II of CEQ regulations (49 FR 49750, December 21, 1984). If the district engineer determines that another agency's draft EIS which involves a Corps permit action is inadequate with respect to the Corps permit action, the district engineer should attempt to resolve the differences concerning the Corps permit action prior to the filing of the final EIS by the other agency. If the district engineer finds that the final EIS is inadequate with respect to the Corps permit action, the district engineer should incorporate the other agency's final EIS or a portion thereof and prepare an appropriate and adequate NEPA document to address the Corps involvement with the proposed action. See 33 CFR 230.21 for guidance. The agency which prepared the original EIS should be given the opportunity to provide additional information to that contained in the EIS in order for the Corps to have all relevant information available for a sound decision on the permit.

21. Monitoring. Monitoring compliance with permit requirements should be carried out in accordance with 33 CFR 230.15 and with 33 CFR Part 325.

[53 FR 3134, Feb. 3, 1988]

SOURCE: 51 FR 41236, Nov. 13, 1986; 55 FR 27821, July 6, 1990, unless otherwise noted.

AUTHORITY: 33 U.S.C. 401 et seq.: 33 U.S.C. 1344; 33 U.S.C. 1413.

33 C. F. R. Pt. 325, App. B, 33 CFR Pt. 325, App. B

Current through Jan. 8, 2015; 80 FR 1328.

© 2015 Thomson Reuters.
END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

W. Va. C.S.R. § 38-2-3


**C**

West Virginia Code of State Rules Currentness
  Title 38. Division of Environmental Protection — Division of Mining and Reclamation
    Legislative Rule (Ser. 2)
      Series 2. West Virginia Surface Mining Reclamation Rule (Refs & Annos)
      → → **§ 38-2-3. Permit Application Requirements and Contents.**


3.1. Applicant Information. All information provided by an applicant in an application for a surface mining permit shall be clear and concise and shall be provided in a format prescribed by the Secretary and/or a format required by the Federal Office of Surface Mining Reclamation and Enforcement. In addition to the information requirements of section 9 of the Act, each application for a permit shall contain the following information except that submittal of a social security number is at the option of the applicant:

    3.1.a.  A statement as to whether the applicant is a corporation, partnership, sole proprietorship, association, or other business entity.

    3.1.b.  The name, address, telephone number and, as applicable, social security number and employer identification number of the:

        3.1.b.1.  Applicant;

        3.1.b.2.  Applicant's resident agent; and

        3.1.b.3.  Person who will pay the abandoned mine land reclamation fee.

    3.1.c.  List, for each person who owns or controls the applicant under the definition of "owned or controlled" and "owns and controls" in subsection 2.85 of this rule (as applicable):

        3.1.c.1.  The person's name, address, social security number, and employer identification number;

        3.1.c.2.  The person's ownership or control relationship to the applicant, including percentage of ownership and location in organizational structure;

        3.1.c.3.  The title of the person's position, date position was assumed, and when submitted under subdivision 3.33.h of this rule, date of departure from the position;

W. Va. C.S.R. § 38-2-3

3.7.c.2.  Engineering specifications utilized to design the rock-toe buttresses or key-way cuts which shall be determined in accordance with paragraph 3.7.b.5 of this subsection.

3.7.d.  A survey of the watershed identifying all man made structures and residents in proximity to the disposal area to determine potential storm runoff impacts. At least thirty (30) days prior to any beginning of placement of material, the accuracy of the survey shall be field verified. Any changes shall be documented and brought to the attention of the Secretary to determine if there is a need to revise the permit.

3.8. New and Existing Structures and Support Facilities:

3.8.a.  Each application for a permit will contain a description, plans, and drawings for each support facility to be constructed, used, or maintained within the proposed permit area. The plans and drawings shall include a map, appropriate cross sections, design drawings, and specifications sufficient to demonstrate compliance with subsection 4.11 of this rule.

3.8.b.  Each application shall contain a description of each existing structure or facility proposed to be used in connection with or to facilitate the surface mining and reclamation operation. The description shall include:

3.8.b.1.  Location;

3.8.b.2.  Plans of the structure which describe its current condition;

3.8.b.3.  Approximate dates on which construction of the existing structure was begun and completed;

3.8.b.4.  A showing, including relevant monitoring data or other evidence, as to whether or not the structure meets the performance standards of the Act and this rule; and

3.8.b.5.  A compliance plan for each existing structure proposed to be modified or reconstructed for use in connection with or to facilitate the surface coal mining and reclamation operation. The compliance plan shall include:

3.8.b.5.A. Design specifications required for the modification or reconstruction of the structure to bring it into compliance with current design requirements and performance standards of the Act and this rule.

3.8.b.5.B.  A construction schedule which shows dates for beginning and completing interim steps and final construction.

3.8.b.5.C.  Provisions for monitoring the structure during and after modification or reconstruction to ensure that the performance standards of the Act and this rule are met.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

W. Va. C.S.R. § 38-2-3

3.8.b.5.D.  A showing that the risk of harm to the environment or to public health or safety is not significant during the period of modification or reconstruction.

3.8.c.  Structures and facilities designed, constructed or in use pursuant to an approved surface mining permit or prospecting approval prior to the effective date of this rule may be subject to revision or reconstruction where the Secretary determines that such revision or reconstruction is necessary to comply with the performance standards set forth in the Act and this rule; provided, that the Secretary will notify the permittee that such revision or reconstruction is necessary and shall provide a reasonable time for compliance. *Provided*, that those structures and facilities, where it can be demonstrated that reconstruction or revision would result in greater environmental harm and the performance standards set forth in the Act and this rule can otherwise be met, may be exempt from revision or reconstruction. This exemption shall not apply to new and existing coal waste facilities.

3.8.d.  The plans of a facility or structure that is to be shared by two or more separately permitted mining operations may be included in one permit application and referenced in the other application. Each permittee shall bond the facility or structure unless the permittees sharing it agree to another arrangement for assuming their respective responsibilities. If such agreement is reached, then the application shall include a copy of the agreement between or among the parties setting forth the respective bonding responsibilities of each party for the facility or structure. The agreement shall demonstrate to the satisfaction of the Secretary that all responsibilities under the Act for the facility or structure will be met.

3.9. Operation(s) Near Public Road.

3.9.a.  Where the proposed mining operation is to be conducted within one hundred feet (100') (measured horizontally) of the outside right-of-way of any public road (except where mine access roads or haulage roads join such right-of-way) or where the applicant proposes to relocate or close any public road, the Secretary shall:

3.9.a.1.  Where the public road is to be closed or relocated, require the applicant to obtain necessary permission from the authority with jurisdiction over the public road.

3.9.a.2.  Provide an opportunity for a public hearing in the locality of the proposed mining operation for the purpose of determining that the interests of the public and affected landowners will be protected.

3.9.a.3.  Upon request for a public hearing by any person, require the applicant to hold a public hearing and give notice of the date, time, and place of the hearing in a newspaper of general circulation in the area of the proposed mining operation at least two (2) weeks in advance of the hearing date.

3.9.a.4.  Make a written finding within thirty (30) days following the hearing or after the close of the comment period as to whether or not the interests of the public and the affected landowners will be protected. Each participant of record at the public hearing shall be notified of the Secretary's findings.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

W. Va. C.S.R. § 38-2-3

3.10. Experimental Practices.

3.10.a.  Each permit application or permit revision shall contain plans and specifications of any proposed experimental practices to be employed as a part of the mining and reclamation operation. All experimental practices shall have prior approval of the Secretary and the director of the Federal Office of Surface Mining Reclamation and Enforcement before a permit or revision can be issued. An application for an experimental practice shall contain descriptions, maps, plans, and data which show:

3.10.a.1.  The nature of the experimental practice, including a description of any performance standards for which variances are requested, the duration of the experimental practice, and any special monitoring which will be conducted;

3.10.a.2.  How use of the experimental practice encourages advances in mining and reclamation technology or allows a postmining land use for industrial, commercial, residential, or public use (including recreation facilities) on an experimental basis;

3.10.a.3.  The experimental practice:

3.10.a.3.A.  Is potentially more, or at least as, environmentally protective, during and after mining operations, as would otherwise be required by the Act and this rule.

3.10.a.3.B.  Will not reduce the protection afforded public health and safety below that provided by the requirements of the rules.

3.10.a.4.  That the applicant will conduct monitoring of the effects of the experimental practice. The monitoring program shall ensure the collection, analysis, and reporting of reliable data that are sufficient to enable the Secretary and the director of the Federal Office of Surface Mining Reclamation and Enforcement to:

3.10.a.4.A.  Evaluate the effectiveness of the experimental practice; and

3.10.a.4.B.  Identify, at the earliest possible time, potential risk to the environment and public health and safety which may be caused by the experimental practice during and after mining.

3.10.a.5.  That the applications for experimental practice under this section will comply with the public notice requirements of the Act and this rule.

3.10.b.  Each permit approved for experimental practices shall be reviewed by the Secretary at least annually following date of issuance. The Secretary may, on the basis of this review, require modifications to the experimental practice.

W. Va. C.S.R. § 38-2-3

3.11. In Situ Mining. Any application for a permit for operations covered by this subsection shall be made according to all requirements of this section applicable to underground mining activities. In addition, the mining and reclamation operations plan for operations involving in situ processing activities shall contain information establishing how those operations will be conducted in compliance with the requirements of section 15 of this rule, including:

3.11.a.  Delineation of proposed holes and wells and production zone for approval of the Secretary;

3.11.b.  Specifications of drill holes and casings proposed to be used;

3.11.c.  A plan for treatment, confinement or disposal of all acid-forming, toxic-forming or radioactive gases, solids, or liquids constituting a fire, health, safety or environmental hazard caused by the mining and recovery process; and

3.11.d.  Plans for monitoring surface and ground water and air quality, as required by the Secretary.

3.12. Subsidence Control Plan.

3.12.a.  Each application for an underground coal mining permit shall contain a subsidence control plan which includes the following:

3.12.a.1.  A survey that identifies, on a topographic map of a scale of 1" = 1,000' more, structures, perennial and intermittent streams, or renewable resource lands and a narrative indicating whether or not subsidence could cause material damage or diminution of value or use of such structures, or renewable resource lands both on the permit area and adjacent areas within an angle of draw of at least 30$^O$ unless a greater area is specified by the Secretary. Provided; however, an angle of draw less than 30$^O$ can be requested by the applicant based upon results of site specific analyses and demonstration that a different angle of draw is justified. Computer program packages predicting surface movement and deformation caused by underground coal extraction can be utilized. A survey that identifies, on a topographic map of a scale of 1" = 1,000', larger, location and type of water supplies and a narrative indicating whether or not subsidence could contaminate, diminish or interrupt water supplies both on the permit area and adjacent areas;

3.12.a.2.  A survey of the quality and quantity of water supplies that could be contaminated, diminished or interrupted by subsidence within the permit area and adjacent areas.

A survey of the condition of all non-commercial building or residential dwellings and structures related thereto that may be materially damaged or for which the foreseeable use may be diminished by subsidence within the area encompassed by the applicable angle of draw, Provided; however:

3.12.a.2.A.  For areas of extraction that is less than or equal to 60 percent, a pre-subsidence struc-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 42. The Public Health and Welfare
      Chapter 55. National Environmental Policy (Refs & Annos)
         Subchapter I. Policies and Goals (Refs & Annos)
            **§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

**(A)** utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

**(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

   **(i)** the environmental impact of the proposed action,

   **(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

   **(iii)** alternatives to the proposed action,

   **(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

   **(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed

action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**(D)** Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)** the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)** after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction. [FN1]

**(E)** study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

**(F)** recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

**(G)** make available to States, counties, municipalities, institutions, and individuals, advice and information

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

useful in restoring, maintaining, and enhancing the quality of the environment;

**(H)** initiate and utilize ecological information in the planning and development of resource-oriented projects; and

**(I)** assist the Council on Environmental Quality established by subchapter II of this chapter.

CREDIT(S)

(Pub.L. 91-190, Title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub.L. 94-83, Aug. 9, 1975, 89 Stat. 424.)

[FN1] So in original. The period probably should be a semicolon.

Current through P.L. 113-234 approved 12-16-2014

Westlaw. (C) 2015 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Effective: August 6, 1996**

United States Code Annotated Currentness
    Title 42. The Public Health and Welfare
        Chapter 6A. Public Health Service (Refs & Annos)
            Subchapter XII. Safety of Public Water Systems
                Part A. Definitions (Refs & Annos)
                    → § 300f. Definitions

For purposes of this subchapter:


**(1)** The term "primary drinking water regulation" means a regulation which--


**(A)** applies to public water systems;


**(B)** specifies contaminants which, in the judgment of the Administrator, may have any adverse effect on the health of persons;


**(C)** specifies for each such contaminant either--


**(i)** a maximum contaminant level, if, in the judgment of the Administrator, it is economically and technologically feasible to ascertain the level of such contaminant in water in public water systems, or


**(ii)** if, in the judgment of the Administrator, it is not economically or technologically feasible to so ascertain the level of such contaminant, each treatment technique known to the Administrator which leads to a reduction in the level of such contaminant sufficient to satisfy the requirements of section 300g-1 of this title; and


**(D)** contains criteria and procedures to assure a supply of drinking water which dependably complies with such maximum contaminant levels; including accepted methods for quality control and testing procedures to insure compliance with such levels and to insure proper operation and maintenance of the system, and requirements as to (i) the minimum quality of water which may be taken into the system and (ii) siting for new facilities for public water systems.


At any time after promulgation of a regulation referred to in this paragraph, the Administrator may add equally effective quality control and testing procedures by guidance published in the Federal Register. Such

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

procedures shall be treated as an alternative for public water systems to the quality control and testing procedures listed in the regulation.

**(2)** The term "secondary drinking water regulation" means a regulation which applies to public water systems and which specifies the maximum contaminant levels which, in the judgment of the Administrator, are requisite to protect the public welfare. Such regulations may apply to any contaminant in drinking water (A) which may adversely affect the odor or appearance of such water and consequently may cause a substantial number of the persons served by the public water system providing such water to discontinue its use, or (B) which may otherwise adversely affect the public welfare. Such regulations may vary according to geographic and other circumstances.

**(3)** The term "maximum contaminant level" means the maximum permissible level of a contaminant in water which is delivered to any user of a public water system.

**(4) Public water system.--**

**(A) In general.**--The term "public water system" means a system for the provision to the public of water for human consumption through pipes or other constructed conveyances, if such system has at least fifteen service connections or regularly serves at least twenty-five individuals. Such term includes (i) any collection, treatment, storage, and distribution facilities under control of the operator of such system and used primarily in connection with such system, and (ii) any collection or pretreatment storage facilities not under such control which are used primarily in connection with such system.

**(B) Connections.--**

**(i) In general.**--For purposes of subparagraph (A), a connection to a system that delivers water by a constructed conveyance other than a pipe shall not be considered a connection, if--

**(I)** the water is used exclusively for purposes other than residential uses (consisting of drinking, bathing, and cooking, or other similar uses);

**(II)** the Administrator or the State (in the case of a State exercising primary enforcement responsibility for public water systems) determines that alternative water to achieve the equivalent level of public health protection provided by the applicable national primary drinking water regulation is provided for residential or similar uses for drinking and cooking; or

**(III)** the Administrator or the State (in the case of a State exercising primary enforcement responsibility for public water systems) determines that the water provided for residential or similar uses for drinking, cooking, and bathing is centrally treated or treated at the point of entry by the provider, a pass-through entity, or the user to achieve the equivalent level of protection provided by the applicable national primary drinking water regulations.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(ii) Irrigation districts.**--An irrigation district in existence prior to May 18, 1994, that provides primarily agricultural service through a piped water system with only incidental residential or similar use shall not be considered to be a public water system if the system or the residential or similar users of the system comply with subclause (II) or (III) of clause (i).

**(C) Transition period.**--A water supplier that would be a public water system only as a result of modifications made to this paragraph by the Safe Drinking Water Act Amendments of 1996 shall not be considered a public water system for purposes of the Act until the date that is two years after August 6, 1996. If a water supplier does not serve 15 service connections (as defined in subparagraphs (A) and (B)) or 25 people at any time after the conclusion of the 2-year period, the water supplier shall not be considered a public water system.

**(5)** The term "supplier of water" means any person who owns or operates a public water system.

**(6)** The term "contaminant" means any physical, chemical, biological, or radiological substance or matter in water.

**(7)** The term "Administrator" means the Administrator of the Environmental Protection Agency.

**(8)** The term "Agency" means the Environmental Protection Agency.

**(9)** The term "Council" means the National Drinking Water Advisory Council established under section 300j-5 of this title.

**(10)** The term "municipality" means a city, town, or other public body created by or pursuant to State law, or an Indian Tribe.

**(11)** The term "Federal agency" means any department, agency, or instrumentality of the United States.

**(12)** The term "person" means an individual, corporation, company, association, partnership, State, municipality, or Federal agency (and includes officers, employees, and agents of any corporation, company, association, State, municipality, or Federal agency).

**(13)(A)** Except as provided in subparagraph (B), the term "State" includes, in addition to the several States, only the District of Columbia, Guam, the Commonwealth of Puerto Rico, the Northern Mariana Islands, the Virgin Islands, American Samoa, and the Trust Territory of the Pacific Islands.

**(B)** For purposes of section 300j-12 of this title, the term "State" means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(14)** The term "Indian Tribe" means any Indian tribe having a Federally recognized governing body carrying out substantial governmental duties and powers over any area. For purposes of section 300j-12 of this title, the term includes any Native village (as defined in section 1602(c) of Title 43).

**(15) Community water system.**--The term "community water system" means a public water system that--

   **(A)** serves at least 15 service connections used by year-round residents of the area served by the system; or

   **(B)** regularly serves at least 25 year-round residents.

**(16) Noncommunity water system.**--The term "noncommunity water system" means a public water system that is not a community water system.

CREDIT(S)

(July 1, 1944, c. 373, Title XIV, § 1401, as added Dec. 16, 1974, Pub.L. 93-523, § 2(a), 88 Stat. 1661; amended June 23, 1976, Pub.L. 94-317, Title III, § 301(b)(2), 90 Stat. 707; Oct. 12, 1976, Pub.L. 94-484, Title IX, § 905(b)(1), 90 Stat. 2325; Nov. 16, 1977, Pub.L. 95-190, § 8(b), 91 Stat. 1397; June 19, 1986, Pub.L. 99-339, Title III, § 302(b), 100 Stat. 666; Aug. 6, 1996, Pub.L. 104-182, Title I, § 101(a), (b)(1), 110 Stat. 1615, 1616.)

Current through P.L. 113-234 approved 12-16-2014

Westlaw. (C) 2015 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

C

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1502. Environmental Impact Statement (Refs & Annos)
        → **§ 1502.16 Environmental consequences.**

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

(a) Direct effects and their significance (§ 1508.8).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area

concerned. (See § 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

40 C. F. R. § 1502.16, 40 CFR § 1502.16

Current through Jan. 8, 2015; 80 FR 1328.

© 2015 Thomson Reuters.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 C.F.R. § 1502.16

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

40 C.F.R. § 1508.8                                                                                    Page 1

**C**

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1508. Terminology and Index (Refs & Annos)
        ➜ § 1508.8 Effects.

Effects include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

40 C. F. R. § 1508.8, 40 CFR § 1508.8

Current through Jan. 8, 2015; 80 FR 1328.

© 2015 Thomson Reuters.
END OF DOCUMENT

C

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
   Title 40. Protection of Environment
      Chapter V. Council on Environmental Quality
         Part 1508. Terminology and Index (Refs & Annos)
           → **§ 1508.9 Environmental assessment.**

Environmental assessment:

(a) Means a concise public document for which a Federal agency is responsible that serves to:

   (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

   (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

   (3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

40 C. F. R. § 1508.9, 40 CFR § 1508.9

Current through Jan. 8, 2015; 80 FR 1328.

© 2015 Thomson Reuters.
END OF DOCUMENT

C

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
 Title 40. Protection of Environment
  Chapter V. Council on Environmental Quality
   Part 1508. Terminology and Index (Refs & Annos)
    ➡ **§ 1508.11 Environmental impact statement.**

Environmental impact statement means a detailed written statement as required by section 102(2)(C) of the Act.

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

40 C. F. R. § 1508.11, 40 CFR § 1508.11

Current through Jan. 8, 2015; 80 FR 1328.

© 2015 Thomson Reuters.
END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Appeal: 14-2129    Doc: 23    Filed: 01/15/2015    Pg: 110 of 112

**C**

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter H. Ocean Dumping
        Part 230. Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material (Refs & Annos)
          Subpart B. Compliance with the Guidelines
            → **§ 230.10 Restrictions on discharge.**

Note: Because other laws may apply to particular discharges and because the Corps of Engineers or State 404 agency may have additional procedural and substantive requirements, a discharge complying with the requirement of these Guidelines will not automatically receive a permit.

Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.

(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

(1) For the purpose of this requirement, practicable alternatives include, but are not limited to:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

(4) For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evalu-

ation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines. In the latter case, it may be necessary to supplement these NEPA documents with this additional information.

(5) To the extent that practicable alternatives have been identified and evaluated under a Coastal Zone Management program, a section 208 program, or other planning process, such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines. Where such evaluation is less complete than that contemplated under this subsection, it must be supplemented accordingly.

(b) No discharge of dredged or fill material shall be permitted if it:

(1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard;

(2) Violates any applicable toxic effluent standard or prohibition under section 307 of the Act;

(3) Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act of 1973, as amended. If an exemption has been granted by the Endangered Species Committee,

the terms of such exemption shall apply in lieu of this subparagraph;

(4) Violates any requirement imposed by the Secretary of Commerce to protect any marine sanctuary designated under title III of the Marine Protection, Research, and Sanctuaries Act of 1972.

(c) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts. Under these Guidelines, effects contributing to significant degradation considered individually or collectively, include:

(1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;

(2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

(3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values.

(d) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. Subpart H identifies such possible steps.

SOURCE: 45 FR 85344, Dec. 24, 1980, unless otherwise noted.

AUTHORITY: Secs. 404(b) and 501(a) of the Clean Water Act of 1977, (33 U.S.C. § 1344(b) and § 1361(a)).

40 C. F. R. § 230.10, 40 CFR § 230.10

Current through Jan. 8, 2015; 80 FR 1328.

© 2015 Thomson Reuters.
END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.