No. 14-2129

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

OHIO VALLEY ENVIRONMENTAL COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY, COAL RIVER MOUNTAIN WATCH and
SIERRA CLUB,
Plaintiffs-Appellants,
v.

UNITED STATES ARMY CORPS OF ENGINEERS, THOMAS P. BOSTICK,
Commander in Chief of Engineers, U.S. Army Corps of Engineers, and STEVEN
MCGUGAN, COLONEL, District Engineer, U.S. Army Corps of Engineers,
Huntington District,
Defendants-Appellees, and

RAVEN CREST CONTRACTING, L.L.C., Defendant-Intervenor-Appellee.

On Appeal from the United States District Court
for The Southern District Of West Virginia,
Case No. 2:12-Cv-6689, Honorable John T. Copenhaver

**RESPONSE BRIEF FOR THE FEDERAL DEFENDANTS-APPELLEES**

JOHN C. CRUDEN
ASSISTANT ATTORNEY GENERAL

AARON AVILA
RUTH ANN STOREY
AUSTIN SAYLOR
ROBERT H. OAKLEY
*Attorneys*
*Environment and Natural Resources Div.*
*U.S. Department of Justice*
*P.O. Box 7415*
*Washington, D.C. 20044*
*(202) 514-4081*
*robert.oakley@usdoj.gov*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................1

STATEMENT OF THE ISSUE................................................................1

STATEMENT OF THE CASE ............................................................. 2

        A.    Statutory Background ....................................................... 2

        B.    Factual Background ......................................................... 9

SUMMARY OF ARGUMENT ......................................................13

ARGUMENT ............................................................................14

STANDARD OF REVIEW .........................................................14

I.    The Corps Correctly Limited Its Examination under NEPA of Environmental Impacts from the Section 404 Permit to Those Resulting from the Discharge of Fill into "Waters of the United States."...................................................16

        A.    The Corps Properly Followed Its Own Regulations in Determining the Scope of Its NEPA Review for the Section 404 Permit Sought by Raven Crest.....................16

        B.    This Court and the Sixth Circuit Have Upheld the Corps' Interpretation of Its NEPA Obligations for Issuance of a Section 404 Permit to Require Examination of Only Those Potential Environmental Impacts to Waters of the United States...........................19

        C.    The Corps' Section 404 Permit Could Not Authorize Surface Mining by Raven Crest. ...................................... 22

D.    Having No Duty to Consider the Environmental
Impacts of the Entire Mine, the Corps' Decision to
Issue the Section 404 Permit Did Not Rely on Analysis
by WVDEP of Possible Effects to Human Health from
Operation of the Raven Crest Mine. ................................. 25

E.    The Corps Did Not Err in Balancing Economic
Benefits against Environmental Harms as Part of Its
Public Interest Review. ..................................................... 27

II.    The Corps' Has No Obligation Under the Section 404
Guidelines to Address Health Impacts Beyond Those
Resulting from the Placement of Fill in Waters of the United
States .......................................................................................... 30

CONCLUSION ............................................................................. 32

CERTIFICATE OF COMPLIANCE .............................................. 33

CERTIFICATE OF SERVICE ........................................................ 34

**CASES** **PAGE**

*Ohio Valley Evironmental Coalition v. Aracoma Coal Co.,*
  556 F.3d 177 (4th Cir. 2009) .......................................... 3, 23, 24, 25, 27, 30

*Auer v. Robbins*, 519 U.S. 452, 461 (1997) ............................................. 18, 24

*Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001) .................. 3

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416 (1971) ........ 17

*Hughes River Water Conservancy v. Glickman,*
  81 F.3d 437 (4th Cir. 1996) ................................................................. 20

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs.*, 746
  F.3d 698 (6th Cir. 2014) ................................................ 11, 16, 18, 25, 27, 32

*Kentuckians for the Commonwealth, Inc. v. Rivenburgh* ........................... 17

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) .................... 17

*Nat'l Audubon Soc'y v. Dept. of the Navy,*
  422 F.3d 174, 185 (4th Cir. 2005) ...................................................... 17

*New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992) .......................... 18

*Ohio Valley Envt'l. Coal. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 128
  (4th Cir. 2013) ........................................................................................ 8

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402 (1971) .............. 18

*People of the State of Ill. v. I.C.C.*, 722 F.2d 1341, 1349 (7th Cir. 1983) ...... 33

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332, 350-51 (1989 ....................................................................... 8

**STATUTES**

5 U.S.C. § 706 ...................................................................................... 15

30 U.S.C. § 1201 ..................................................................................... 2

30 U.S.C. § 1202 ..................................................................................... 3

33 U.S.C. § 1251 ..................................................................................... 4

30 U.S.C. § 1253 ................................................................................... 27

30 U.S.C. § 1254 ..................................................................................... 3

33 U.S.C. § 1344 ......................................................................... 1, 5, 21, 24

42 U.S.C. § 4332(2) ................................................................................. 7

42 U.S.C. § 4321 ..................................................................................... 6

## REGULATIONS

33 C.F.R. § 230.10 ................................................................... 7

33 C.F.R. § 230.11 ................................................................... 7

33 C.F.R. § 320(a)(1) ............................................................. 31

33 C.F.R. § 320.4(a)(1) ............................................. 4, 6, 28, 30

33 C.F.R. § 320.4(b)(4) ............................................................. 6

33 C.F.R. part 325, app. B, § 7 ............................... 8, 16, 19, 20, 31

33 C.F.R. pt. 320 ..................................................................... 8

40 C.F.R. § 230.11 ................................................................... 6

40 C.F.R. § 230.3 ..................................................................... 6

40 C.F.R. § 1500 ..................................................................... 8

40 C.F.R. § 1502.14 ................................................................. 8

## Other Authorities

51 Fed. Reg. at 41,220 ........................................................... 31

53 Fed. Reg. at 3121 ............................................................... 8

## STATEMENT OF JURISDICTION

Federal Defendants-Appellees the United States Army Corps of Engineers, Thomas P. Bostick, Commander in Chief of Engineers, U.S. Army Corps of Engineers, and Steven McGugan, Colonel, District Engineer, U.S. Army Corps of Engineers, Huntington District (collectively, "the Corps") agree with the statement of jurisdiction by appellants Ohio Valley Environmental Coalition, *et al.* (collectively referred to as "OVEC"). OVEC Brief at 1.

## STATEMENT OF THE ISSUE

OVEC challenges the Corps' issuance of a permit under Section 404 of the Clean Water Act (33 U.S.C. § 1344(a)) allowing intervenor-defendant Raven Crest Contracting, L.L.C. ("Raven Crest") to place dredged or fill material in "waters of the United States." Raven Crest sought the permit as part of its operation of a surface coal mine in West Virginia. During the comment period on the proposed permit, OVEC submitted materials suggesting that surface coal mines might pose health risks to nearby surrounding communities. In granting this permit, the Corps examined the possible environmental impacts (including possible impacts to human health) of placing dredged material or fill in waters it regulated, but did not

examine the possible environmental impacts of operation of the entire surface mine. The issue raised by this appeal is:

1. Whether the Corps in issuing a permit under Section 404 of the Clean Water Act has a duty under the under National Environmental Policy Act, the Clean Water Act, or its own regulations to address potential health effects from the operation of a surface coal mine where the only federal involvement in the project is the issuance of the Section 404 permit allowing placement of fill in waters of the United States.

## STATEMENT OF THE CASE

### A.    Statutory Background

#### 1.    The Surface Mining Control and Reclamation Act

Congress enacted the Surface Mining Control and Reclamation Act of 1977 ("SMCRA") (30 U.S.C. § 1201 *et seq.*) to, among other things, "strike a balance between the nation's interests in protecting the environment from the adverse effects of surface coal mining and in assuring the coal supply essential to the nation's energy requirements" and "to its economic and social well-being." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001); 30 U.S.C. § 1202(f). SMCRA avoids federal-state conflicts by "cooperative federalism," where responsibility for regulating surface coal

mining operations is shared by the Secretary of the Interior and state regulatory authorities. *Bragg*, 248 F.3d at 288. If the state does not have a regulatory program approved by the Department of the Interior, then Interior will regulate surface mining in that state. 30 U.S.C. § 1254. If, as is true of West Virginia, the state has a regulatory program that has been approved by the Department of the Interior as meeting the minimum standards of SMCRA, then the approved state has "exclusive jurisdiction" to regulate surface mining within the state. *See* 30 U.S.C. § 1253(a); *Bragg*, 248 F.3d at 289, 294; *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 189 (4th Cir. 2009) ("*Aracoma*").[1] The agency in West Virginia responsible for regulating surface mining is the West Virginia Department of Environmental Protection ("WVDEP").

The SMCRA permitting process requires consideration of environmental impacts in the entire project area. Thus, substantial environmental analyses are conducted by the State before approving a

---

[1]    To be sure, DOI retains the authority in certain circumstances to enforce violations relative to a permit issued by an state with an approved state program or violations of SMCRA. 30 U.S.C. § 1271(a)-(b). That, however, is different from being the permitting authority in the first instance, as West Virginia is here.

Additionally, SMCRA contains a provision stating that it does not repeal or otherwise modify certain other federal statutes, including the Clean Water Act and NEPA. 30 U.S.C. § 1292(a).

SMCRA permit. For example, SMCRA requires that the permit applicant prepare a determination of the probable hydrologic consequences of the proposed mining and reclamation operations, both on and off the mine site. 30 U.S.C. § 1257(b)(11). SMRCA also requires that the regulatory authority prepare an assessment of the probable cumulative impact of all anticipated mining in the area upon the hydrologic balance of the area. 30 U.S.C. §§ 1257(b)(11) and 1260(b)(3). To the extent data submitted as part of the SMCRA permit application or obtained by the regulatory authority during the SMCRA permit application review process is relevant to issues considered by the Corps, the Corps may rely upon that data without duplicating the analysis. *See* 33 C.F.R. § 320.1(a)(5).

### 2. The Clean Water Act

The Clean Water Act ("CWA") establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA authorizes the discharge of pollutants into waters of the United States under two permit programs. Section 402 (33 U.S.C. § 1342) requires a permit for discharge of pollutants from point sources. These permits are known as "National Pollutant Discharge Elimination System ("NPDES") permits.

Under 33 U.S.C. § 1342(b), EPA has authorized WVDEP to issue NPDES permits in that state.

Section 404 of the Clean Water Act requires a permit to authorize discharges of dredged or fill material, such as overburden from surface coal mining, into the "waters of the United States." 33 U.S.C. § 1344. This includes dredged and fill material associated with typical surface coal mining and reclamation activities – such as the construction of valley fills, stream channel diversions, sediment ponds, and road crossings. 33 U.S.C. § 1344.

Section 404 permits must comply with regulations promulgated by the EPA in conjunction with the Corps, which are referred to as the "404(b)(1) Guidelines" or "Guidelines," codified at 40 C.F.R. Part 230. They provide in relevant part that a discharge cannot be permitted that would cause or contribute to significant degradation of waters of the United States. In turn, this requires the Corps to ensure that a proposed discharge will not cause significantly adverse effects on human health or welfare, aquatic life, and aquatic ecosystems. 40 C.F.R. § 230.10(c)(1)-(4). To comply with this requirement and the Guidelines, the Corps must make a written determination of the effects of a proposed discharge "on the physical, chemical, and biological components of the aquatic environment."

40 C.F.R. § 230.11. "Aquatic environment" or "aquatic ecosystem" means "waters of the United States, including wetlands that serve as habitat for interrelated and interacting communities and populations of plants and animals." 40 C.F.R. § 230.3(c). Compliance with the Guidelines is mandated by the Corps' regulations. 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6).

In addition to addressing the environmental impacts of issuance of a Section 404 permit under NEPA (discussed below), the Corps' regulations require it to conduct a "public interest review." This review is independent of the Guidelines, and balances the "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1). Permits can contain special conditions as necessary to mitigate applicable statutory and public interest requirements. 33 C.F.R. § 325.4(a) and (b). Subject to the Guidelines and other applicable criteria, the Corps will grant a permit "unless the district engineer determines that [to do so] would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

### 3. The National Environmental Policy Act

The National Environmental Policy Act, 42 U.S.C. §§ 4321-4370h, focuses the attention of federal decision makers and the public on potential environmental effects of proposed federal agency action. NEPA is purely

procedural, and it neither compel particular results nor does it impose substantive obligations. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989). NEPA does not require that an agency select any particular course of action. Instead, it requires only that the agency make its decision to proceed with a particular action (such as the Corps' issuance of the Section 404 permit at issue here) after taking a "hard look" at potential environmental consequences. *Ohio Valley Envt'l. Coal. v. U.S. Army Corps of Eng'rs*, 716 F.3d 119, 128 (4th Cir. 2013). "NEPA merely prohibits uninformed – rather than unwise – agency action." *Robertson*, 490 U.S. at 351.

NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") only for major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C); *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 371 (1989). To determine if a particular action requires an EIS, the Corps may prepare an environmental assessment ("EA"). 33 C.F.R. § 230.10; 40 C.F.R. § 1501.3. If the Corps finds through the EA that the proposed action will not have a significant impact on human health or the environment, it then issues a "finding of no significant impact" ("FONSI") and the NEPA process is complete. 33 C.F.R. § 230.11.

When a permit application requires analysis of environmental impacts of a proposed action under NEPA, the Corps follows three sets of regulations: (1) the Corps' own NEPA regulations, set forth at 33 C.F.R. pts. 230 and 325, appendix B; (2) the Corps' general regulatory policies at 33 C.F.R. pt. 320; and (3) the regulations promulgated by the Council on Environmental Quality, set forth at 40 C.F.R. § 1500 *et seq.* The regulations require consideration of the potential direct, indirect, and cumulative effects of the proposed action, as well as alternatives. 40 C.F.R. §§ 1502.14(f), 1508.7, 1508.8, 1508.9, 1508.27(b)(7).

The Corps' own NEPA regulations address the scope of its NEPA review for Section 404 permits. These regulations establish that its NEPA document (whether it is an EA or an EIS) should "address the impacts of the specific activity requiring a [Corps] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. pt. 325, app. B, § 7(b)(1). In the preamble to this regulation, the Corps stated it "authorizes the discharge of dredged or fill material in 404 permits. Therefore, the action the Corps studies in its NEPA document is the discharge of dredged or fill material." 53 Fed. Reg. at 3121. The Corps does not study other activities, even if they are part of the same project, because "NEPA does not

expand the authority of the Corps to either approve or disapprove activities outside waters of the United States." *Id*.

### B.    Factual Background

#### 1.    The Section 404 Permit

Prior to applying to the Corps for a Section 404 permit, Raven Crest had already obtained from WVDEP a permit under the West Virginia SMCRA regulatory program to construct and operate a surface mine, and a NPDES permit to discharge pollutants. J.A. 48. The proposed mine will be located on a 724-acre site near Racine, in Boone County, West Virginia. To construct and operate the mine, Raven Crest must discharge fill material into streams that constitute "waters of the United States." Raven Crest sought the Section 404 permit to construct five sediment control ponds, and various "mine throughs" as part of its surface coal mining operations. "Mine throughs" or "mining through" refers to a process whereby the ground underlying and through a streambed is excavated to extract coal, then backfilled. *See Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs.*, 746 F.3d 698, 707 n.2 (6th Cir. 2014) ("*Kentuckians*"). The waters to be affected by the permit are Roundbottom Creek and Mill Branch, and unnamed tributaries of the streams. No party disputes that the

waters addressed by the Section 404 permit are "waters of the United States." J.A. 35 n.2.

Raven Crest's original October 29, 2009 application for a permit under CWA Section 404 involved impacts to waters of the United States that make up about 1.04 acre of the total area for the Project of 724.4 acres, or 0.1 percent of the total area of the project. J.A. at 530, 538. A surface mine necessarily requires the excavation of earth, referred to as "spoil." Raven Crest planned to return some of the spoil to the mined-out area and place the remaining spoil on an adjacent permitted site. *Id.* at 46.

On July 1, 2010, in response to the Corps' issuance of a public notice for the application, Margaret Janes, on behalf of various environmental groups including plaintiffs-appellants here, submitted comments objecting to the issuance of the Permit. After the close of the public comment period, on November 11, 2011 and August 17, 2012, OVEC submitted two additional sets of comments. The comments included articles and news reports suggesting that surface coal mining might put human health at risk. None of the materials addressed the possible health impacts of the proposed Raven Crest mine; rather, they described many different types of mining activities that they claim may affect human health through unrelated exposure pathways. A major consideration for these studies seems to be the

placement of spoil in valley fills (J.A. at 216), which will not occur at the Raven Crest mine. *Id.* at 46.

Following Raven Crest's submission of the Section 404 permit application and conceptual Compensatory Mitigation Plan (CMP), discussions between the Corps, EPA, and Raven Crest resulted in the development of a complete CMP. The CMP included mitigation measures that, among other things, require reconstruction of 12,000 feet of streams that will be filled by mining. The reconstruction would occur within a year of the cessation of mining. Raven Crest will also restore off-site streams and plant vegetation in the riparian zone. J.A. at 47.

On August 10, 2012, the Corps signed the Combined Decision Document approving the Permit. J.A. at 583. The Combined Decision Document included the Corps' EA addressing the possible environment impacts of allowing the placement of fill in waters regulated by the Corps. Based on that EA, the Corps made a finding that issuance of the Permit would have no significant impact on the environment. *Id.* at 582. With respect to OVEC's comments on possible human health risks from the entire operation of the mine, the Corps stated "[r]eferences concerning water quality and public health have been reviewed. These issues are not within the purview of the Corps' regulatory authority, but are considered by

WVDEP during the SMCRA permitting process to assure the project would not violate EPA-approved water quality standards, pursuant to CWA Sections 401 and 402." *Id.* at 642. After Raven Crest accepted the terms of the Permit, the Corps executed the Permit on August 30, 2012, making it effective.

A few months later, OVEC filed this action. OVEC alleged that the Corps had failed to address the human health impacts of surface mining it had raised in its comments on the proposed Permit. This failure, OVEC maintained, violated NEPA, the Clean Water Act, and the Corps' public interest review regulations at 40 C.F.R. § 320.4.[2] Raven Crest intervened to defend issuance of the Permit. The parties filed cross-motions for summary judgment, and the district court, relying on this Court's decision in *Aracoma*, granted summary judgment to the Corps and Raven Crest. J.A. at 88.

---

[2] OVEC's complaint also alleged that the construction and operation of the surface coal mine would violate water quality standards required by the Clean Water Act, but later agreed to dismiss these allegations from its complaint. J.A. at 50-51. As a result, "only the claims regarding the effects on human health and welfare are at issue." *Id.* at 51.

# SUMMARY OF ARGUMENT

OVEC's appeal concerns the scope of the Corps' examination of possible environmental impacts from the issuance of the Section 404 permit. Following its regulations, the Corps limited its NEPA examination to potential impacts to the "waters of the United States" in which Raven Crest proposed to place fill. OVEC contends that the Corps should have examined the environmental impacts from operation of the mine as a whole, and in particular should have addressed risks to human health that OVEC says will be created by the operation of the entire mine.

In its *Aracoma* decision, this Court has already addressed the scope of the Corps' obligation to address environmental impacts when issuing a Section 404 permit to a surface coal mine. In *Aracoma*, the Court upheld the Corps' interpretation of its regulations as limiting NEPA review on these facts to the environmental impacts resulting from placement of fill in waters regulated by the Corps under the Clean Water Act. The Court concluded that in this context the Corps had no obligation to consider impacts from the operation of the entire mine. This Court recognized that regulation of surface mining is governed by SMCRA, and that because West Virginia's surface mining program has been approved by the Department of the Interior, West Virginia has "exclusive jurisdiction" to regulate surface

13

mining within that state. *See* n.1 *supra*. The Sixth Circuit has endorsed this Court's decision in *Aracoma* and reached the same conclusion. *Kentuckians for the Commonwealth v. U.S. Army Corps of Engineers*, 746 F.3d 698 (6th Cir. 2014). OVEC fails to show any meaningful difference between this case and *Aracoma* or *Kentuckians* supporting a different result here.

OVEC also claims that the Corps had a duty under the Section 404 Guidelines and the Corps' public interest review regulation to consider environmental impacts from operation of the entire Raven Crest mine. Neither regulation extends the Corps' regulatory jurisdiction beyond that which exists under Section 404 and the discharges associated with a small part of the overall surface mining area and process. The district court decision should be affirmed.

## ARGUMENT

### STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo. Nat'l Audubon Soc'y v. Dept. of the Navy*, 422 F.3d 174, 185 (4th Cir. 2005). Claims under both NEPA and the CWA are subject to judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 439

(4th Cir. 2003). The APA requires that the Corps' action be upheld unless the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *see also Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416 (1971).

The scope of this Court's review under the APA is quite narrow. The Court is not empowered to substitute its judgment for that of the Corps, but is to evaluate whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park,* 401 U.S. at 416. Courts will uphold the agency's conclusions "if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992) (citation omitted). Substantial deference is given to an agency's interpretation and application of its own regulations, *Kentuckians*, 317 F.3d at 439 ("[T]he agency is entitled to interpret its own regulation and the agency's interpretation is 'controlling unless plainly erroneous or inconsistent with the regulation.'") (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

15

I.    **The Corps Correctly Limited Its Examination under NEPA of Environmental Impacts from the Section 404 Permit to Those Resulting from the Discharge of Fill into "Waters of the United States."**

A.    **The Corps Properly Followed Its Own Regulations in Determining the Scope of Its NEPA Review for the Section 404 Permit Sought by Raven Crest.**

The Corps' regulations establish that its NEPA document (whether it is an environmental assessment or an EIS) should "address the impacts of the specific activity requiring a [Corps] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. pt.325, app. B, § 7(b)(1). The Corps is deemed to have sufficient "control and responsibility" over parts of the project beyond the limits of the specific activity being authorized only in narrow circumstances. Typical factors include "[w]hether or not the regulated activity comprises 'merely a link' in a corridor type project"; "whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity"; and whether "the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project." 33 C.F.R. pt. 325, app. B § 7.b(2). "Federal control" occurs in cases "where the environmental consequences of the additional portions of the projects are

16

essentially products of Federal financing, assistance, direction, regulation, or approval * * *." *Id.*

An example of a case where these other factors s were present necessitating a broader scope of environmental review is found in *Hughes River Water Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996) (cited in OVEC Brief 27-28). In *Hughes River*, one federal agency paid for all of the construction costs of a multi-purpose dam, and a second federal agency oversaw design and construction of the dam. *Id.* at 441. The much greater federal involvement in and control over the action in Hughes River made a more extensive NEPA review there appropriate under the Corps' regulations.

Where the only involvement by the Corps is the issuance of a Section 404 permit, the Corps has recognized that a more narrow scope of environmental review is warranted. In the preamble to 33 C.F.R. pt. 325, app. B, § 7(b)(1), the Corps stated that it "authorizes the discharge of dredged or fill material in 404 permits. Therefore, the activity the Corps studies in its NEPA document is the discharge of dredged or fill material." *See* 53 Fed. Reg. at 3121. The Corps does not study typically other activities, even if they are part of the same project, because "NEPA does not expand

the authority of the Corps to either approve or disapprove activities outside waters of the United States." *Id.*

The District Engineer (the permitting officer) appropriately followed the Corps' regulations here. The "specific activity" for which Raven Crest sought a permit was "direct discharge of fill material into waters of the" United States in order to extract coal pursuant a surface mining permit issued by WVDEP. J.A. at 530. The affected streams were located in Roundbottom Creek and Mill Branch watersheds. *Id.* at 536.

In approving the Section 404 Permit, the Corps fully analyzed the potential environmental impacts to these streams. *See, e.g.*, J.A. at 547-74. As part of that analysis, the Corps considered health risks through pathways other than drinking water, and possible risks to drinking water supplies that cannot be addressed through treatment of the water supply. *See, e.g.*, J.A. at 548, 550, 552, 554-61, 562, 564-568, and 577-80.

OVEC does not challenge the conclusions the Corps reached concerning the potential impacts to the waters of the United States; rather, OVEC challenges the Corps' scope of its environmental review. As we show, the Corps correctly interpreted its own regulations as establishing the scope of review under NEPA.

18

**B.    This Court and the Sixth Circuit Have Upheld the Corps'
Interpretation of Its NEPA Obligations for Issuance of a
Section 404 Permit to Require Examination of Only Those
Potential Environmental Impacts to Waters of the United
States.**

OVEC's brief is a search for a statute that will compel the Corps to
address the general health effects that might result from the general
operation of Raven Crest's mine. As we have explained, the Corps, relying
on its interpretation of its own regulations, limited its NEPA review of
potential environmental impacts of the action it approved in the Section
404 permit. That action was the placement of fill in waters the Corps
regulates under the CWA. The Corps' interpretation of its regulations
governing NEPA review where the sole federal action is issuance of a
Section 404 permit has been upheld by this Court in *Aracoma* and by the
Sixth Circuit in *Kentuckians*.

In *Aracoma*, the Corps had issued four Section 404 permits to an
operator of a coal surface mine. As the mine was located on a mountaintop,
the operator used established methods to remove the overburden ("spoil")
to extract the coal. *Aracoma*, 556 F.3d at 186. The spoil not needed to
restore the mine site to its approximate original contour was to be placed in
adjacent valleys ("valley fills"). *Id.* The operator sought the Section 404
permits to authorize 23 valley fills and construction of 23 sediment ponds

as part of a system to collect and hold surface runoff from the valley fills. *Id.* at 187. Following its regulations, the Corps limited its NEPA review to the environmental impacts from placement of fill in waters of the United States, and did not examine the impacts from the entire valley fill project.[3] Along with the permits, the Corps had issued EAs that found no significant impacts to the environment would occur as a result of activity allowed by the Section 404 permits. *Id.*

Plaintiffs challenged the Section 404 permits under NEPA and the CWA. In relevant part, the district court agreed with the Plaintiffs that under NEPA the Corps should have considered impacts from the entire valley fill project, and not just impacts to waters of the United States. *Aracoma*, 556 F.3d at 188. The Corps appealed, and this Court reversed.

This Court began by noting that the Corps had issued regulations stating that its NEPA review should "address the impacts of the specific activity" requiring a Section 404 permit" *Aracoma*, 556 F.3d at 194 (*see* discussion in prior section above). Accordingly, the Corps' decision at issue was based on its interpretation of its own regulations, and judicial review of the Corps' interpretation was "highly deferential, with the agency's

---

[3]    As noted earlier, Raven Crest's mining procedures will avoid the creation of valley fills here. J.A. at 46-47.

20

interpretation 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Id.* at 193 (quoting *Auer*, 519 U.S. at 461).

The Court then turned to the "complex statutory framework" that regulates surface mining. The Court noted that Congress enacted SMCRA to establish a nationwide regulatory program for surface mining. *Aracoma*, 556 F.3d at 189. In contrast, Section 404 was "unambiguous about what the Corps is authorized to permit under the CWA: the Corps 'may issue permits, after notice and opportunity for public hearings *for the discharge of dredged or fill material into the navigable waters* at specified disposal sites.'" *Id.* at 194 (quoting 33 U.S.C. § 1344(a)) (emphasis added by the Court).

This Court found the Corps' interpretation of its regulations was reasonable. *Aracoma*, 556 F.3d at 195. To require the Corps to address the environmental impacts of the entire project in the context of an application for a Section 404 permit would "read out of the equation the elaborate, congressionally mandated schema for the permitting of surface mining operations prescribed by SMCRA." *Id.* Because West Virginia has an approved program under SMCRA to regulate surface mining, "the State of West Virginia has 'exclusive jurisdiction over the regulation of surface coal mining and reclamation operations.'" *Id.*, (quoting 30 U.S.C. § 1253). See

21

n.1, *supra*. If issuance of a Section 404 permit turned an entire surface mining operation into a federal action for NEPA purposes, then West Virginia's regulation of surface mining under SMCRA "becomes at best duplicative, and at worst, meaningless." *Id.* at 196.

The Sixth Circuit has endorsed this Court's decision in *Aracoma*. *Kentuckians*, 746 F.3d 698. In *Kentuckians*, the Sixth Circuit held that "[h]ere, the overall mining project is not the specific activity authorized by the § 404 permit, nor does the Corps' district engineer maintain sufficient control and responsibility over other portions of the entire project to warrant federal review." *Id.* at 707. In reaching its conclusion, the Sixth Circuit stated that this Court's decision in *Aracoma* "strongly and persuasively supports the Corps' decision to limit its scope of analysis." *Id.* at 710.

Thus, the two Circuits to have addressed this issue have held that the Corps' review of environmental impacts from issuance of a Section 404 permit to a surface coal mine are properly limited to those activities within the Corps' authority, and does not extend to the surface mine as a whole.

C.    **The Corps' Section 404 Permit Could Not Authorize Surface Mining by Raven Crest.**

OVEC's brief does not mention *Kentuckians*. That decision, while not controlling on this Court, warrants discussion because the Sixth Circuit's

22

decision rejected OVEC's first attempt to distinguish *Aracoma*. OVEC

asserts that because the Corps' Section 404 permit allows the placement of

fill in waters of the United States as a result of the extraction of coal by

"mining through" stream beds, the Corps' Section 404 permit here

"specifically authorized mining within its self-defined jurisdictional area.

There can be little question that the Corps authorized mining." OVEC Brief

at 22. Accordingly, OVEC contends, NEPA requires the Corps to examine

the impacts of operation of the entire mine and human health risks that

might result. *Id.*[4] OVEC claims that *Aracoma* is distinguishable because the

permitted activity in that case consisted of 23 valley fills and construction

of 23 sediment ponds, but no "mine throughs." *Id.* at 24-25 (citing

*Aracoma*, 556 F.3d at 189).

The Sixth Circuit identified the flaws in this argument in

*Kentuckians*:

> [t]he Corps did not authorize mining *per se* [through issuance
> of a Section 404 permit], but only the discharges into streams
> that are a necessary part of a "mine through." That is, the Corps
> authorized "mining through" because of the activity's impacts
> on stream beds and not because of its purpose to extract coal.
> Furthermore, the Corps does not even have the authority to

---

[4]    *Kentuckians* defined this technique involving the scraping away of a
stream bed to extract coal. *Kentuckians*, 746 F.3d at 707 n.2.

> authorize surface coal mining, and the plaintiffs do not argue
> that the permit exceeded the scope of § 404.

746 F.3d at 707 n.2.

The Sixth Circuit's analysis rests on this Court's holding that the Corps cannot authorize surface mining through a Section 404 permit. Instead, SMCRA gives West Virginia "exclusive jurisdiction" to issue permits for surface mining in that state. *Aracoma*, 556 F.3d at 195 (citing 30 U.S.C. § 1253). Rather, all that the Corps can authorize through a Section 404 permit is the "discharge of dredged material or fill" into the waters of the United States. 33 U.S.C. § 1344(a). Put another way, had the mine operator in *Kentuckians* lacked a surface mining permit, its Section 404 permit would not have authorized the removal of coal through the "mining through" process. The Corps' Section 404 permit authorizes the placement of fill in waters of the United States, and this does not change because the fill is generated by a mining technique. The Sixth Circuit's recognition of the difference between the scope of regulation under Section 404 and under SMCRA is consistent with this Court's analysis in *Aracoma* and should apply here.

**D.** **Having No Duty to Consider the Environmental Impacts of the Entire Mine, the Corps' Decision to Issue the Section 404 Permit Did Not Rely on Analysis by WVDEP of Possible Effects to Human Health from Operation of the Raven Crest Mine.**

OVEC next seeks to distinguish *Aracoma* from this case (1) by arguing that here the Corps violated NEPA by delegating its NEPA obligations to WVDPEP, or alternatively, (2) by asserting that WVDEP's failure to investigate possible health impacts from operation of the proposed mine somehow shifted the responsibility to do so to the Corps. Both arguments lack merit.

First, OVEC claims that the Corps delegated its NEPA responsibility to consider impacts from the operation of the entire mine to WVDEP without verifying that WVDEP would satisfy that responsibility. OVEC Brief at 29-30 (citing J.A. 642). This argument assumes that the Corps has such a duty to consider impacts from the entire mine, which *Aracoma* held that it did not. Accordingly, the Corps had no reason to delegate a NEPA responsibility it did not have to WVDEP. The Corps has been quite plain in stating that it recognized no such responsibility. In responding to OVEC's comments about possible health effects from operation of the surface mine, the Corps stated that issues concerning impacts from operation of the mine as a whole "are not within the purview of the Corps' regulatory authority

25

but are considered by WDVEP." J.A. 642. Elsewhere in its approval of the Section 404 permit, the Corps stated that its scope of NEPA analysis was "consistent with" this Court's decision in *Aracoma*, and that a "broader scope, such as the entire area to be mined, is not appropriate because the CWA does not provide the Corps legal authority to regulate coal mining activities beyond the limits of waters of the U.S. and associated riparian corridor." *Id.* at 538.

Second, OVEC contends that the failure or inability of WVDEP to examine possible human health impacts from operation of the proposed surface mine creates a duty for the Corps to do so. OVEC Brief at 31-32. OVEC claims that this Court's decision in *Aracoma* turned on this Court's conclusion that "existing statutory schemes * * * adequately address[ed] the very concerns raised by commenters." OVEC Brief at 31 (citing *Aracoma*, 556 F.3d at 195-96). OVEC contends that because West Virginia has not addressed its concerns about health risks posed by the proposed mine, it must be the duty of the Corps to do so.

OVEC's argument that the Court's decision in *Aracoma* turned on the Court's assumption about what West Virginia had done or would do with respect to water quality is not supported by the pages cited by OVEC in its brief. The Court did not discuss the facts concerning West Virginia's

26

regulation of the valley fill project at issue. The basis for the Court's
decision in *Aracoma* was the Court's conclusion that "[t]he Corps'
jurisdiction under CWA § 404 *is limited* to the narrow issue of the filling of
jurisdictional waters." 556 F.3 at 195 (emphasis added).

Nor does OVEC cite any authority to support its contention that
alleged inaction by West Virginia creates a duty on the Corps. The district
court correctly recognized the fallacy in OVEC's argument, stating that "the
absence of state control over a particular activity does not generally imply
that federal control exists. Federal control is defined by the Constitution
and federal law alone." J.A. at 72.

### E. The Corps Did Not Err in Balancing Economic Benefits against Environmental Harms as Part of Its Public Interest Review.

OVEC claims that that the Corps erred in its NEPA analysis by
identifying economic benefits as those coming from the operation of the
entire mining project while confining its examination of negative
environmental impacts to the placement of fill in waters of the United
States. OVEC Brief at 36-37. OVEC notes that the Corps' NEPA regulations
require the Corps to use the same scope of analysis when looking at benefits
and impacts of a proposed action. OVEC Brief at 35 (quoting 33 C.F.R. Pt.
325, app. B § 7(b)(3)). OVEC claims that the consideration of the benefits to

the local economy from the operation of the entire mine was inconsistent with the Corps' limitation of its review of impacts to the area covered by the Section 404 permit. *Id.*

The district court agreed that the Corps should have used the same scope of review for both benefits of the project and for harms, but held that any error was harmless because the Corps' analysis of the environmental impacts to water of the United States had not been shown to be erroneous. J.A. at 82-83.

The error in OVEC's argument here, and in the district court's conclusion that EPA's NEPA review used the wrong scope for comparison of benefits to impacts, is that this comparison was not made as part of the Corps' NEPA's review. Instead, the Corps made this comparison as part of its "public interest review" as required by 33 C.F.R. § 320.4(a)(1). The heading in the Corps' decision document containing this comparison is "Economics [33 C.F.R. § 320.4(a)(1)]." J.A. at 551 (discussing economic benefits from mine operation as part of its review of the public interest; brackets in original heading). The Sixth Circuit explained the distinction between a public interest review and review of potential environmental impacts under NEPA: "Even though the Corps' regulations require a public interest review for all permit decisions, 33 C.F.R. § 320.4(a), and the

§ 404(b)(1) Guidelines require the consideration of certain effects on the public interest, *see, e.g.*, 40 C.F.R. § 230.10(c), these are not NEPA obligations." *Kentuckians*, 746 F.3d at 712. For this reason, "the fact that the Corps used a wider scope of review in performing its public interest analysis, as required by the § 404(b)(1) Guidelines and its own regulations, does not mean that the Corps violated its NEPA obligations." *Id.*

In any event, even if the Corps should not have addressed economic benefits accruing from operation of the entire mine, any error was, as the district court concluded, harmless. The district court noted that "the Corps [has] adequately studied the proposed activity and taken a hard look at the relevant environmental consequences of its decision." J.A. at 82-83. OVEC has not shown that there was error by the Corps in its assessment of environmental impacts to waters of the United States; its argument is that the scope of that analysis was too narrow. A remand to have the Corps narrow its benefit analysis would not produce the broad analysis of health effects that OVEC seeks and would serve no purpose. *See People of the State of Ill. v. I.C.C.*, 722 F.2d 1341, 1349 (7th Cir. 1983) ("A remand would therefore be pointless, and is not required.").

II.   **The Corps Has No Obligation Under the Section 404 Guidelines to Address Health Impacts Beyond Those Resulting from the Placement of Fill in Waters of the United States.**

Finally, OVEC turns to sources other than NEPA to create a duty for the Corps to consider health impacts from operation of the entire mine. OVEC first contends that the Corps failed to comply with the requirements of the Section 404(b)(1) Guidelines to address possible health risks through pathways other than drinking water, and possible risks to drinking water supplies that cannot be addressed through treatment of the water supply. OVEC Brief at 39. In fact, the Corps did address these and related environmental issues as part of its NEPA analysis. *See, e.g.*, J.A. at 548, 550, 552, 554-61, 562, 564-568, and 577-80. OVEC does not show any error in this analysis. OVEC Brief at 40-41. Rather OVEC's complaint is, as it has been throughout, with the scope of this analysis. OVEC contends that the Corps should have examined impacts from the operation of the mine, and not have limited its review to the impacts over which the Corps has control, the placement of fill in waters of the United States. The Guidelines regulations do not expand the scope of the Corps' regulatory authority.

Second, OVEC contends that the Corps violated its regulation requiring a review of the public interest. OVEC Brief at 40 (citing 33 C.F.R. § 320.4(a)(1)). OVEC notes that the Section 404 permit as approved by the

Corps requires measures affecting areas not containing waters of the United States, including requiring revegetation, protection for an endangered species, and alternative configurations of upland mining. *Id.* (citing J.A. 540-47). OVEC contends the inclusion of mitigation measures establish that the Corps has control over the entire mine site. *Id.*

The public interest review regulation requires that the Corps consider the "probable impact which the proposed activity may have on the public interest[.]." 33 C.F.R. § 320.4(a)(1). The district court agreed that the "proposed activity" here was "the discharge of dredged or fill material into jurisdictional waters" and no broader. The district court also noted that the "authority to conduct the public interest review stems from the authority granted to the Corps under the CWA. See Final Rule for Regulatory Programs, 51 Fed. Reg. at 41,220." J.A. at 86-87. As such, the regulation could not extend the Corps' regulatory authority beyond that given to the agency under Section 404 of the Clean Water Act.

Here the mitigation efforts considered by the Corps related to the placement of fill in waters of the United States. The Corps' authority to impose mitigation measures has never been held to be limited to waters of the United States. To use the Corps' authority to require mitigation measures to protect waters of the United States as a bootstrap to extend the

Corps' authority over the entire operation of the mine would ignore this

Court's holding in *Aracoma* and the express intent of Congress in enacting

SMCRA. Once again, OVEC fails to show a basis for the Corps to exercise

the broad power over surface mining.

**CONCLUSION**

For these reasons, the district court's judgment should be affirmed.

> JOHN C. CRUDEN
> ASSISTANT ATTORNEY GENERAL
>
> /s/ Robert H. Oakley
> AARON P. AVILA
> RUTH ANN STOREY
> AUSTIN SAYLOR
> ROBERT H. OAKLEY
>    *Attorneys*
>    *Environment and Natural Res.*
>    *Div.*
>    *U.S. Department of Justice*
>    *P.O. Box 7415*
>    *Washington, D.C. 20044*
>    *(202) 514-4081*
>    *robert.oakley@usdoj.gov*

February 2015
90-5-1-4-19656

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. Excepting portions of the brief described in Fed. R. App. P. 32(A)(7)(B)(iii), the brief contains 6826 words. This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. Pl. 32(a)(6). The brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2013 in Century, 14-point.

/s/ Robert H. Oakley
Robert H. Oakley

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of February 2015, I have served the forgoing Appellees-Federal Defendants Response Brief on all registered counsel through the Court's electronic filing system (ECF).

/s/ Robert H. Oakley
Robert H. Oakley

34