**RECORD NO. 14-2129**

## IN THE
# United States Court of Appeals
### FOR THE FOURTH CIRCUIT

OHIO VALLEY ENVIRONMENTAL COALITION, INC.;
WEST VIRGINIA HIGHLANDS CONSERVANCY, INC.;
SIERRA CLUB; COAL RIVER MOUNTAIN WATCH INC.,

*Plaintiffs - Appellants,*

v.

UNITED STATES ARMY CORPS OF ENGINEERS;
THOMAS P. BOSTICK, Commander and Chief of Engineers,
U.S. Army Corps of Engineers;
STEVEN MCGUGAN, Colonel, District Engineer,
U.S. Army Corps of Engineers, Huntington District,

*Defendants - Appellees.*

RAVEN CREST CONTRACTING, LLC,

*Interventor/Defendant - Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**RESPONSE BRIEF OF INTERVENOR/DEFENDANT-APPELLEE
RAVEN CREST CONTRACTING, LLC**

ROBERT G. MCLUSKY
JACKSON KELLY PLLC
1600 Laidley Tower
500 Lee Street, East
Post Office Box 553
Charleston, West Virginia 25322
Phone (304) 340-1281
Fax: (304) 340-1272

DOUGLAS J. CROUSE
JACKSON KELLY PLLC
1600 Laidley Tower
500 Lee Street, East
Post Office Box 553
Charleston, WV 25322
Phone (304) 340-1347
Fax: (304) 340-1272

*Counsel for Interventor/Defendant-Appellee
Raven Crest Contracting, LLC*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

No.    14-2129            Caption:    Ohio Valley Environmental Coalition v.
                                      U.S. Army Corps of Engineers

Pursuant to FRAP 26.1 and Local Rule 26.1, Raven Crest Contracting, LLC, which is an intervenor-appellee, makes the following disclosures:

1.    Is party/amicus a publicly held corporation or other publicly held entity?
         (  ) YES            ( X ) NO

2.    Does party/amicus have any parent corporations?
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations
         ( X ) YES            (  ) NO
      Xinergy Ltd.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
         ( X ) YES            (  ) NO
      If yes, identify all such owners:
      Xinergy Ltd.

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
         ( X ) YES            (  ) NO
      If yes, identify entity and nature of interest:
      Xinergy Ltd. (98.87%) and Xinergy Finance, Inc. (1.13%)
                      ↓
      Xinergy Corp. (100%)
                      ↓
      Xinergy of West Virginia, Inc. (100%)
                      ↓
      Shenandoah Energy, LLC (100%)
                      ↓
      Raven Crest Mining, LLC (100%)
                      ↓
      Raven Crest Contracting, LLC

5.    Is party a trade association? (amici curiae do not complete this question)
         (  ) YES            ( X ) NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?
              (   ) YES               ( X ) NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature:     /s/Douglas J. Crouse          Date:  February 17, 2015

Counsel for:     Raven Crest Contracting, LLC

TABLE OF CONTENTS

Page

Corporate Disclosure

Table of Authorities ................................................................... ii

Preliminary Statement ...............................................................1

Statement of Issues....................................................................4

Statement of the Case................................................................4

Statement of Facts ....................................................................5

Argument....................................................................................5

    A.    Fourth Circuit precedent is directly applicable to the facts and
        issues in this case and supports the Corps' issuance of Raven
        Crest's § 404 permit ...............................................................5

    B.    The health studies do not sufficiently assert a causal connection
        between mining, fill discharges, and human health to implicate
        NEPA review.............................................................................13

Conclusion ...............................................................................20

Certificate of Compliance ......................................................21

Certificate of Filing and Service ...........................................22

# TABLE OF AUTHORITIES

## CASES

*Bragg v. Robertson*,
  83 F. Supp. 2d 713 (S.D. W.Va. 2000)..........................................................7

*Bragg v. West Virginia Coal Association*,
  248 F.3d 275 (4th Cir. 2001) ....................................................................3, 7

*Department of Transport v. Public Citizen*,
  541 U.S. 752 (2004)..............................................................................17, 18

*Huss v. Gayden*,
  571 F.3d 442 (5th Cir. 2009) ....................................................................19

*Kentuckians for the Commonwealth v. Rivenburgh*,
  317 F.3d 425 (4th Cir. 2003) ......................................................................3

*Kentuckians for the Commonwealth v. U.S.A.C.E.*,
  963 F. Supp. 2d 670 (W.D. Ky. 2013), *affirmed* 746 F.3d 698
  (6th Cir. 2014)..........................................................2, 3, 6, 10, 13

*Kentucky Waterways Alliance v. Johnson*,
  540 F.3d 466 (6th Cir. 2008) ....................................................................12

*Metro.Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983)..............................................................................17, 18

*New Jersey Dept. of Envtl. Prot. v. Nuclear Regulatory Comm'n*,
  561 F.3d 132 (3rd Cir. 2008) ......................................................................18

*Norris v. Baxter Healthcare Corp.*,
  397 F.3d 878 (10th Cir. 2005) ....................................................................17

*Ohio Valley Envtl. Coal. v. Aracoma Coal Company*,
  556 F.3d 177 (4th Cir. 2009) ..............................................................*passim*

*Ohio Valley Envtl. Coal. v. Bulen*,
  429 F.3d 493 (4th Cir. 2005) ......................................................................3

*Ohio Valley Envtl. Coal. v. U.S.A.C.E.*,
  716 F.3d 119 (4th Cir. 2013) ....................................................3, 7, 9

*Peters v. AstraZeneca LP*, 224 Fed. Appx.
  503, 507 (7th Cir. 2007) ...............................................................19

*Samaan v. St. Joseph Hospital*,
  670 F.3d 21 (1st Cir. 2012)............................................................19

*U.S. v. Valencia*,
  00 F.3d 389 (5th Cir. 2010) ...........................................................19

## STATUTES AND REGULATIONS

33 C.F.R. pt. 325, App. B .....................................................................5
40 C.F.R. Pt. 434 pt 434......................................................................11
40 C.F.R. § 1502.9 ..............................................................................13
30 C.F.R. § 715.17 ..............................................................................11

5 U.S.C. § 551-559................................................................................2
5 U.S.C. § 521 .......................................................................................2
 5 U.S.C. § 701-706...............................................................................2
5 U.S.C. §§ 1305, 3105.........................................................................2
5 U.S.C. § 3344 .....................................................................................2
5 U.S.C. § 5372 .....................................................................................2
30 U.S.C. §§ 1202-1328 .......................................................................1
33 U.S.C. § 1342..............................................................................1, 11
33 U.S.C. § 1344....................................................................................1
42 U.S.C. §§ 4321-4370(h).....................................................................2

W. Va. Code St. R. 38-2-3.22.a-.i..................................................12, 13
W. Va. Code St. R. § 38-2-5.4.a .........................................................11
W. Va. Code St. R. §§ 47-2-6.2 ..........................................................12
W. Va. Code St. R. § 47-30-6.2.c .......................................................12

## <u>OTHER AUTHORITIES</u>

http://content.sierraclub.org/coal/about-the-campaign and
http://action.sierraclub.org/site/MessageViewer?em_id=211461.0 ..........................2

## Preliminary Statement

Raven Crest Contracting, LLC ("Raven Crest") operates its Boone North No. 5 Surface Mine, a surface coal mine, in West Virginia.  About 50 employees work at the mine and another 21 work at its associated preparation plant.  The mine is the sole source of coal to the preparation plant.  Raven Crest operates the mine pursuant to a surface mining permit issued by the West Virginia Department of Environmental Protection (WVDEP) as required by the Federal Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1202-1328; a water discharge or "NPDES" permit issued by WVDEP as required by the Clean Water Act ("CWA") controlling the concentrations of pollutants in water leaving the site, 33 U.S.C. § 1342; and a CWA 404 permit  issued  by  Corps of Engineers for discharges of "fill" material necessary for constructing ponds and advancing a simple contour mine across narrow drainage channels.  33 U.S.C. § 1344.  *See also Ohio Valley Envtl. Coal. v. Aracoma Coal Company,* 556 F.3d 177, 189-192 (4th Cir. 2009) (providing a detailed summary of the overlapping statutory and regulatory permitting framework involved in the authorization of surface coal mining).

As part of its publicly announced "Beyond Coal" campaign[1] the Sierra Club and several state-level anti-mining groups ("Sierra Club," "OVEC," or "Appellants") simultaneously filed two complaints in Federal district courts of West Virginia and Kentucky under the CWA, National Environmental Procedure Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706, 1305, 3105, 3344, 5372, 7521. Each complaint challenged the Corps' issuance of CWA § 404 "dredge and fill" permits to allow surface coal mining. Complaint, ECF Doc. # 1, J.A. 9-31; Kentucky Complaint, ECF Doc. # 38-2.[2] In each case, the Sierra Club argued that the Corps, which authorizes only a very small part of a coal mine, was obligated to expand its review beyond the narrow scope of its permitting activities to embrace all effects of the mines at issue.

This is not the first time the Sierra Club and it followers have challenged permits issued by the Corps or other agencies for coal mines. They have done so repeatedly before both this Court and the Sixth Circuit Court of Appeals—with

---

[1] *See* http://content.sierraclub.org/coal/about-the-campaign and http://action.sierraclub.org/site/MessageViewer?em_id=211461.0 for information describing the Sierra Club's "Beyond Coal" campaign.

[2] The complaint filed in West Virginia has resulted in the present appeal. The Kentucky case has been resolved in favor of the Corps and the intervening permit holder, and is styled *Kentuckians for the Commonwealth v. U.S.A.C.E.*, 963 F. Supp. 2d 670 (W.D. Ky. 2013), *affirmed* 746 F.3d 698 (6th Cir. 2014).

little success.[3]   Nor is it the first time they have argued that the Corps was

obligated to expand the scope of its review into activities and areas that fall to the

authority or control of other agencies.  Those arguments have also been previously

rejected.  *See Aracoma*, 556 F.3d 177 (4th Cir. 2009); *Kentuckians for the

Commonwealth v. U.S.A.C.E.*, 746 F.3d 698 (6th Cir. 2014).   Indeed, the court

below relied on these rulings to reject the Sierra Club's challenge to Raven Crest's

404 Permit. J.A. 67-73, 75, 79, 82-83.

To avoid the rulings in *Aracoma* and *Kentuckians*, the Sierra Club argued

below—and argues here—that Raven Crest's 404 Permit is different, and required

the Corps to apply a more expansive review.  They argue first that the types of

effects at issue are different; that *Aracoma* was based on ecological effects while

the present case is based on human health.  Second, they argue that the type of

---

[3] *See, e.g., Bragg v. West Virginia Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001)
(holding that suit to enjoin state agency from granting coal mining permits
pursuant to its delegated state program was barred by the Eleventh Amendment
and finding that district court had subject matter jurisdiction to enter consent
decree designed to minimize placement of spoil in valley fills); *Kentuckians for the
Commonwealth v. Rivenburgh*, 317 F.3d 425 (4th Cir. 2003) (reversing injunction
prohibiting Corps from approving valley fills and finding Corps' issuance of CWA
§ 404 permit was not arbitrary and capricious); *Ohio Valley Envtl. Coal. v. Bulen*,
429 F.3d 493 (4th Cir. 2005) (holding that Corps complied with CWA § 404(e)
when issuing "nationwide permit"); *Aracoma*, 556 F.3d 177 (4th Cir. 2009)
(holding that Corps was not required to consider environmental effects of entire
valley fill and that Corps had otherwise properly issued CWA § 404 permit); *Ohio
Valley Envtl. Coal. v. U.S.A.C.E.*, 716 F.3d 119 (4th Cir. 2013) (holding that the
Corps had properly considered cumulative impacts and had satisfied NEPA in
issuing CWA § 404 permit).

activities permitted in the cases are different; "valley fills" in *Aracoma* and "mine throughs" here.  "Mine throughs," they argue, are somehow more closely intertwined with and indistinguishable from overall mining than were the activities permitted in *Aracoma*.  These efforts failed both in *Kentuckians* and below.  They fail here, too.

In *Aracoma*, this Court found that the Corps exercises limited authority and control over surface mining operations compared to other regulatory authorities, and thus is not obligated to include the effects of overall mining activities that do not include "filling" in its review.  556 F.3d at 194-97.  Whether the challenged effects relate to aquatic ecology or to human health was, and is, irrelevant to the Corps' required scope of review.  *See Kentuckians*, 746 F.3d at 706-08; J.A. 66-74.  Nor can the Sierra Club avoid *Aracoma* by distinguishing between "valley fills" and "mine throughs."  Indeed, while the focus of the Sierra Club's claimed harms in *Aracoma* focused on "valley fills," at least some of the permits at issue there involved both "mine throughs" and "valley fills."

## Statement of Issues

The brief of the Corps accurately identifies the issues raised by the Sierra Club's appeal.

## Statement of the Case

The brief of the Corps accurately summarizes the case.

## Statement of Facts

The Corps' brief accurately states the facts.

## Argument

To avoid repetition, Raven Crest will rely on the disposition of the case below and the arguments advanced by the Corps. It supplements them with a detailed explanation that the types of "filling" activities at issue here warrant no different treatment than those considered in *Aracoma*. In fact, precisely the types of activities at issue here were considered and permitted by the Corps in the permits reviewed in *Aracoma*. Likewise, the types of effects on which the Sierra Club focuses—whether they be on human health or on aquatic biology—are irrelevant to determining the required scope of analysis. And, finally, the Sierra Club failed utterly to show that any of the health "studies" they cited below even claimed to have established a causal connection between human health and either filling or mining generally. Accordingly, the information on which they rely to impose a duty on the Corps was simply inadequate to the task.

**A.    Fourth Circuit precedent is directly applicable to the facts and issues in this case and supports the Corps' issuance of Raven Crest's § 404 permit.**

The Corps maintains its own NEPA implementation procedures for complying with Section 404 of the CWA. *See* 33 C.F.R. pt. 325, App. B. It has long applied these procedures to limit the scope of its NEPA analysis at

Appalachian surface mines to the "waters" filled rather than extend the analysis to the entire mine site. It has done so because the broad project area—the coal mine—is subject to the extensive regulatory control of other agencies under SMCRA and its state analogue. *Aracoma,* 556 F.3d at 193-94; *Kentuckians*, 746 F.3d at 709-11. The Corps did the same here, and the district court below determined that the Corps acted appropriately. J.A. 538 (Corps' determination that its NEPA scope "is limited to the narrow issue of the filling of jurisdictional waters," consistent with this Court's decision in *Aracoma*); J.A. 74 (district court's finding that the Corps properly limited its NEPA scope of review).

Because the Corps' determination rested on an interpretation of its own NEPA rules, this Court has previously determined that its "review is cabined to assessing the reasonableness of that interpretation. This kind of review is highly deferential, with the agency's interpretation 'controlling unless plainly erroneous or inconsistent with the regulations.'" *Aracoma*, 556 F.3d at 193. Here, the Sierra Club offers two arguments to escape the effect of *Aracoma*. First, it claims that the types of <u>activities</u> here—"mine throughs"—are fundamentally different than those at issue in *Aracoma*. Second, that the environmental <u>effects</u> the Sierra Club is concerned with are also different from the effects it challenged in *Aracoma*. Neither argument provides any basis to distinguish or avoid the effect of *Aracoma*.

The Sierra Club says that "mine throughs" are "mining" and are more

inextricably connected to the entire mine site and mining activity than were the excess spoil valley fills in *Aracoma*. Sierra Club Br. at 18-20. This, they claim, required the court below to find that the Corps acted unreasonably in limiting the scope of its NEPA review. Nonsense.[4]

Implicit in the Sierra Club's argument is that the activities permitted by the Corps in *Aracoma* were restricted to valley fill construction, and did not include "mine throughs." But that is simply wrong. There were four mines at issue in *Aracoma*. 556 F.3d at 187. At least one of them, Elk Run's "Black Castle" mine, was a contour mine like Raven Crest's. *See* Corps' Statement of Findings for Black Castle Contour Mine at 36-37 (relevant portions of Corps' finding attached as Additional Materials p. 6).

---

[4] There is also a certain irony to the Sierra Club's claims. For years, its primary complaints about surface mines have been about the effects of excess spoil valley fills. *See Bragg*, 248 F.3d at 286. *See also Ohio Valley Envtl. Coal. v. U.S.A.C.E.*, 716 F.3d 119, 122 (4th Cir. 2013) (describing valley fills). It has worked hard to ensure that such fills are minimized. *See Bragg v. Robertson,* 83 F. Supp. 2d 713 (S.D. W.Va. 2000) (approving consent decree provisions designed to minimize placement of spoil in valley fills). Here, the result of those minimization efforts is a rare mine plan that does not require a valley fill. The district court correctly noted that this plan resulted in a "lesser effect" than a mine with a valley fill. J.A. 70. Now, though, the Sierra Club contends that Raven Crest's minimization of these activities and their "lesser effects" somehow expands the scope of analysis required by the Corps.

7

The following illustrations depict the contour mining process compared to the mountaintop mining process:

<u>**Contour mining**</u>              <u>**Mountaintop mining**</u>










In *Aracoma*, at stake were four separate § 404 permits issued by the Corps. 556 F. 3d at 185-86 & 202 n.22. As demonstrated by the joint appendix in the appeal of that case, one of those mines was a contour mine, and the Corps' permit authorized both valley fills in the stream channels located below the mined coal

seams <u>and</u> "mine throughs" above them in areas where the contour mine passed across and through minor stream channels. Additional Materials, pp. 3, 8, 14-16 (noting permits approve "mine through" areas in which stream will be re-connected after mining).[5] Thus, the activities at issue in *Aracoma* entailed <u>both</u> valley fill construction <u>and</u> "mine throughs." Together, the valley fills and "mine throughs" affected a greater portion of the overall mine area and involved more mining activity than the simple "mine throughs" at issue here. And, valley fills are no less integral to and a part of the mining process at surface mines across the region than are "mine throughs"—both are usually necessary and part of the mining process. *See Aracoma*, 556 F.3d at 195 (OVEC noting that valley fills are generally a necessary component of overall surface mining projects). See also *Ohio Valley Envtl. Coal. v. U.S.A.C.E.*, 716 F.3d 119, 129 (4th Cir. 2013) (Corps' decision document for 404 permit issued to Highland Mining Company concluded that "the valley fill, sediment pond, <u>and mine through activities</u> … should not …

---

[5] Some of the other permits at issue in *Aracoma* were not contour mines, where parallel cuts are made along a ridge to access coal, but instead were mountaintop mines, where the entire mountain above the valley fills are removed to access the coal and then restored. *See Aracoma*, 556 F.3d at 186 (describing mountaintop removal method of mining). The mountaintop mines had two types of impacts on streams. First, the valley fills covered portions of stream channels located below the lowest seam mined as depicted in the drawings above. Second, to the extent there were stream channels within the Corps' jurisdiction above the valley fill locations on those permits, the mining process would have removed the <u>entire</u> channel and not just have "mined through" a portion of it. Thus, if anything, the filling activities at issue in *Aracoma* were more intertwined with the mining process than is the case here.

result in … significant adverse impacts….") (emphasis added). There is, accordingly, no rational basis for concluding that the § 404 activities at Raven Crest are tied more closely to the overall mine in a way that makes *Aracoma* inapplicable. *See Kentuckians*, 746 F.3d at 707, n.2 (Corps only authorizes "mine throughs" because of the impacts of fill discharges to stream beds, not because the activity involves coal extraction).

Nor does the Sierra Club's focus on health effects in this case, as opposed to other environmental effects it focused on in *Aracoma*, serve to expand the required scope of the Corps' analysis beyond that recognized as permissible in *Aracoma*. The primary rationale of *Aracoma* was <u>not</u> that every conceivable <u>effect</u> of general mining activities was analyzed by other agencies pursuant to other permitting schemes under the CWA or SMCRA. Instead, as the district court correctly observed, this Court declined to declare that a § 404 permit "federalizes" a whole mine site for purposes of NEPA primarily because of the pervasive control granted by Congress to other agencies under SMCRA and CWA § 402. J.A. 72-73 ("[T]he expansive scope created by Congress for the SMCRA permitting scheme suggests that the scope of the Corps' permitting analysis is limited.") (citing *Aracoma,* 556 F.3d at 195 and *Kentuckians*, 746 F.3d at 708).

Additionally, the district court noted that even if West Virginia's SMCRA and NPDES programs do not require consideration of human health, "the absence

10

of state control over a particular activity does not generally imply that federal control exists. Federal control is defined by the Constitution and federal law alone." J.A. 72.

In any event, the Sierra Club's claim that West Virginia's surface mining and NPDES programs do not require site-specific "reviews" of human health impacts also misses the point because those programs themselves are designed to minimize and control environmental and health effects. Applicable surface mining laws require that all water that contacts areas disturbed by surface mining be passed through a sediment control structure such as a ditch or pond before it is discharged from a mine site to nearby streams. W. Va. Code St. R. § 38-2-5.4.a. *See also* 30 C.F.R. § 715.17. The discharge from each of these structures is considered a "point source" discharge. Each is covered by a water discharge permit issued by the State under a program approved by USEPA pursuant to CWA § 402. Accordingly, all of the surface drainage from the mine, including that which will issue from the areas "filled" pursuant to CWA § 404, is subject to a CWA § 402 (33 U.S.C. § 1342) discharge permit that limits the levels of pollutants allowed into downstream "waters."

These discharge permits, known as NPDES permits, impose "effluent limits" designed to comply with both "technology-based" limits established by USEPA for the coal industry (40 C.F.R. Pt. 434) and impose any more stringent limits

11

necessary to ensure compliance with "water quality standards." States adopt water quality standards to restrict in-stream levels of pollutants necessary to protect recognized water uses, such as "public water supplies" and "aquatic life." *See Kentucky Waterways Alliance v. Johnson*, 540 F.3d 466, 470 (6th Cir. 2008) (discussing effluent limits and water quality standards). Indeed, NPDES permits issued in West Virginia must include limits to ensure that in-stream water quality standards are protected. W. Va. Code St. R. § 47-30-6.2.c (required permit conditions). Such water quality standards are designed to protect the health of individuals who consume or recreate in "waters of the State." W. Va. Code St. R. §§ 47-2-6.2 (requiring protection of waters used for human consumption), -6.4 (protecting water used for "contact recreation") & -8, App. E, Table 1 (establishing allowable numeric concentrations on pollutants to protect drinking water supplies and recreational waters). Thus, the NPDES permit program is designed to protect the health of downstream water users.

Likewise, the State SMCRA program includes detailed application requirements and "performance standards" concerning airborne dust and impacts to both surface and groundwater users. *See, e.g.*, W. Va. Code St. R. §§ 38-2-3.22.a-.i (requiring hydrologic information, well owner information, baseline surface and groundwater data, a hydrologic reclamation plan and a plan to "protect, restore or

replace" water supplies of water users); -3.6.k (requiring fugitive dust control plan); and 14.5.b (requiring compliance with effluent limits).

Therefore, as this Court affirmed the Corps' issuance of the CWA § 404 permits at issue in *Aracoma*, so should it affirm the Corps' issuance of Raven Crest's permit.

## B. The health studies do not sufficiently assert a causal connection between mining, fill discharges, and human health to implicate NEPA review.

Of the four "Record" health studies[6] provided by the Sierra Club, three purport to examine health statistics associated with "mountaintop mining." J.A. 668-673 (summarizing contents and inadequacies of all four studies). These articles discriminate the potential effects of mountaintop mining from other types of surface mining by defining "mountaintop mining" as "large scale surface mining … that disposes of rock in heads of hollows or valleys with streams" by pushing the "excess rock … into adjacent valleys where it buries existing streams." J.A. 217 (defining "MTM/VF" as operations that "dispose[] of excess rock in heads of

---

[6] As the district court explained, the Sierra Club presented four "Record" studies to the Corps prior to permit issuance, and provided additional "Non-Record" studies either after the permit was issued or as attachments to its motion for summary judgment. The district court noted that, while the Sierra Club did not argue that the Corps should have issued a revised Environmental Assessment after receiving the "Non-Record" articles, those studies "show only general health effects associated with mining rather than discharge-related effects". J.A. 75. Accordingly, the district court held that "[t]he Corps did not abuse its discretion in not considering them." J.A. 75 (*citing* 40 C.F.R. § 1502.9; *Kentuckians*, 963 F. Supp. at 684).

hollows or valley fills") & J.A. 243-244 (mountaintop mining involves the placement of excess rock "in sites adjacent to the mining pits, typically in valleys at heads-of-hollows or headwater streams"). Of course, as the Sierra Club so thoroughly points out in an effort to distinguish the types of mining here from those reviewed in *Aracoma*, there are no proposed valley fills at Raven Crest's mine. J.A. 531. Thus, while the Sierra Club strains to avoid the application of *Aracoma* by emphasizing the difference between the mine here (no valley fills) and the mines in *Aracoma* (all had valley fills), that very difference demonstrates that these health studies do not inform the Corps about the activities permitted at Raven Crest.

The other "Record" study similarly cannot inform the Corps about potential effects from surface mining without a valley fill. It correlated the conditions of aquatic insects in streams with cancer mortality rates and "coal mining intensity." J.A. 670-671. It did not limit its correlation efforts to the effects of "fill" discharges or even to surface mining in general. Instead, it correlated the "intensity" of <u>all</u> types of mining (i.e., underground, surface, refuse disposal) to an aquatic index score for area streams and to cancer mortality rates. J.A. 670. By including all types of mining, it cannot discriminate between underground and surface mining. Moreover, the article does not even try to identify how people with cancer mortality could have been exposed to either the stream water or the

14

insects in such waters, or how "mining intensity" might affect cancer mortality. J.A. 670-671.

Likewise, none of the four "Record" studies contain any evidence that the discharge of fill material authorized by the Corps cause negative health impacts. The studies merely purport that proximity to mining generally is correlated with statistical health disparities. They do not suggest a correlation between the filling of streams and health problems and do not even explore causal pathways between any aspect of mining and human health. Indeed, the studies themselves concede that they do not demonstrate any causal link between any mining activity and any human health problem. J.A. 668-673 (detailed review of inadequacies of Sierra Club's four "record" health studies).

Specifically, the first "Record" article is not a study at all. It is a two page "letter to the editor" in the "Policy Forum" section of a magazine that simply summarized other work. J.A. 216-17 (discussed at J.A. 668). It did not report the results of original work, and none of its authors have degrees in medicine, human toxicology, or epidemiology. J.A. 668.

The second "Record" article correlated an aquatic insect index with cancer mortality rates and "mining intensity," without regard to the type of mining. The article did not attempt to connect exposure to any particular streams to cancer

15

mortality – let alone assert that proximity to mining explains the correlation.  218-231(discussed at J.A. 670-671).

The third "Record" article attempted to survey health-related quality of life in mountaintop mining areas, but neither identified individual exposures to mining, nor explain how mining directly affects health-related quality of life.  J.A. 252-57 (discussed at J.A. 671-672).

The final "Record" article tried to compare birth defect rates in mountaintop mining areas to non-mining areas.  J.A.  243-51 (discussed at J.A. 672-73).  This article simply associated county residence with mountaintop mining areas – it did not identify any individual exposure to mining.  J.A. 673.  It also relied on "self-reported" data, which the authors conceded is likely inaccurate with regard to certain behaviors, particularly tobacco and alcohol use.  *Id.*

The "Non-Record" studies all suffer similar limitations.  Most examine poverty or health statistics in areas of general "mining," while others purport to limit their analysis to "mountaintop mining."  Some relied on "self-reported" cancer rates during telephone and door-to-door surveys.  None purport to examine a causal relationship between any aspect of mining and any particular health effects.  J.A. 674-688 (summarizing contents of all "Non-Record" studies).[7]

---

[7] For example, the Sierra Club claims that one of its "non-record" studies "indicates that reliance on municipal drinking water in coal-mining areas is not a guarantee against health effects of mining discharges."  Sierra Club Br. at 39.  That

NEPA requires a "reasonably close <u>causal</u> relationship" between an environmental effect and its alleged cause in order to mandate that a federal agency consider such effect. *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004); *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) ("*P.A.N.E.*"). NEPA rules also require this same sort of causal connection. *See* 40 C.F.R. § 1508.8 ("Effects include: (a) direct effects, which <u>are caused</u> by the action and occur at the same time and place. (b) Indirect effects, which <u>are caused</u> by the action and are later in time or farther in distance, but are still reasonably foreseeable….") (emphasis added). Because every study identified by the Sierra Club lacks any sort of causal relationship, even if the Corps had an obligation to consider the impacts of all general mining activities, it was not required to consider the Sierra Club's articles.

This Court has noted that "the Supreme Court rejected the idea that 'an agency's action is considered a cause of an environmental effect [for purposes of NEPA] … when the agency has no authority to prevent the effect.'" 556 F.3d at 196 (*quoting Public Citizen*). In *Public Citizen* and *P.A.N.E.*, the Supreme Court

---

article analyzed violations of the Safe Drinking Water Act that were based not only on health conditions, but also on paperwork deficiencies. *Id.* The study actually found <u>fewer</u> health-based drinking water violations in mountaintop mining locations than in others. Not content with that conclusion, however, the activist authors claimed that those same water providers committed more paperwork violations, and then speculated that proper reporting by those providers might have revealed higher rates of health-based violations. J.A. 683-684 ("[T] he extent of true health-based violations in MTM areas is not known.").

held that to demonstrate causation under NEPA, one must "draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Public Citizen*, 541 U.S. at 767; *P.A.N.E.*, 460 U.S. at 774. Federal agencies cannot be considered responsible for areas over which they do not have control. *New Jersey Dept. of Envtl. Prot. v. Nuclear Regulatory Comm'n*, 561 F.3d 132, 139 (3rd Cir. 2008). Here, the Corps only controls whether or not it issues the § 404 permit and what conditions it will impose in the permit if it is issued.

The Sierra Club did not provide information either during the public comment period or thereafter that the activity authorized by the § 404 permit – discharging fill material into a stream – will cause any health problems. Michael Hendryx, co-author of many of the cited papers, has stated that while he believes there is "an environmental contribution, I can't prove it." Exhibit 1 to Raven Crest's Reply in Support of its Cross-Motion for Partial Summary Judgment, ECF Doc. # 25-1 at 2 (emphasis added). Indeed, the studies merely correlate proximity to general mining activities with various health effects. They do not claim links between mining and particular health effects, J.A. 668, nor do they explore any potential causal pathways, measure direct impacts of mining, or measure environmental exposure. J.A. 671-673. *See also* J.A. 674 (None of the "Non-

Record" studies "purport to establish a causal connection between any aspect of mining and particular health effects").

Such correlative studies, which do not incorporate experimental testing, cannot prove a causal link. *See, e.g., Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) ("Any scientist or statistician must acknowledge, however, that correlation is not causation."); *U.S. v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010) ("Evidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence…."); *Peters v. AstraZeneca LP*, 224 Fed. Appx. 503, 507 (7th Cir. 2007) ("[A] correlation alone is not evidence of causation."); *Norris v. Baxter healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005) ("A correlation does not equal causation."); *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 33 (1st Cir. 2012) ("Correlation is not causation….").

The so-called studies cited by the Sierra Club are insufficiently tied to the activity permitted by the Corps (filling) and, regardless of the required scope of the Corps' NEPA review, fail to offer evidence of a causal connection between any aspect of mining and human health. They are, as a result, simply insufficient to impose additional NEPA duties on the Corps. Accordingly, the district court did not err in upholding the Corps' issuance of Raven Crest's CWA § 404 permit.

19

## Conclusion

Raven Crest's mine has withstood scrutiny by the State of West Virginia, EPA, the Corps, and the district court. The Corps made no errors in this process by analyzing the aspects of the project under its control: the impacts of filling waters of the United States. Therefore, the Corps correctly applied NEPA, the CWA, and its own regulations. Accordingly, the Court should affirm the judgment of the district court.

Respectfully submitted,

/s/ *Robert G. McLusky*
ROBERT G. McLUSKY
DOUGLAS J. CROUSE
JACKSON KELLY PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
*Counsel for Raven Crest Contracting, LLC*

20

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. Excepting portions of the brief described in Fed. R. App. P. 32(a)(7)(B)(iii), the brief contains 4620 words. This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point.

/s/ Robert G. McLusky
Robert G. McLusky

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of February 2015, I have served the foregoing Intervenor-Defendant-Appellee Response Brief on all registered counsel through the Court's electronic filing system (ECF). Due to the inaccessibility of the Clerk's Office on 17 February 2015 because of inclement weather, counsel has relied on the time extension provided by Local Rule 26 in filing this brief.

/s/ Robert G. McLusky
Robert G. McLusky