No. 14-2129

_____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
_____

OHIO VALLEY ENVIRONMENTAL COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY, COAL RIVER MOUNTAIN WATCH and
SIERRA CLUB

*Plaintiffs-Appellants*,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, THOMAS P. BOSTICK
Commander in Chief of Engineers, U.S. Army Corps of Engineers, and STEVEN
MCGUGAN, Colonel, District Engineer, U.S. Army Corps of Engineers,
Huntington District,

*Defendant-Appellees*,

and,

RAVEN CREST CONTRACTING, LLC,

*Intervenor/Defendant-Appellee.*

_____

Appeal from the United States District Court for the Southern District of West
Virginia at Charleston in Case No. 2:12-cv-6689, Judge John T. Copenhaver

---

**APPELLANTS' REPLY BRIEF**

---

Joseph M. Lovett                        Peter Morgan
J. Michael Becher                       Sierra Club
Appalachian Mountain Advocates          1536 Wynkoop St, Ste. 312
P.O. Box 507                            Denver, CO 80202
Lewisburg, WV 24901                     *peter.morgan@sierraclub.org*
*jlovett@appalmad.org*                  303-454-3367
*mbecher@appalmad.org*
304-382-4798

**Dated:  March 10, 2015**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………...……………iv

ARGUMENT……………………………………………………………………..1

   I.   The Corps Violated Its Duty to Consider All Aspects of the Activities, Including Mining, it Authorizes in Jurisdictional Streams……...…………..1

       A. Sierra Club Does Not Challenge the Corps' Determination of the Geographic Scope of its Jurisdiction in this Case…………...………..1

       B. The Corps' Own Regulations, as Well as NEPA Case Law, Make Clear that the Corps Must Consider All Aspects of the Authorized Activity – Here, Instream Mining…………..……………………..2

          1. The "specific activity" authorized by the Corps is whatever activity occurs within the jurisdictional waters………………2

            a. The federal register notice and examples from the regulation itself confirm that the specific regulated activity is more than just the discharge of fill………….4

            b. Case law from this and other circuits confirms that the specific activity subject to the Corps' NEPA review is broader than just the discharge of fill material………….6

          2. The *Aracoma* decision did not address whether the Corps could restrict the scope of its jurisdiction to avoid considering the effects of mine through activities………….……………10

   II.  The Corps Failed Entirely to Consider the Evidence Presented in the Health Studies Showing that Coal Mining Such as the Instream Mining it Authorized Here Negatively Impacts the Health of Nearby Residents…….14

       A. The Corps' Findings in its Decision Documents Do Not Address the Issues Raised in the Health Studies…………….……………………15

B. Proof of Causation is Not Required in Order for There to be a Duty to Conduct Further NEPA Review…………………………………..18

C. Raven Crest's Criticism of the Studies Are Post-Hoc Rationalizations that Should Not Be Considered by the Court…………………..……24

III.   The Corps Violated NEPA When It Applied a Broader Scope of Analysis to Its Consideration of Benefits Than to its Consideration of Harms…...…....25

CONCLUSION…………...……………………………………………27

# TABLE OF AUTHORITIES

**Cases**

*Am. Bird Conservancy Inc. v. FCC,* 516 F.3d 1027 (D.C. Cir. 2008).....................19

*Anglers of the Au Sable v. U.S. Forest Service,* 565 F.Supp.2d 812
    (E.D. Mich. 2008)...........................................................................19

*Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic
    Energy Comm'n,* 449 F.2d 1109..............................................17

*Catron Cty Bd of Comm'rs v. U.S. Fish and Wildlife Servs,* 75 F.3d 1429
    (10th Cir. 1996) ............................................................................18

*Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
    (9th Cir. 2008) 538 F.3d 1172, .............................................. 19-20

*City of Davis v. Coleman,* 521 F.2d 661(9th Cir. 1975).........................................19

*Dept. of Transp. v. Public Citizen,* 541 U.S. 752 (2004)................................. 19-20

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.,* 681 F.2d 1172
    (9th Cir. 1982) ...............................................................................19

*Friends of Back Bay v. U.S. Army Corps of Engineers,* 681 F.3d 581
    (4th Cir. 2012) ..............................................................................22

*Hughes River Watershed Conservancy v. Glickman,* 81 F.3d 437
    (4th Cir. 1996)... ......................................................................... 7-8

*Huss v. Gayden,* 571 F.3d 442 (5th Cir. 2009) ................................................. 22-23

*Idaho Sporting Congress v. Thomas,* 137 F.3d 1146 (9th Cir. 1998) ....................19

*Kentuckians for the Commonwealth, et al. v. U.S. Army Corps of
    Engineers,* 746 F.3d 698 (6th Cir. 2014)....................................13

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,* 387 F.3d 989
    (9th Cir. 2004) ..............................................................................16

*Limerick Ecology Action, Inc. v. United States Nuclear Regulatory
    Comn'n.,* 869 F.2d 719 (3d Cir. 1989) ........................................18

*McDaniels v. U.S.,* 300 F.3d 407, 413 (4th Cir. 2002) ..........................................24

*Metro. Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766 (1983) ... 19-20

*Missouri Coalition for the Environment v. U.S. Army Corps of
    Engineers,* 866 F.2d 1025 (8th Cir. 1989).....................................8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)........................................................................24

*Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7 (2d Cir. 1997).....................................22

*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005) ........................23

*Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846................. 21, 23

*Ohio Valley Envirnomental Coalition v. Aracoma, Coal Co.*,
    556 F.3d 177, (4th Cir. 2009) ..................................................................... 9-12

*Peters v. AstraZeneca LP*, 224 Fed. Appx. 503 (7th Cir. 2007)............................23

*Samaan v. St. Joseph Hosp.*, 670 F.3d 21 (1st Cir. 2012) .......................................23

*Save Our Sonoran, Inc. v. Flowers,* 408 F.3d. 113 (9th Cir. 2004)...........................7

*Save the Bay, Inc. v. U. S.Army Corps of Eng'rs*, 610 F.2d 322
    (5th Cir. 1980) ................................................................................................9

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D. D.C. 2006)..................................20

*State of Idaho v. Interstate Commerce Comm'n*, 35 F.3d 585
    (D.C. Cir. 1996) ...........................................................................................18

*State of N.C. v. F.A.A.*, 957 F.2d 1125 (4th Cir. 1992)............................................17

*Stewart v. Potts,* 996 F.Supp. 668 (S.D. Tex. 1998)..................................................8

*Sylvester v. U.S. Army Corp of Eng'rs*, 884 F.2d 394 (9th Cir. 1989) .....................8

*U.S. v. Valencia*, 600 F.3d 389 (5th Cir. 2010) ......................................................22

*Water Works v. Sewer Bd. Of the City of Birmingham v. U.S. Dept.*
    *of Army, Corps of Eng'rs*, 983 F.Supp. 1052 (N.D. Ala. 1997).....................9

*Winnebago Tribe of Neb. v. Ray,* 621 F.2d 269 (8th Cir. 1980)...........................8-9

## Regulations

33 C.F.R. § 320.4. ...................................................................................................25

33 C.F.R. Pt. 325, App. B .......................................................................... 3, 5-8, 25

40 C.F.R. § 1508.3 ..................................................................................................18

40 C.F.R. § 1508.27 .................................................................................................21

## Other Authorities

53 Fed. Reg. 3120 *et seq*.......................................................................................3,5

## ARGUMENT

The National Environmental Policy Act ("NEPA") requires the U.S. Army Corps of Engineers ("the Corps" or "the government") to consider all aspects of the complete activities it authorizes within the geographic area it designates as comprising the scope of its jurisdiction. In this case, the Corps authorized instream mining activities within jurisdictionally designated streams and riparian corridors. As a result, the Corps was required to consider the health studies in its possession that demonstrate that surface coal mining activities negatively impact the health of nearby residents. The Corps violated its NEPA duties when it failed to consider those studies.

I.    **The Corps Violated Its Duty to Consider All Aspects of the Activities, Including Mining, It Authorizes in Jurisdictional Streams.**

A. **Sierra Club Does Not Challenge the Corps' Determination of the Geographic Scope of its Jurisdiction in this Case.**

Both the Corps and Raven Crest Contracting, LLC ("Raven Crest") have misapprehended the fundamental argument put forward by Plaintiffs-Appellants Ohio Valley Environmental Coalition, West Virginia Highlands Conservancy, Coal River Mountain Watch, and Sierra Club (collectively "Sierra Club") in this case. This case does not turn on the Corp's scope of review. Sierra Club does not assert that the Corps must have control over the entire Boone North mine, or that the Corps must consider impacts from mining activities that occur entirely and

1

separately on upland portions of the mine.  Sierra Club argues, instead, that the

Corps has a duty to consider all aspects of the activities it authorizes in

jurisdictional streams. In this case, the Corps had a duty to consider the human

health impacts of the coal mining activities it authorized within the stream

corridors it designated as within its scope of review. J.A. 537-38 ("The proposed

project would directly impact 15,079 feet of stream, with an estimated average

width of 3 feet. . . The Corps includes a riparian corridor as part of a stream system

. . . (generally 60 feet of uplands from each stream bank).")[1]

### B. The Corps' Own Regulations, as Well as NEPA Case Law, Make Clear that the Corps Must Consider all Aspects of the Authorized Activity – Here, Instream Mining.

#### 1. The "specific activity" authorized by the Corps is whatever activity occurs within the jurisdictional waters.

The Corps' NEPA regulations make plain that whether the agency limits its

scope of review to portions of a project within jurisdictional waters or extends it to

include upland portions of the project as a whole, the agency must consider all

---

[1] Sierra Club's opening brief clearly and unambiguously states the argument that the Corps violated its NEPA obligations when it failed to consider the impacts of activities within the geographic scope the Corps itself defined.  *See* Sierra Club Brief at 12 ("Even accepting the Corps' own determination of the limited geographic scope of its jurisdiction over the Boone North mine, the Corps was still required under NEPA to consider evidence of the mine's serious health risks"); *Id.* at 22 ("Because the Corps defined the authorized activity in this case as coal mining through streams, the Court need not resolve the question of whether the Corps improperly limited the scope of its review, or whether the Corps had control or responsibility over mining on upland areas."). *See also, id.* at 4-5 n. 2; 19-20.

environmental effects of the portions of the project within that scope of review: "In any case, once the scope of analysis has been defined, the NEPA analysis for that action should include direct, indirect, and cumulative impacts on all Federal interests within the purview of the NEPA statue." 33 C.F.R. § 325 Part B(7)(b)(3). In other words,

> Although the Corps' permitting authority is limited to those aspects of a development that directly affect jurisdictional waters, it has responsibility under NEPA to analyze all of the environmental consequences of a project. Put another way, while it is the development's impact on jurisdictional waters that determines the scope of the Corps' permitting authority, it is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility. The Corps' responsibility under NEPA to consider the environmental consequences of a permit extends even to environmental effects with no impact on jurisdictional waters at all.

*Save Our Sonoran, Inc. v. Flowers,* 408 F.3d. 1113, 1122 (9th Cir. 2004). At minimum this must include the work that is to be performed in the jurisdictional area:

> if an applicant seeks a [Corps] permit to fill waters or wetlands on which other construction or work is proposed, the control and responsibility of the Corps, as well as its overall Federal involvement would extend to the portions of the project to be located on the permitted fill.

33 C.F.R. § 325 App. B(7)(b)(3); *see also*, 53 Fed. Reg. 3120, 3121 (Feb. 3, 1988) ("The Corps NEPA document should address *all aspects* of the activity within its jurisdiction") (emphasis added).

Both the Corps and Raven Crest attempt to bypass the plain language of the regulations by defining the regulated activity at issue in this case as simply the generic "discharge of dredged or fill material." Corps Brief at 17, Raven Crest Brief at 18-19. Although it is uncontested that this case involves dredge and fill activities, and therefore that a section 404 permit is required, the Corps and Raven Crest suggest that those activities can somehow be segregated from other aspects of the instream coal mining. The implication is that dredging and filling of streams is something other than mining—it is not. The instream mining at issue in this case involves removing material from the streambed to access the coal below (dredging), and eventually re-depositing that material and other mine waste (filling). There is no separate discharge or activity. Furthermore, even if the discharge of dredged or fill material were separate from other instream mining activities, the Corps would still be required to consider those additional mining activities taking place within the jurisdictional areas designated by the Corps itself.

> **a. The federal register notice and examples from the regulation itself confirm that the specific regulated activity is more than just the discharge of fill.**

To support its overly narrow definition of "activity," the Corps selectively quotes from the Federal Register notice accompanying publication of its NEPA guidelines. The Corps quotes language suggesting that "the activity the Corps studies in its NEPA document is the discharge of dredged or fill material." Corps

Brief at 17 (quoting 53 Fed. Reg. at 3121). However, taken in its full context the quoted language makes clear that the Corps must consider all impacts of the complete activities that occur within jurisdictional waters.

On the very same page of the federal register from which the Corps takes its selective quotation, the Corps provided the example of "the application for a Corps permit for a pier which is part of a larger, upland oil refinery project." 53 Fed. Reg. at 3121. The federal register notice then states that "the scope of analysis the Corps will use for permit cases normally will cover the regulated activity (e.g., the pier). . ." *Id*. The Corps did *not* define the "regulated activity" as merely the discharge of dredged or fill material related to construction of the pier. Instead, the Corps recognized that the regulated activity *is* the pier.

This example from the federal register reflects the language and examples in the Corps' regulation itself.  In that regulation, in the section describing the "scope of analysis," the Corps recognized that "a permit applicant may propose to conduct a specific activity requiring a Department of the Army (DA) permit (e.g., construction of a pier in a navigable water of the United States) which is merely one component of a larger project (e.g., construction of an oil refinery on an upland area)."  33 C.F.R. § Pt. 325, App. B, 7.b. The Corps regulations instruct that in such a situation "[t]he district engineer should establish the scope of the NEPA document (e.g., the EA or EIS) to address the impacts of the specific activity

5

requiring a DA permit . . . ." *Id*. Once again, the Corps has defined the "specific activity" in terms encompassing the full nature of the permitted activity – "construction of a pier" – and not just the mere discharge of fill. Other examples from the regulation include a "pipeline," a "supply loading terminal," and a "fill road." 33 C.F.R. § 325, App. B(7)(b)(3). Nowhere is an activity limited to the generic "dredging and filling."

The Corps has therefore articulated a test for determining which activities must be addressed in its NEPA review, and that test is based entirely on the geographic location of the activity. If the activity takes place within a jurisdictional stream, including on top of material placed in that jurisdictional stream, then the Corps must address the impacts of that activity. In other words, the Corps is required by NEPA to consider not just the discharge of fill, but also all other impacts from the permitted project that will occupy the same geographic area as the fill. Accordingly, in this case the Corps was required to consider in its NEPA review "all aspects" of the environmental effects of the authorized instream coal mining occurring within the geographic scope of the Corps' jurisdiction.

### b. Case law from this and other circuits confirms that the specific activity subject to the Corps' NEPA review is broader than just the discharge of fill material.

This Court has previously recognized that NEPA requires the Corps to consider the full range of environmental effects of activities authorized by 404

6

permits. In so doing, the Court further recognized that the Corps' responsibility to consider all aspects of authorized activities occurring within jurisdictional waters is not limited to the discharge of fill material.

Neither the Corps nor Raven Crest effectively distinguished this Court's *Hughes River* decision discussed in Sierra Club's opening brief. In *Hughes River*, this Court held that the Corps was required to take a hard look at activities resulting from the construction of a dam, not simply the dredging and filling portions of its construction. These included indirect effects of invasive species via recreational activities on the resulting reservoir. 81 F.3d 437, 445-46 (4th Cir. 1996). In other words, the "authorized activity" requiring Corps review was the entire dam, not just the discharge of fill material.

Raven Crest made no reference whatsoever to *Hughes River* in its response brief. The government's cursory attempt to distinguish the decision was premised on a misreading of the facts of the case. The government's response brief strongly implies that the Court's *Hughes River* decision was based on a determination that the Corps had " 'control and responsibility' over parts of the project beyond the limits of the specific activity being authorized." Corps Brief at 16-17. The government's brief then discusses the factors set forth in the Corps regulations for determining where such expanded "control and responsibility" applies. *Id*. (quoting 33 C.F.R. pt.325, app. B, § 7(b)). Finally, the government seeks to characterize the

7

*Hughes River* decision as "[a]n example of a case where these other factors s [sic] were present necessitating a broader scope of environmental review." Corps Brief at 17. The fatal flaw in the government's argument is that the phrase "control and responsibility" appears nowhere in the *Hughes River* decision, nor is there any discussion of the cited factors, nor, indeed, is there any reference or citation to 33 C.F.R. pt.325, app. B. *Hughes River*, 81 F.3d 437.

Relevant case law from other circuits is consistent in interpreting the Corps' regulations to require an analysis of all impacts of the permitted activity that occur within the geographic scope of review. "In all of the cases in which Corps jurisdictional disclaimers have been upheld, the activities involving waters of the United States, and therefore invoking Corps jurisdiction and NEPA, were physically, functionally, and logically separable from the activities held not subject to NEPA analysis." *Stewart v. Potts,* 996 F.Supp. 668, 682 (S.D. Tex. 1998); *see e.g. Sylvester v. U.S. Army Corp of Eng'rs*, 884 F.2d 394 (9th Cir. 1989) (Corps considered effects of golf course constructed on jurisdictional wetlands, but not upland portions of resort or resort as a whole); *Missouri Coalition for the Environment v. U.S. Army Corps of Eng'rs*, 866 F.2d 1025 (8th Cir. 1989) (Corps considered effects of levee that crossed jurisdictional wetlands, but not effects of entertainment area encircled by levee); *Winnebago Tribe of Neb. v. Ray,* 621 F.2d

269 (8th Cir. 1980) (finding that the Corps had only to consider impacts of a river crossing, not an entire 67 mile power line).

Indeed, the *Aracoma* court itself identified just such a partitioning as the basis for its decision that the Corps need only consider the actual activity impacting jurisdictional waters: "[t]he specific activity that the Corps is permitting when it issues a § 404 permit is nothing more than the filling of jurisdictional waters for the purpose of creating an underdrain system for the larger valley fill." *Ohio Valley Environmental Coalition v. Aracoma Coal Co.,* 556 F.3d 177, 194 (4th Cir. 2009). In this way the Court separated a distinct activity within the Corps' jurisdiction – "creating an underdrain system" – from the upland portion of the project – "the larger valley fill." *Id.* This falls in line with other examples where the courts have upheld the Corps' geographic partitioning. *See, e.g.*, *Save the Bay, Inc. v. U. S.Army Corps of Eng'rs*, 610 F.2d 322, 327 (5th Cir. 1980) (requiring NEPA review for outfall pipe crossing jurisdictional wetland, but not for associated manufacturing plant), *Water Works v. Sewer Bd. Of the City of Birmingham v. U.S. Dept. of Army Corps of Eng'rs* 983 F.Supp. 1052 (N.D. Ala. 1997) (requiring NEPA review for the construction of a water intake structure and pipeline in jurisdictional waters, but not for the associated water treatment plant).

In this case, however, there is no way to partition dredging and filling activities from mining through streams—they are the same action. Specifically,

the Corps described the authorized activity as the construction of "attendant and associated features to facilitate the practicable recovery of steam-grade coal" (J.A. 530) including activities "where the original streambed and riparian area would be destroyed by excavation through the stream and underlying earth" (J.A. 532 n.1). The Corps must, therefore, consider the impacts of those portions of the mine within its jurisdictional area, even if it is not required to consider the impacts of the whole surface mine.

>   **2.  The *Aracoma* decision did not address whether the Corps could restrict the scope of its jurisdiction to avoid considering the effects of mine through activities.**

In an attempt to assert that the holding in this Court's *Aracoma* decision should control the outcome of this case, Raven Crest misrepresents the discussion and holding in that decision, and relies on extraneous documents. Raven Crest Brief at 6-10. Raven Crest's effort fails because none of the factors this Court identified as relevant to its holding in *Aracoma* are present in this case.

Raven Crest devotes multiple pages of its brief to combing through the minutiae of the administrative record from the *Aracoma* proceedings to pull out references to mine through activities. Raven Crest Brief at 6-10. That effort is ultimately wasted for two reasons. First, Raven Crest once again misconstrues Sierra Club's argument as an attempt to establish Corps jurisdiction over all mining activities at the site, including mining outside of jurisdictional streams. *See*

Raven Crest Brief at 9-10. More fundamentally, Raven Crest's parsing of the

*Aracoma* administrative record is a futile exercise because what Raven Crest does

not do, and cannot do, is identify any place in the *Aracoma* decision where this

Court acknowledged or discussed mine through activities.[2]

In fact, this Court's *Aracoma* decision was premised precisely on its

determination that plaintiffs' claims related exclusively to impacts from activities

on upland areas, and that the Corps properly excluded those activities from the

scope of its review. The *Aracoma* court expressly determined that the authorized

activity at issue was "nothing more than the filling of jurisdictional waters for the

purpose of creating an underdrain system for the larger valley fill." *Aracoma,* 556

F3d. at 194. The *Aracoma* decision makes absolutely *no reference* to either "mine

through" or "contour mining" activities. Accordingly, even if Raven Crest is

correct that some of the mining activities authorized by the permits at issue in

*Aracoma* included mine throughs similar to those authorized by the Corps in this

case, the plain language of the decision makes clear that the Court did *not* consider

those activities, and only considered valley fills. The converse is also true: as

---

[2] As explained in more detail in Sierra Club's "Response in Opposition to Raven Crest Contracting, LLC's Motion For Leave to File," the additional materials from the *Aracoma* administrative record that Raven Crest cites cannot and do not demonstrate that the *Aracoma* Court's decision was influenced by its consideration of mine through activities. *See* Doc. 37. The language of that decision is unambiguous that the *only* activity this Court considered was the construction of valley fills.

Raven Crest acknowledges, the Boone North mine does not involve any of the valley fills central to the *Aracoma* holding. Raven Crest Brief at 14 (citing J.A. 531 ("No valley fills would be constructed")).

The central question of *Aracoma* was whether the Corps was required to consider the environmental impacts of activities – the upslope portions of valley fills – that occur entirely outside the geographic limits of jurisdictional streams. The Court ultimately held that the Corps "reasonably determined" that the scope of its NEPA analysis need not extend "beyond the Corps' limited jurisdiction to include environmental effects on upland areas." *Id*. at 197. At the core of this holding was the Court's determination that "the Corps has no legal authority to prevent the placement of fill material in areas outside of the waters of the United States." *Id*. at 194. Those factors, however, are simply not present in this case. Here, there is no question that the Corps authorized actual coal mining *within* the streams themselves. Regardless of whether the Corps *also* has jurisdiction over any upland mining activities, it is obligated by NEPA to consider the impacts of the instream mining activities.

This Court's *Aracoma* decision, with its emphasis on the importance of geography to defining the scope of the Corps' jurisdiction, is entirely consistent with the position Sierra Club has taken throughout this litigation: when the Corps

authorizes an activity within a jurisdictional stream, it must consider all aspects of the environmental effects of that activity.

The Sixth Circuit's decision in *Kentuckians for the Commonwealth, et al. v. U.S. Army Corps of Engineers* relies on a misunderstanding of the mining process, and a fallacious distinction between "mining" and a "mine through." 746 F.3d 698 (6th Cir. 2014). In a footnote to the opinion, the court explained,

> The plaintiffs argue that the Corps authorized actual surface coal mining, beyond the mere filling of stream beds, because Leeco's permit states that the Corps "authoriz[es] your company's proposal to construct . . . various 'mine throughs.'" This argument misconstrues the specialized language used in the permit and disregards the context in which the permit is granted. As the Corps explained at oral argument, "mining through" is the process of scraping away the surface of an ephemeral stream bed, extracting the coal seams that are then exposed, and refilling the stream bed.

*Id.* at 707 n.2. To avoid the same misconception, Appellants will be clear: ***mining through streams is simply mining within the Corps' jurisdictional area.*** When mining through streams, the mine operator does not take extra care to peel back a streambed, remove the coal without causing any further destruction or disturbance, and then put the stream back. The company simply blasts, bulldozes, or drags an excavator bucket through the streambed as if it were any other part of the land, eventually returning spoil material to the site and digging a new stream channel. The only difference is that one part of the mining (the mine though) occurs in a jurisdictional area. *See* J.A.

13

129-131 (showing mineral removal area for the mine). This court should not make the same mistake as the Sixth Circuit and reject Appellants' argument on the basis of a faulty understanding of the mining process and an arbitrary distinction between mining and mine throughs.

The Corps must fully assess the portion of the activity that occurs in jurisdictional waters. If this Court were to accept the arguments put forward by Raven Crest and the government, it would allow the Corps to restrict its NEPA review to a scope far narrower than what the statute, the Corps' own regulations, or previous case law require. Such a decision would have implications far beyond this case.

## II.    The Corps Failed Entirely to Consider the Evidence Presented in the Health Studies Showing that Coal Mining Such as the Instream Mining it Authorized Here Negatively Impacts the Health of Nearby Residents.

Having established that the Corps must consider all aspects of the activities it authorizes in streams, and having established that in this case the authorized activity is coal mining in streams, the remaining question is whether the Corps adequately considered all aspects of that coal mining activity. Neither the Corps nor Raven Crest disputes that the Corps did not consider the health studies as part of its decision document or FONSI. Instead, they seek to cover over the Corps' failure by pointing to unrelated findings made by the Corps and the WVDEP.

14

**A. The Corps' Findings in Its Decision Documents Do Not Address the Issues Raised in the Health Studies.**

The Corps does not – and cannot – argue that it considered the human health studies as part of its NEPA review. Instead, it asserts that it "considered health risks through pathways other than drinking water, and possible risks to drinking water supplies that cannot be addressed through treatment of the water supply." Corps Brief at 18. In support of this conclusory statement, the Corps merely offers a string citation to various pages of the Corps' decision documents, with no discussion or explanation. *Id.*; *see also id.* at 30. In fact, none of the cited pages demonstrates that the Corps applied the "hard look" required by NEPA to the very serious issues raised in the health studies.

Among the documents referenced in the Corps' string cite is the finding by the Corps that "[t]he proposed fill site on Mill Branch is approximately ½ mile from the residential community of Racine," and that "[o]ne residence exists at the mouth of the Roundbottom Creek watershed." J.A. 552. That this reference to the nearby human communities that will be impacted by the Boone North mine comes not from a discussion of human health concerns, but rather from a section discussing "aesthetics" (*id.*), is indicative of the dismissive manner in which the Corps regards its duty to consider impacts to human health.

The Corps also cites to J.A. 548, which includes a "will/ will not" checkbox option related to the question of whether the authorized activity will "cause or

15

contribute to significant degradation of waters of the United States, including

adverse impacts to human health." J.A. 548. This kind of automatic boilerplate

language cannot satisfy NEPA's "hard look" requirement. *Klamath-Siskiyou*

*Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 995 (9th Cir. 2004)

(holding that a checkbox analysis is a conclusory presentation that is "insufficient

to constitute a 'hard look'").

Another of the Corps' citations, to J.A. 577-80, refers to decision documents

discussing mitigation. The cited language, however, includes no discussion in this

section of the role mitigation may play in increasing or decreasing the likelihood or

severity of human health impacts.

The remaining decision document pages cited by the Corps as constituting a

sufficient analysis of human health impacts all rely heavily on references to

conditions and assessments in the mine's SMCRA and NPDES permits issued by

the WVDEP. The Corps references J.A. 550, which is a discussion of "[m]easures

incorporated within the WVDEP-approved mining permit" and "NPDES permit

conditions." The Corps also references J.A. 554-57, which is a discussion of water

quality that relies heavily on the existence of "SMCRA and Section 402 [NPDES

permit] reviews." J.A. 557-61 is a discussion of "fish and wildlife values"

premised on the Corps' recognition that "[t]he potential adverse effect of the entire

project on downstream aquatic resources is evaluated by WVDEP as part of the

SMCRA, NPDES and § 401 individual water quality certification (WQC)

reviews." J.A. 557. The Corps' discussion of "water supply and conservation" at

J.A. 562 is based entirely on the Corps' determination that "[t]he SMCRA

permitting process has included reviews and requirements to protect surface and

groundwater sources that would violate water quality standards." The Corps'

assessment of the "general needs and welfare of the people" at J.A. 564-68 consists

of a brief discussion of the economic and other circumstances of the community

that will be impacted by the mine, followed by the finding that "[p]otential project

effects concerning blasting, truck traffic, noise, dust, water wells, and groundwater

quality are fully evaluated by the WVDEP as part of the SMCRA permit process."

Nowhere in its decision documents, however, did the Corps explain how

WVDEP's analyses addressed the serious public health concerns raised by the

health studies, nor did the Corps explain how WVDEP's analyses could otherwise

substitute for the Corps' own review.

The government and Raven Crest do not even address Sierra Club's

argument that a federal agency cannot satisfy its independent NEPA obligation by

relying on another agency's conclusions about a project's impacts on the

environment. *See* Sierra Club Brief at 29-31 (citing *State of N.C. v. F.A.A.*, 957

F.2d 1125, 1129-30 (4th Cir. 1992); and *Calvert Cliffs' Coordinating Committee,*

*Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1122-23 (D.C. Cir.

1971)). This is especially true where, as here, the other environmental statutes –

SMCRA and the Clean Water Act's section 401 and 402 provisions – do not

contain a functionally equivalent review. *See* Sierra Club Brief at 30-31 (citing

*Limerick Ecology Action, Inc. v. United States Nuclear Regulatory Comn'n.*, 869

F.2d 719, 729 (3d Cir. 1989); *Catron Cty Bd of Comm'rs v. U.S. Fish and Wildlife

Servs*, 75 F.3d 1429, 1435-36 (10th Cir. 1996); and *State of Idaho v. Interstate

Commerce Comm'n*, 35 F.3d 585, 595-96 (D.C. Cir. 1996).

The Corps and Raven Crest also fail to address Sierra Club's argument that

reliance on existing West Virginia SMCRA and NPDES permitting will not

adequately protect human health because all of the coal mines addressed in the

health studies were themselves fully permitted by the state. *See* Sierra Club Brief at

34- 35. The health studies available to the Corps make clear that impacts to human

health are not adequately considered or prevented under the existing permitting

schemes.

### B. Proof of Causation is Not Required in Order for There to be a Duty to Conduct Further NEPA Review.

Contrary to Raven Crest's argument, Appellants need not *prove* that mining

within the Corps' jurisdictional area will *cause* health problems.  NEPA requires

the Corps to examine not only effects that are likely to occur, but those that *may*

occur.  40 C.F.R. § 1508.3 ("Affecting means will or *may* have an effect on")

18

(emphasis added). The only limitation is that an impact must be reasonably foreseeable. To require more "would in essence be requiring that the plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." *City of Davis v. Coleman,* 521 F.2d 661, 670-71 (9th Cir. 1975); *see also, Am. Bird Conservancy Inc. v. FCC,* 516 F.3d 1027, 1033 (D.C. Cir. 2008). For that reason, a plaintiff succeeds on a NEPA claim "[i]f substantial questions are raised whether a project may have a significant effect upon the human environment." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1177-78 (9th Cir. 1982); *accord Anglers of the Au Sable v. U.S. Forest Service,* 565 F.Supp.2d 812, 825 (E.D. Mich. 2008) ("a plaintiff need not show that significant effects *will in fact occur*.") (quoting *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 11250 (9th Cir. 1998) (emphasis in original)).

Raven Crest argues that Appellants have failed to show "a reasonably close causal relationship," relying on *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004) and *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983). Raven Crest Brief at 17. The "causation" discussion in each decision hinged on issues not present in this case.

In *Public Citizen,* the agency was statutorily precluded from taking any action that could alleviate the harms that plaintiffs sought to have analyzed under NEPA, *Public Citizen*, 541 U.S. at 758, and only for that reason did the Court hold

19

that causation was lacking. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1213–15 (9th Cir. 2008) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 105 (D.D.C. 2006) ("The holding in *Public Citizen* extends only to those situations where an agency has 'no ability' because of lack of 'statutory authority' to address the impact.")).

In *Metropolitan Edison*, the human health impacts were unrelated to any environmental effect. 460 U.S. at 778. The question in *Metro Edison* was whether developers of the Three Mile Island nuclear reactor, were required to consider if restarting the facility would cause psychological harm for nearby residents. 460 U.S. 766. In holding that the NRC was not required to consider psychological harm, the Court drew a clear distinction between impacts arising from effects on the physical environment and impacts arising from the perception of risk. *Id*. at 775. In the present case, all of the effects implicated by the health studies are physical: the instream mining authorized by the Corps changes the physical environment, and those changes lead to negative physical impacts to the health of nearby residents including cancer (J.A. 499), mortality from cancer (J.A. 218), kidney disease (J.A. 389), birth defects (J.A. 243), mortality from cardiovascular and pulmonary disease (J.A. 406), impaired function, and poor health and mortality in general (J.A. 252).

A more relevant discussion of the duty NEPA imposes on agencies confronted with uncertainty regarding the potential impacts of environmental effects is presented in *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005). There, the Ninth Circuit held that the Corps violated NEPA when it failed to prepare a full environmental impact statement to help resolve uncertainty regarding whether the oil refinery dock it authorized would lead to increased oil tanker traffic and an increased risk of an oil spill. *Id*. at 871. In reaching this decision, the court held that "an EIS *must* be prepared if substantial questions are raised as to whether a project *may* cause significant degradation of some human environmental factor." *Id*. at 864 (emphasis in original; internal quotation and ellipses omitted). The court further held that "[w]here the environmental effects of a proposed action are highly uncertain or involve unique or unknown risks, an agency must prepare an EIS." *Id*. at 870 (citing 40 C.F.R. § 1508.27(b)(5)). Here, at a minimum the health studies presented to the Corps raised substantial questions as to the negative effects of the authorized instream mining on human health. The Corps was therefore obligated to fully investigate those questions as part of its NEPA review.

Raven Crest's attempt to minimize the weight of the health studies also fails. *See* Raven Crest Brief at 13-19. The district court properly rejected Raven Crest's assertion that because the studies primarily demonstrate a close correlation

21

between proximity to surface coal mining and negative health outcomes, they do not assert a sufficient causal relationship to require NEPA review. The court correctly stated that it "regards, as without merit, Raven Crest's argument that the Corps could simply ignore the articles presented because, Raven Crest suggests, correlation does not imply causation." J.A. 80, n.14.

At a minimum, the studies establish a strong presumption that surface coal mining will have a negative effect on human health. This is enough to warrant a more complete review under NEPA. As this Court has explicitly recognized, "when it is a close call whether there will be a significant environmental impact from a proposed action, an EIS should be prepared." *Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581, 590 (4th Cir. 2012) (quoting *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 18 (2d Cir. 1997)). That is because "NEPA's policy goals require agencies to err in favor of preparation of an EIS when the proposed action is likely to have a significant environmental impact." *Hoffman*, 132 F.3d at 18.

To support its contention that correlative studies do not "prove a causal link" and therefore may be ignored by the Corps, Raven Crest selectively quotes from five decisions that did not involve NEPA and that therefore do not support Raven Crest's broader argument. Raven Crest Brief at 19. All five decisions relied on by Raven Crest involved questions of tort liability or criminal culpability, and

22

therefore necessarily employed a higher causal standard. *See Huss v. Gayden*, 571 F.3d 442 (5th Cir. 2009) (medical malpractice liability); *U.S. v. Valencia*, 600 F.3d 389 (5th Cir. 2010) (criminal wire fraud); *Peters v. AstraZeneca LP*, 224 Fed. Appx. 503 (7th Cir. 2007) (unpublished decision involving pharmaceutical products liability); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005) (products liability); *Samaan v. St. Joseph Hosp.*, 670 F.3d 21 (1st Cir. 2012) (medical malpractice). In contrast, the present case involves a question with a lower threshold of proof: did the studies raise "substantial questions" as to whether the instream coal mining "*may* cause significant degradation of some human environmental factor." *See Ocean Advocates*, 402 F.3d at 864. Raven Crest offers no authority to support its contention that correlative studies are insufficient to trigger a duty under NEPA to conduct further investigation.[3]

The health studies that were cited by Sierra Club in its comments on the permit and subsequently ignored by the Corps are not pseudo-science appearing in fringe publications. Rather, they are rigorously reviewed studies appearing in

---

[3] The extent to which Raven Crest must stretch the truth in its strained effort to downplay the significance of the health studies also serves only to underscore the actual weight of the studies. For example, Raven Crest attempts to characterize the first study as "a two page 'letter to the editor' in the 'Policy Forum' section of a magazine." Raven Crest Brief at 15. In fact, that study – at J.A. 216-17 – is a peer reviewed paper published in the journal *Science*, one of the preeminent scientific publications in the world. *See Am. Ass'n for Advancement of Sci. v. Hearst Corp.*, 498 F. Supp. 244, 248 (D.D.C. 1980) (recognizing that *Science* employs "[a] rigorous reviewing and editing process [that] insures a high level of quality and accuracy" and therefore enjoys a "reputation for reliability").

reliable and well regarded publications. As such, the studies and their findings

demanded further attention and review by the Corps.

### C. Raven Crest's Criticism of the Studies Are Post-Hoc Rationalizations that Should Not Be Considered by the Court.

In any event, Raven Crest's criticisms of the health studies and arguments

regarding causation should not be considered by the Court because they are merely

*post hoc* rationalizations by the Intervenor.  *Motor Vehicle Mfrs. Ass'n v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("courts may not accept

appellate counsel's *post hoc* rationalizations for agency action"). The Corps was

clear in its response to Sierra Club's comments concerning human health that it

considered those issues to be outside the scope of its review:

> References concerning water quality and public health have been
> reviewed.  These issues are not within the purview of the Corps'
> regulatory authority, but are considered by WVDEP during the
> SMCRA permitting process to assure the project would not violate
> EPA-approved water quality standards, pursuant to CWA Sections
> 401 and 402.  The Corps defers to the WVDEP as the agency with
> primary responsibility and expertise for assuring the proposed effluent
> discharges meet the state water quality standards.

J.A. 642; *see also,* J.A. 653 (referring to the above statement).  A court may not

provide a rationale for a decision that the agency itself has not articulated.

*McDaniels v. U.S.*, 300 F.3d 407, 413 (4th Cir. 2002) ("[I]t is the agency's

responsibility, not this Court's, to explain its decision.").

### III. The Corps Violated NEPA When It Applied a Broader Scope of Analysis to Its Consideration of Benefits Than to Its Consideration of Harms.

The Corps' own NEPA regulations require that "[i]n all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal." 33 CFR Pt. 325, App. B § 7(b)(3). The Corps violated that requirement in its analysis of the Boone North permit when it applied a much narrower scope for its consideration of environmental effects as compared to its consideration of economic benefits. The district court agreed, finding that "the Corps did not strictly comply with the prescription of [33 CFR part 325, App. B § 7(b)(3)] by considering these economic benefits while limiting the scope of the health effects to the filling of jurisdictional waters." J.A. 82.

Raven Crest did not address this argument in its response brief. The Corps, responding to Sierra Club's argument and the determination of the district court, does not dispute that the Corps' analysis was lopsided. Corps Brief at 27-29. Instead, the government asserts that this analysis was appropriate because it was conducted under a separate provision of the Corps' regulations, the "public interest review" required by 33 C.F.R. § 320.4(a)(1). *Id*. at 28. The governments' argument fails because it overlooks the fact that even the Corps' alternatives analysis

employed an overly broad consideration of economic benefits as compared to harms.

The Corps' alternatives analysis included, among other things, a "no action" alternative. J.A. 547. The Corps' description of that "no action" alternative consists almost exclusively of its broad assessment of the economic impacts of choosing that alternative: "This alternative would result in the loss or non-sustainment of an estimated 90 direct jobs, loss of tax revenues, royalty income, and non-use of approximately 6.8 million tons of marketable coal (representing 19.1 billion kilowatt hours of electricity generation)." *Id*. That assessment is very similar to the description of broad economic benefits found just four pages later in the Corps' public interest review, which include consideration of the mine's anticipated effect on "employment, income, local economy, tax base, and energy needs." J.A. 551.

The Corps therefore applied an overly-broad consideration of economic benefits throughout its decision document. This includes in its alternatives analysis, which unquestionably lies at the heart of its NEPA responsibilities. In fact, the alternatives analysis includes consideration of the specific number of kilowatt hours expected to result from combustion of the mined coal, a broad, indirect economic benefit that is not even directly cited in the Corps' public interest review. *Compare* J.A. 547 *with* 551.

26

The government also seeks to downplay the severity of this violation by describing it as a "harmless" error. Corps Brief at 29. The Corps' argument presumes that the only remedy available on remand would be an order directing the Corps to narrow its consideration of economic benefits. But that is not the result Sierra Club seeks. Rather, it is Sierra Club's contention that the Corps must be required to broaden its consideration of environmental impacts to include consideration of the health studies showing that surface coal mining harms human health. Because the Corps considered broader economic benefits, including the indirect benefit of the number of kilowatt hours of electricity that might eventually be produced via combustion of the mined coal, the Corps was also required to consider broader harm such as the negative impacts of the mining on human health.

## CONCLUSION

For all of the reasons described above and in its opening brief, Sierra Club respectfully request that the Court reverse the decision of the District Court upholding the Boone North permit and instruct the District Court to set the permit aside.

DATED:  March 10, 2015

Respectfully Submitted,

/s/ J. Michael Becher
Joseph M. Lovett
J. Michael Becher
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
*jlovett@appalmad.org*
*mbecher@appalmad.org*
304-382-4798

/s/ Peter Morgan
Peter Morgan
Sierra Club
1536 Wynkoop St, Ste. 312
Denver, CO 80202
*peter.morgan@sierraclub.org*
303-454-3367

*Counsel for Ohio Valley Environmental Coalition, West Virginia Highlands Conservancy, Coal River Mountain Watch, and Sierra Club*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  Excepting portions of the brief described in Fed. R. App. P. 32(A)(7)(B)(iii), the brief contains 6,693 words.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. Pl. 32(a)(6).  The brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2013 in Times New Roman, 14-point.


DATED:  March 10, 2015

/s/ Peter Morgan
Peter Morgan

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of March 2015, I have served the forgoing

Appellants' Reply Brief on all registered counsel through the Court's electronic

filing system (ECF).

<u>/s/ Peter Morgan</u>
Peter Morgan
